No. 25-1959

# In the United States Court of Appeals for the First Circuit

---

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.,

Plaintiffs-Appellants,

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, Local 3707,

Plaintiff,

v.

SCOTT KUPOR, in the official capacity as Director of the Office of Personnel Management; OFFICE OF PERSONNEL MANAGEMENT,

Defendants-Appellees.

---

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 1:25-cv-10276-GAO
Hon. George A. O'Toole, Jr., Judge

---

**Appendix to Plaintiffs-Appellants' Opening Brief**

---

Counsel for Plaintiffs-Appellants
*[Additional Counsel on following page]*

4106515

KEKER, VAN NEST & PETERS
LLP
CODY S. HARRIS
BAILEY W. HEAPS
NIALL M. FRIZZELL
CHARLOTTE J. KAMAI
633 Battery Street
San Francisco, California 94111
Telephone: 415 391 5400
Facsimile:  415 397 7188

DEMOCRACY FORWARD
FOUNDATION
ELENA GOLDSTEIN
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Facsimile: (202) 796-4426

AMERICAN FEDERATION
OF GOVERNMENT
EMPLOYEES, AFL-CIO
RUSHAB B. SANGHVI
80 F Street N.W.
Washington, D.C.  20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928

AMERICAN FEDERATION
OF STATE, COUNTY, AND
MUNICIPAL EMPLOYEES,
AFL-CIO
MATTHEW S. BLUMIN
1625 L Street N.W.
Washington, D.C. 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556

Counsel for Plaintiff-Appellant
American Federation of
Government Employees, AFL-
CIO and Local 3707

Counsel for Plaintiff-Appellant
American Federation of State,
County, and Municipal
Employees, AFL-CIO

4106515

# TABLE OF CONTENTS

**Volume I:** *American Federation of Government Employees, AFL-CIO, et al. v. Ezell, et al.* **No. 1:25-cv-10276-GAO (D. Mass)**

District Court Docket Report ............................................................. A001

Complaint (Dkt. 1) (Feb. 4, 2025) .................................................... A023

Electronic Clerk's Notes for proceedings held before Judge
    (Dkt. 42) (Feb. 6, 2025)............................................................. A064

Transcript of Motion Hearing (Dkt. 48) (Feb. 6, 2025)..................... A065

Electronic Clerk's Notes for proceedings held before Judge
    (Dkt. 60) (Feb. 10, 2025).......................................................... A072

TRO Hearing Transcript (Dkt. 63) (Feb. 10, 2025) ......................... A073

Hon. D.J. O'Toole Opinion and Order (Dkt. 66)
    (Feb. 12, 2025) ....................................................................... A112

Amended Complaint (Dkt. 77) (March 31, 2025).............................. A117

Hon. D.J. O'Toole Opinion and Order (Dkt. 104)
    (Sept. 24, 2025)....................................................................... A180

Hon. George A. OToole, Jr Order of Dismissal (Dkt. 105)
    (Sept. 24, 2025) ...................................................................... A182

Notice of Appeal (Dkt. 106) (Oct. 7, 2025) ...................................... A183

4106515

**Query      Reports      Utilities      Help      Log Out**

<span style="color:green">APPEAL</span>

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25-cv-10276-GAO

| | |
|---|---|
| American Federation of Government Employees, AFL-CIO et al v. Ezell et al | Date Filed: 02/04/2025 |
| Assigned to: Judge George A. OToole, Jr | Date Terminated: 09/24/2025 |
| Case in other court: USCA - First Circuit, 25-01959 | Jury Demand: None |
| Cause: 28:1331 Fed. Question | Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **American Federation of Government Employees, AFL-CIO** | represented by | **Nicolas Mendoza**<br>Murphy Anderson PLLC<br>1401 K Street NW<br>Suite 300<br>Washington, DC 20005<br>202-223-2620<br>Email: nmendoza@murphypllc.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Ajay S. Krishnan**<br>Keker & Van Nest, LLP<br>633 Battery Street<br>San Francisco, CA 94111<br>(415) 391-5400<br>Email: akrishnan@keker.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Andres M. Grajales**<br>AFGE<br>80 F. Street, N.W.<br>Washington, DC 20001<br>202-639-6426<br>Email: grajaa@afge.org<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Bailey Heaps**<br>Keker, Van Nest & Peters LLP<br>633 Battery St<br>San Francisco, CA 94111<br>415-391-5400<br>Fax: 415-397-7188<br>Email: bheaps@keker.com |

*ATTORNEY TO BE NOTICED*

**Charlotte Kamai**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
415-391-5400
Fax: 415-397-7188
Email: ckamai@keker.com
*ATTORNEY TO BE NOTICED*

**Cody S. Harris**
Keker and Van Nest LLP
633 Battery Street
San Francisco, CA 94111
415-391-5400
Fax: 415-397-7188
Email: charris@keker.com
*ATTORNEY TO BE NOTICED*

**Daniel Alexander McGrath**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-812-7824
Email: dmcgrath@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
Democracy Forward Foundation
PO Box 34553
Washington, DC 20043
202-448-9090
Email: egoldstein@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Erin E. Meyer**
Keker and Van Nest LLP
633 Battery Street
San Francisco, CA 94111
415-391-5400
Fax: 415-397-7188
Email: emeyer@keker.com
*ATTORNEY TO BE NOTICED*

**Michael T. Anderson**
Murphy Anderson PLLC
33 Harrison Ave.
7th Floor
Boston, MA 02111
617-227-5720
Fax: 617-227-5767
Email: manderson@murphypllc.com
*ATTORNEY TO BE NOTICED*

A002

Case: 25-1959     Document: 00118411312     Page: 6     Date Filed: 03/02/2026     Entry ID: 6789986

**Michael Ceja Martinez**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: mmartinez@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Niall Frizzell**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
415-962-8843
Email: nfrizzell@keker.com
*ATTORNEY TO BE NOTICED*

**Rushab Sanghvi**
American Federation of Government
Employees
80 F Street, NW
Washington
Washington, DC 20001
202-639-6424
Email: sanghr@afge.org
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
254-722-5745
Email: sperryman@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Federation of Government Employees, AFL-CIO, Local 3707**
*TERMINATED: 04/01/2025*

represented by **Nicolas Mendoza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Alexander McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael T. Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

A003

**Michael Ceja Martinez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rushab Sanghvi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

American Federation of State, County    represented by    **Michael Ceja Martinez**
and Municipal Employees, AFL-CIO                           (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

**Ajay S. Krishnan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bailey Heaps**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Charlotte Kamai**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cody S. Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Alexander McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erin E. Meyer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Georgina Yeomans**
American Federation of State, County, and
Municipal Employee
1625 L Street, N.W.
Washington, DC 20036
202-775-5900

Email: gyeomans@afscme.org
*ATTORNEY TO BE NOTICED*

**Matthew Stark Blumin**
American Federation of State, County &
Municipal Employees (
1625 L Street NW
Washington, DC 20036
202-775-5900
Email: mblumin@afscme.org
*ATTORNEY TO BE NOTICED*

**Michael T. Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Niall Frizzell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicolas Mendoza**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Teague Paterson**
AFSCME Information Center
1625 L Street, NW
Washington, DC 20036
202-775-5900
Fax: 202-452-0556
Email: tpaterson@afscme.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Association of Government Employees, Inc.**

represented by **Nicolas Mendoza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ajay S. Krishnan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bailey Heaps**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Charlotte Kamai**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cody S. Harris**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Alexander McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erin E. Meyer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael T. Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Ceja Martinez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Niall Frizzell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Elizabeth Suszczyk**
National Association of Government
Employees, Inc.
159 Thomas Burgin Parkway
Quincy, MA 02169
617-376-7239
Fax: 617-376-0285
Email: ssuszczyk@nage.org
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Charles Ezell**                                          represented by **Joshua E. Gardner**
*in his official capacity as Acting Director of*                     DOJ-Civ
*the Office of Personnel Management*                                 Poc Agostinho, Jean
                                                                    1100 L St., N.W.
                                                                    Ste 12200
                                                                    Washington, DC 20530
                                                                    202-305-7583

A006

Email: joshua.e.gardner@usdoj.gov
*TERMINATED: 05/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-514-3301
Email: eric.hamilton@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jason Altabet**
DOJ-Civ
1100 L St NW
Ste Office 11308
Washington, DC 20003
202-305-0727
Email: jason.k.altabet2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Kevin K. Bell**
DOJ-Civ
1100 L St. NW
Washington, DC 20005
202-880-0329
Email: kevin.k.bell@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3100
Fax: 617-748-3971
Email: rayford.farquhar@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Office of Personnel Management**                    represented by    **Joshua E. Gardner**
(See above for address)
*TERMINATED: 05/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Altabet**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin K. Bell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Commonwealth of Massachusetts**
*TERMINATED: 02/10/2025*

represented by **Hannah C. Vail**
Office of the Attorney General
One Ashburton Place
18th Floor
Boston, MA 02108
617-963-2512
Email: hannah.vail@mass.gov
*TERMINATED: 02/10/2025*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Former Public Officials and Legal Scholars**
*TERMINATED: 02/10/2025*

represented by **Michael R. Keefe**
Segal Roitman, LLP
33 Harrison Avenue
Ste 7th Floor
Boston, MA 02111
617-742-0208
Fax: 617-742-2187
Email: mkeefe@segalroitman.com
*TERMINATED: 02/10/2025*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Montana, State of**
*TERMINATED: 02/10/2025*

represented by **Patrick Strawbridge**
Consovoy McCarthy PLLC
Ten Post Office Square
Boston, MA 002109
617-227-0548
Email: patrick@consovoymccarthy.com
*TERMINATED: 02/10/2025*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/04/2025 | 1 | Verified COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants Filing fee: $ 405, receipt number AMADC-10823109 (Fee Status: Filing Fee paid), filed by American Federation of Government Employees, AFL-CIO,American Federation of Government Employees, LOCAL 3707, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Attachments: # 1 Civil Cover Sheet)(Mendoza, Nicolas) Docket text modified on 2/4/2025 (CAM). (Entered: 02/04/2025) |

| | | |
|---|---|---|
| 02/04/2025 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge George A. OToole, Jr assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (SEC) (Entered: 02/04/2025) |
| 02/04/2025 | 3 | Summons Issued as to Charles Ezell, Office of Personnel Management. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (CAM) (Entered: 02/04/2025) |
| 02/04/2025 | 4 | NOTICE of Appearance by Michael T. Anderson on behalf of American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, Local 3707, American Federation of State, County and Municipal Employees, AFLCIO, National Association of Government Employees, Inc., Charles Ezell (Anderson, Michael) (Entered: 02/04/2025) |
| 02/04/2025 | 5 | Category Form by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, Local 3707, American Federation of State, County and Municipal Employees, AFLCIO. (Anderson, Michael) (Main Document 5 replaced on 2/5/2025, with corrected PDF) (FGD). (Entered: 02/04/2025) |
| 02/04/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice for admission of Teague Patterson Filing fee: $ 125, receipt number AMADC-10823853 by American Federation of State, County and Municipal Employees, AFLCIO. (Attachments: # 1 Declaration of Teague Patterson ISO pro hac vice motion)(Anderson, Michael) (Entered: 02/04/2025) |
| 02/04/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice for admission of Matthew Blumin Filing fee: $ 125, receipt number AMADC-10823855 by American Federation of State, County and Municipal Employees, AFLCIO. (Attachments: # 1 Declaration of Matthew Blumin) (Anderson, Michael) (Entered: 02/04/2025) |
| 02/04/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice for admission of Rushab Sanghvi Filing fee: $ 125, receipt number AMADC-10823859 by American Federation of Government Employees, AFL-CIO. (Attachments: # 1 Declaration of Rushab Sanghvi,)(Anderson, Michael) (Entered: 02/04/2025) |
| 02/04/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice for admission of Andres Grajales Filing fee: $ 125, receipt number AMADC-10823860 by American Federation of Government Employees, AFL-CIO. (Attachments: # 1 Declaration of Andres Grajales)(Anderson, Michael) (Entered: 02/04/2025) |
| 02/04/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Sarah Suszczyk Filing fee: $ 125, receipt number AMADC-10823862 by National Association of Government Employees, Inc.. (Attachments: # 1 Affidavit Declaration of Sarah Suszczyk)(Anderson, Michael) (Entered: 02/04/2025) |
| 02/05/2025 | 11 | MOTION for Temporary Restraining Order by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, Local 3707, American Federation of State, County and Municipal Employees, AFLCIO, National Association of Government Employees, Inc., Charles Ezell. (Attachments: # 1 Proposed Order)(Anderson, Michael) (Entered: 02/05/2025) |
| 02/05/2025 | 12 | MEMORANDUM in Support re 11 MOTION for Temporary Restraining Order filed by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, Local 3707, American Federation of State, County and Municipal Employees, AFLCIO. (Anderson, Michael) (Entered: 02/05/2025) |

| 02/05/2025 | 13 | Assented to MOTION *for Video Conferencing* re 12 Memorandum in Support of Motion, 11 MOTION for Temporary Restraining Order by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, Local 3707, American Federation of State, County and Municipal Employees, AFLCIO.(Anderson, Michael) Modified docket text on 2/5/2025 (FGD). (Entered: 02/05/2025) |
|---|---|---|
| 02/05/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Elena Goldstein Filing fee: $ 125, receipt number AMADC-10824564 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Affidavit Declaration of Elena Goldstein)(Anderson, Michael) (Attachment 1 replaced on 2/5/2025) (FGD). (Entered: 02/05/2025) |
| 02/05/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael Martinez Filing fee: $ 125, receipt number AMADC-10824585 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Declaration of Michael Martinez)(Anderson, Michael) (Entered: 02/05/2025) |
| 02/05/2025 | 16 | MOTION for Leave to Appear Pro Hac Vice for admission of Daniel McGrath Filing fee: $ 125, receipt number AMADC-10824709 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Affidavit Declaration of Daniel McGrath)(Anderson, Michael) (Entered: 02/05/2025) |
| 02/05/2025 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of Skye Perryman Filing fee: $ 125, receipt number AMADC-10824750 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Affidavit Declaration of Skye Perryman)(Anderson, Michael) (Entered: 02/05/2025) |
| 02/05/2025 | 18 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 6 Motion for Leave to Appear Pro Hac Vice Added Teague Patterson. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 02/05/2025) |
| 02/05/2025 | 19 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 7 Motion for Leave to Appear Pro Hac Vice Added Matthew Stark Blumin. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at** |

**https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

(FGD) (Entered: 02/05/2025)

| 02/05/2025 | 20 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 8 Motion for Leave to Appear Pro Hac Vice Added Rushab Sanghvi. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 02/05/2025) |
|---|---|---|
| 02/05/2025 | 21 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 9 Motion for Leave to Appear Pro Hac Vice Added Andres Grajales. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (FGD) (Entered: 02/05/2025) |
| 02/05/2025 | 22 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 10 Motion for Leave to Appear Pro Hac Vice Added Sarah Suszczyk. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 02/05/2025) |

| 02/05/2025 | 23 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 14 Motion for Leave to Appear Pro Hac Vice Added Elena Goldstein.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 02/05/2025) |
| --- | --- | --- |
| 02/05/2025 | 24 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 15 Motion for Leave to Appear Pro Hac Vice Added Michael Martinez.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 02/05/2025) |
| 02/05/2025 | 25 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 16 Motion for Leave to Appear Pro Hac Vice Added Daniel McGrath.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 02/05/2025) |
| 02/05/2025 | 26 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 17 Motion for Leave to Appear Pro Hac Vice Added Skye Perryman.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |

| | | |
|---|---|---|
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 02/05/2025) |
| 02/05/2025 | 27 | NOTICE of Appearance by Kevin K. Bell on behalf of Charles Ezell, Office of Personnel Management (Bell, Kevin) (Entered: 02/05/2025) |
| 02/05/2025 | 28 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered.The Court acknowledges 11 Plaintiffs' Motion For A Temporary Restraining Order and 13 Unopposed Motion For Video-Conferenced Hearing And To Appear Remotely. It is hereby ORDERED that the parties shall appear via Zoomgov.com at 1:00 PM on Thursday, February 6, 2025, for a hearing on 11 Motion For A Temporary Restraining Order. It is further ORDERED that the Plaintiffs shall serve a copy of this Order on the Defendants immediately upon receipt to ensure that the Defendants' counsel will appear at the preliminary conference. (FGD) (Entered: 02/05/2025) |
| 02/05/2025 | 29 | **ELECTRONIC NOTICE Setting Hearing on Motion**: 11 MOTION for Temporary Restraining Order. Motion Hearing set for 2/6/2025 at 01:00 PM in Remote Proceeding : Boston before Judge George A. OToole Jr. Counsel of record will receive a video conference invite at the email registered in CM/ECF. (FGD) (Entered: 02/05/2025) |
| 02/06/2025 | 30 | NOTICE of Appearance by Daniel Alexander McGrath on behalf of American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (McGrath, Daniel) (Entered: 02/06/2025) |
| 02/06/2025 | 31 | NOTICE of Appearance by Elena Goldstein on behalf of American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Goldstein, Elena) (Entered: 02/06/2025) |
| 02/06/2025 | 32 | NOTICE of Appearance by Michael Ceja Martinez on behalf of American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Martinez, Michael) (Entered: 02/06/2025) |
| 02/06/2025 | 33 | NOTICE of Appearance by Skye Lynn Perryman on behalf of American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Perryman, Skye) (Entered: 02/06/2025) |
| 02/06/2025 | 34 | NOTICE of Appearance by Eric Hamilton on behalf of Charles Ezell, Office of Personnel Management (Hamilton, Eric) (Entered: 02/06/2025) |

| 02/06/2025 | 35 | NOTICE of Appearance by Joshua E. Gardner on behalf of Charles Ezell, Office of Personnel Management (Gardner, Joshua) (Entered: 02/06/2025) |
|---|---|---|
| 02/06/2025 | 36 | NOTICE of Appearance by Sarah Elizabeth Suszczyk on behalf of National Association of Government Employees, Inc. (Suszczyk, Sarah) (Entered: 02/06/2025) |
| 02/06/2025 | 37 | NOTICE of Appearance by Matthew Stark Blumin on behalf of American Federation of State, County and Municipal Employees, AFL-CIO (Blumin, Matthew) (Entered: 02/06/2025) |
| 02/06/2025 | 38 | NOTICE of Appearance by Teague Paterson on behalf of American Federation of State, County and Municipal Employees, AFL-CIO (Paterson, Teague) (Entered: 02/06/2025) |
| 02/06/2025 | 39 | MOTION for Leave to File Excess Pages by Charles Ezell, Office of Personnel Management. (Attachments: # 1 Exhibit Proposed opposition to Plaintiffs' motion for a temporary restraining order)(Gardner, Joshua) (Entered: 02/06/2025) |
| 02/06/2025 | 40 | NOTICE of Appearance by Rushab Sanghvi on behalf of American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707 (Sanghvi, Rushab) (Entered: 02/06/2025) |
| 02/06/2025 | 41 | NOTICE of Appearance by Rayford A. Farquhar on behalf of Charles Ezell, Office of Personnel Management (Farquhar, Rayford) (Entered: 02/06/2025) |
| 02/06/2025 | 42 | Electronic Clerk's Notes for proceedings held before Judge George A. O'Toole, Jr: Plaintiffs reply brief due by 6:00 PM on Friday, February 7, 2025. Merits arguments continued to 2:00 PM on Monday, February 10, 2025, for an in-person only hearing. (Court Reporter: Valerie OHara at vaohara@gmail.com.) (Attorneys present: N. Mendoza, A. Grajales, D. McGrath, E. Goldstein, S. Suszczyk and M. Anderson for the Plaintiffs; J. Gardner for the Defendants.) (JMF) Modified on 2/6/2025 to add Defendant's attorney. (JMF). (Entered: 02/06/2025) |
| 02/06/2025 | 43 | ELECTRONIC NOTICE Setting Hearing on Motion 11 MOTION for Temporary Restraining Order : Motion Hearing set for 2/10/2025 02:00 PM in Courtroom 22 (In person only) before Judge George A. O'Toole Jr.. (JMF) (Entered: 02/06/2025) |
| 02/06/2025 | 44 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 39 MOTION for Leave to File Excess Pages;<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (FGD) (Entered: 02/06/2025) |
| 02/06/2025 | 45 | MEMORANDUM in Opposition re 11 MOTION for Temporary Restraining Order filed by Charles Ezell, Office of Personnel Management. (Gardner, Joshua) (Entered: 02/06/2025) |
| 02/06/2025 | 46 | NOTICE by Charles Ezell, Office of Personnel Management (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Email notification)(Gardner, Joshua) (Entered: 02/06/2025) |
| 02/06/2025 | 47 | NOTICE of Appearance by Jason Altabet on behalf of Charles Ezell, Office of Personnel Management (Altabet, Jason) (Entered: 02/06/2025) |
| 02/07/2025 | 48 | Transcript of Motion Hearing held on February 6, 2025, before Judge George A. OToole. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com. Redaction Request due 2/28/2025. |

| | | Redacted Transcript Deadline set for 3/10/2025. Release of Transcript Restriction set for 5/8/2025. (DRK) (Entered: 02/07/2025) |
|---|---|---|
| 02/07/2025 | 49 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 02/07/2025) |
| 02/07/2025 | 50 | Second MEMORANDUM in Support re 11 MOTION for Temporary Restraining Order *(as directed by Court)* filed by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc.. (Attachments: # 1 Text of Proposed Order Amended Prop Order, # 2 Exhibit Redline to Org Prop Order)(Goldstein, Elena) (Entered: 02/07/2025) |
| 02/09/2025 | 51 | ~~NOTICE of Appearance by Hannah C. Vail on behalf of Commonwealth of Massachusetts (Vail, Hannah)~~. Modified on 2/10/2025: notice stricken pursuant to E-Order, entry no. 59. (FGD) (Entered: 02/09/2025) |
| 02/09/2025 | 52 | MOTION for Leave to File *Brief of Amici Curiae States* by Commonwealth of Massachusetts. (Attachments: # ~~(1) Exhibit A~~)(Vail, Hannah) Modified on 2/10/2025: removed attachment pursuant to E-Order, entry no. 59. (FGD) (Entered: 02/09/2025) |
| 02/09/2025 | 53 | ~~NOTICE of Appearance by Michael R. Keefe on behalf of Former Public Officials and Legal Scholars (Keefe, Michael)~~. Modified on 2/10/2025: notice stricken pursuant to E-Order, entry no. 59. (FGD) (Entered: 02/09/2025) |
| 02/09/2025 | 54 | MOTION for Leave to Appear Pro Hac Vice for admission of Danielle Leonard, Zoe Palitz Filing fee: $ 250, receipt number AMADC-10831364 by Former Public Officials and Legal Scholars. (Attachments: # 1 Affidavit Affidavit of Attorney Danielle Leonard, # 2 Affidavit Affidavit of Attorney Zoe Palitz)(Keefe, Michael) (Entered: 02/09/2025) |
| 02/09/2025 | 55 | ~~NOTICE of Appearance by Patrick Strawbridge on behalf of Montana, State of (Strawbridge, Patrick)~~. Modified on 2/10/2025: notice stricken pursuant to E-Order, entry no. 59. (FGD) (Entered: 02/09/2025) |
| 02/09/2025 | 56 | MOTION for Leave to File *Amicus Curiae Brief* by Former Public Officials and Legal Scholars. (Attachments: # ~~(1) Exhibit A - Brief of Amici Curiae Former Public Officials and Legal Scholars~~)(Keefe, Michael) Modified on 2/10/2025: removed attachment pursuant to E-Order, entry no. 59. (FGD) (Entered: 02/09/2025) |
| 02/09/2025 | 57 | MOTION for Leave to File *Amicus Brief of Montana and Twenty-One Other States* by Montana, State of. (Attachments: # 1 ~~Exhibit Proposed Amicus Brief~~)(Strawbridge, Patrick) Modified on 2/10/2025: removed attachment pursuant to E-Order, entry no. 59. (FGD) (Entered: 02/09/2025) |
| 02/09/2025 | 58 | MOTION for Leave to Appear Pro Hac Vice for admission of Christian Corrigan Filing fee: $ 125, receipt number AMADC-10831370 by Montana, State of. (Attachments: # 1 Affidavit Corrigan Declaration for Pro Hac Admission)(Strawbridge, Patrick) (Entered: 02/09/2025) |
| 02/10/2025 | 59 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered. The 52 Motion for Leave to File Brief of Amici Curiae States of Hawai'i, Massachusetts, Arizona, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia; 56 Motion for Leave to File Brief of Amicus |

| | | Curiae Former Public Officials and Legal Scholars; and 57 Motion for Leave to File Amicus Brief are DENIED.<br><br>While there may be no positive rule forbidding it, in my judgment a trial court generally should not receive nor consider volunteered submissions by non-parties except as may be specifically authorized by statute or other authority. The proposed memoranda, attached to the motions, are stricken, and the Clerk is instructed to delete them from the docket.<br><br>The related 54 Motion for Leave to Appear Pro Hac Vice of Danielle Leonard and Zoe Palitz and 58 Motion for Admission of Christian Corrigan Pro Hac Vice are also DENIED. The Clerk is further instructed to strike 51 Notice of Appearance by Hannah C. Vail; 53 Notice of Appearance by Michael R. Keefe; and 55 Notice of Appearance by Patrick Strawbridge from the docket. (FGD) (Entered: 02/10/2025) |
|---|---|---|
| 02/10/2025 | 60 | Electronic Clerk's Notes for proceedings held before Judge George A. O'Toole, Jr: Motion hearing held on 2/10/2025. Counsel for Plaintiffs and Defendants present. Arguments held re: 11 Motion for Temporary Restraining Order. The Court orders that the current stay of the February 6, 2025, deadline to remain in effect until further order of the Court. Matter taken under advisement. (Court Reporter: Valerie OHara at vaohara@gmail.com.) (Attorneys present: D. McGrath, E. Goldstein, M. Anderson and S. Suszczyk for the Plaintiffs; J. Gardner, E. Hamilton, J. Altabet and R. Farquhar for the Defendants.) (JMF) (Entered: 02/10/2025) |
| 02/10/2025 | 61 | MOTION for Clarification re 60 Motion Hearing,, by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc.. (Attachments: # 1 Proposed Order)(Goldstein, Elena) (Entered: 02/10/2025) |
| 02/10/2025 | 62 | NOTICE by Charles Ezell, Office of Personnel Management (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Email notification)(Bell, Kevin) (Entered: 02/10/2025) |
| 02/11/2025 | 63 | Transcript of Motion Hearing held on February 10, 2025, before Judge George A. OToole. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com. Redaction Request due 3/4/2025. Redacted Transcript Deadline set for 3/14/2025. Release of Transcript Restriction set for 5/12/2025. (DRK) (Entered: 02/11/2025) |
| 02/11/2025 | 64 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 02/11/2025) |
| 02/11/2025 | 65 | Notice of Supplemental Authorities re 11 MOTION for Temporary Restraining Order (McGrath, Daniel) (Entered: 02/11/2025) |
| 02/12/2025 | 66 | Judge George A. OToole, Jr: ORDER entered. OPINION AND ORDER.<br><br>For the foregoing reasons the temporary restraining order previously entered is DISSOLVED and further preliminary injunctive relief is DENIED.<br><br>It is SO ORDERED. (FGD) (Entered: 02/12/2025) |
| 03/04/2025 | 67 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered terminating as moot 61 MOTION for Clarification re 60 Motion Hearing. (FGD) (Entered: 03/04/2025) |

A016

2/2/26, 8:59 PM                      CM/ECF - USDC Massachusetts - Version 6.3.5 as of 12/12/2025

| 03/31/2025 | 68 | AFFIDAVIT OF SERVICE as to Charles Ezell by American Federation of State, County and Municipal Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of Government Employees, AFL-CIO. (Anderson, Michael)(FGD). **Modified on 4/1/2025: Main Document 68 replaced to remove blank page. Docket text corrected to properly reflect document filed.** (FGD) (Entered: 03/31/2025) |
|---|---|---|
| 03/31/2025 | 69 | AFFIDAVIT OF SERVICE as to Pam Bondi by American Federation of State, County and Municipal Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of Government Employees, AFL-CIO. (Anderson, Michael) **Modified on 4/1/2025: Main Document 69 replaced to remove blank page. Docket text corrected to properly reflect document filed.** (FGD) (Entered: 03/31/2025) |
| 03/31/2025 | 70 | AFFIDAVIT OF SERVICE as to Office of Personnel Management by American Federation of State, County and Municipal Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of Government Employees, AFL-CIO. (Anderson, Michael) **Modified on 4/1/2025: Main Document 70 replaced to remove blank page. Docket text corrected to properly reflect document filed.** (FGD) (Entered: 03/31/2025) |
| 03/31/2025 | 71 | AFFIDAVIT OF SERVICE as to Leah B. Foley, US Attorney by American Federation of State, County and Municipal Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of Government Employees, AFL-CIO. (Anderson, Michael) **Modified on 4/1/2025: Main Document 70 replaced to remove blank page. Docket text corrected to properly reflect document filed.** (FGD) (Entered: 03/31/2025) |
| 03/31/2025 | 72 | MOTION for Leave to Appear Pro Hac Vice for admission of Niall Frizzell Filing fee: $ 125, receipt number AMADC-10922164 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Affidavit Niall Frizzell)(Anderson, Michael) (Entered: 03/31/2025) |
| 03/31/2025 | 73 | MOTION for Leave to Appear Pro Hac Vice for admission of Cody Harris Filing fee: $ 125, receipt number AMADC-10922183 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Affidavit Cody Harris)(Anderson, Michael) (Entered: 03/31/2025) |
| 03/31/2025 | 74 | MOTION for Leave to Appear Pro Hac Vice for admission of Bailey Heaps Filing fee: $ 125, receipt number AMADC-10922189 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Affidavit Bailey Heaps)(Anderson, Michael) (Entered: 03/31/2025) |
| 03/31/2025 | 75 | MOTION for Leave to Appear Pro Hac Vice Filing fee: $ 125, receipt number AMADC-10922200 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Affidavit Charlotte Kamai)(Anderson, Michael) (Entered: 03/31/2025) |
| 03/31/2025 | 76 | MOTION for Leave to Appear Pro Hac Vice for admission of Ajay Krishnan Filing fee: $ 125, receipt number AMADC-10922210 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Affidavit Ajay Krishnan)(Anderson, Michael) (Entered: 03/31/2025) |

| | | |
|---|---|---|
| 03/31/2025 | 77 | AMENDED COMPLAINT against All Defendants, filed by American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Anderson, Michael) **Modified on 4/1/2025: corrected filer names on docket text.** (FGD) (Entered: 03/31/2025) |
| 04/01/2025 | 78 | MOTION for Leave to Appear Pro Hac Vice for admission of Georgina Yeomans Filing fee: $ 125, receipt number AMADC-10924904 by American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 3707, American Federation of State, County and Municipal Employees, AFL-CIO. (Attachments: # 1 Affidavit Georgina Yeomans)(Anderson, Michael) (Entered: 04/01/2025) |
| 04/01/2025 | 79 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 72 Motion for Leave to Appear Pro Hac Vice Added Niall Frizzell.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 04/01/2025) |
| 04/01/2025 | 80 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 73 Motion for Leave to Appear Pro Hac Vice Added Cody S. Harris.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 04/01/2025) |
| 04/01/2025 | 81 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 74 Motion for Leave to Appear Pro Hac Vice Added Bailey Heaps.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |

A018

| | | |
|---|---|---|
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 04/01/2025) |
| 04/01/2025 | 82 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 75 Motion for Leave to Appear Pro Hac Vice Added Charlotte J. Kamai. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 04/01/2025) |
| 04/01/2025 | 83 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 76 Motion for Leave to Appear Pro Hac Vice Added Ajay S. Krishnan. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (FGD) (Entered: 04/01/2025) |

| | | |
|---|---|---|
| 04/01/2025 | 84 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 78 Motion for Leave to Appear Pro Hac Vice Added Georgina Yeomans.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 04/01/2025) |
| 04/02/2025 | 85 | NOTICE of Appearance by Charlotte Kamai on behalf of American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Kamai, Charlotte) (Entered: 04/02/2025) |
| 04/02/2025 | 86 | NOTICE of Appearance by Ajay S. Krishnan on behalf of American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Krishnan, Ajay) (Entered: 04/02/2025) |
| 04/02/2025 | 87 | NOTICE of Appearance by Erin E. Meyer on behalf of American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Meyer, Erin) (Entered: 04/02/2025) |
| 04/02/2025 | 88 | NOTICE of Appearance by Niall Frizzell on behalf of American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Frizzell, Niall) (Entered: 04/02/2025) |
| 04/02/2025 | 89 | NOTICE of Appearance by Bailey Heaps on behalf of American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Heaps, Bailey) (Entered: 04/02/2025) |
| 04/02/2025 | 90 | NOTICE of Appearance by Cody S. Harris on behalf of American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc. (Harris, Cody) (Entered: 04/02/2025) |
| 04/07/2025 | 91 | NOTICE of Appearance by Georgina Yeomans on behalf of American Federation of State, County and Municipal Employees, AFL-CIO (Yeomans, Georgina) (Entered: 04/07/2025) |
| 04/11/2025 | 92 | Consent MOTION for Extension of Time to May 8, 2025 to File Answer re 77 Amended Complaint by Charles Ezell, Office of Personnel Management.(Altabet, Jason) Modified on 4/14/2025: Corrected docketing event. (FGD) (Entered: 04/11/2025) |
| 04/22/2025 | 93 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 92 Motion for Extension of Time to Answer re 77 Amended Complaint. |

Case: 25-1959    Document: 00118411912    Page: 24    Date Filed: 03/02/2026    Entry ID: 6789986

| | | |
|---|---|---|
| | | Charles Ezell answer due 5/8/2025; Office of Personnel Management answer due 5/8/2025. (FGD) (Entered: 04/22/2025) |
| 05/06/2025 | 94 | Consent MOTION for Leave to File Excess Pages by Charles Ezell, Office of Personnel Management.(Gardner, Joshua) (Entered: 05/06/2025) |
| 05/08/2025 | 95 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 94 Consent MOTION for Leave to File Excess Pages; <br><br> Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (FGD) (Entered: 05/08/2025) |
| 05/08/2025 | 96 | MOTION to Dismiss by Charles Ezell, Office of Personnel Management. (Gardner, Joshua) Modified on 5/9/2025: Memorandum in support removed and properly refiled as a separate entry. Please see entry 97 . (FGD). (Entered: 05/08/2025) |
| 05/08/2025 | 97 | MEMORANDUM in Support re 96 MOTION to Dismiss filed by Charles Ezell, Office of Personnel Management. (FGD) (Entered: 05/09/2025) |
| 05/12/2025 | 98 | Consent MOTION for Extension of Time to 6/05/2025 to File Response/Reply *to Defendants' Motion to Dismiss* by American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO.(Meyer, Erin) (Entered: 05/12/2025) |
| 05/21/2025 | 99 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 98 Consent MOTION for Extension of Time to 6/05/2025 to File Response/Reply to Defendants' Motion to Dismiss. <br><br> Responses due by 6/5/2025. (FGD) (Entered: 05/21/2025) |
| 05/21/2025 | 100 | MOTION to Withdraw as Attorney by Charles Ezell, Office of Personnel Management. (Gardner, Joshua) (Entered: 05/21/2025) |
| 05/27/2025 | 101 | Judge George A. OToole, Jr: ELECTRONIC ORDER entered GRANTING 100 Motion to Withdraw as Attorney. Attorney Joshua E. Gardner terminated. (FGD) (Entered: 05/27/2025) |
| 06/05/2025 | 102 | Opposition re 96 MOTION to Dismiss *Amended Complaint* filed by American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc.. (Harris, Cody) (Entered: 06/05/2025) |
| 09/16/2025 | 103 | Notice of Supplemental Authorities re 96 MOTION to Dismiss In Support of Opposition [Dkt. 102 ]. (FGD). (Attachment(s) added on 9/16/2025: # 1 Exhibit A) (Kamai, Charlotte) . (Main Document 103 replaced on 9/16/2025, detached from exhibit.) (FGD) (Entered: 09/16/2025) |

A021

| | | |
|---|---|---|
| 09/24/2025 | 104 | Judge George A. OToole, Jr: ORDER entered. OPINION AND ORDER.<br><br>There is no need for a discussion that simply repeats the two major points argued by the defendants: (1) that this Court lacks subject matter jurisdiction over the plaintiffs' claims in light of the remedies available under the CSRA and FSL-MRS, and (2) that, under the circumstances described in the pleadings and arguments, the plaintiffs lack standing to litigate the grievances set forth in their claims and arguments. For these two reasons, the Amended Complaint is dismissed with prejudice.<br><br>It is **SO ORDERED.** (FGD) (Entered: 09/24/2025) |
| 09/24/2025 | 105 | Judge George A. OToole, Jr: ORDER entered. ORDER DISMISSING CASE. (FGD) (Entered: 09/24/2025) |
| 10/07/2025 | 106 | NOTICE OF APPEAL as to 104 Memorandum & ORDER,, 105 Order Dismissing Case by American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc.. Filing fee: $ 605, receipt number AMADC-11285876 Fee Status: Not Exempt.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 10/27/2025. **(Harris, Cody) (Entered: 10/07/2025)** |
| 10/07/2025 | 107 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 106 Notice of Appeal. (MAP) (Entered: 10/07/2025) |
| 10/08/2025 | 108 | USCA Case Number 25-1959 for 106 Notice of Appeal, filed by American Federation of State, County and Municipal Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, National Association of Government Employees, Inc.. (MAP) (Entered: 10/08/2025) |
| 01/16/2026 | 109 | MOTION to Withdraw as Attorney by American Federation of Government Employees, AFL-CIO, American Federation of State, County and Municipal Employees, AFL-CIO, National Association of Government Employees, Inc..(Krishnan, Ajay) (Entered: 01/16/2026) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/02/2026 18:59:13 | | |
| **PACER Login:** | kvpresearch | **Client Code:** | fork |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-10276-GAO |
| **Billable Pages:** | 19 | **Cost:** | 1.90 |

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MASSACHUSETTS**

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
80 F Street N.W.,
Washington, D.C. 20001,

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
LOCAL 3707
975 Patriot Ave,
Chicopee, MA 01022,

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO,
1625 L Street, N.W.
Washington, D.C. 20036,

and

NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, INC.
159 Thomas Burgin Parkway
Quincy, MA 01269

        *Plaintiffs*,

     v

CHARLES EZELL, in his official capacity as
Acting Director of the Office of Personnel
Management,
1900 E Street, N.W. Washington, D.C. 20415,

and

OFFICE OF PERSONNEL MANAGEMENT,
1900 E Street, N.W.
Washington, D.C. 20415

        *Defendants*.

Case No. 1:25-cv-10276

1

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE), AFGE Local 3707 (Local 3707), American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME), and National Association of Government Employees, Inc. (NAGE) bring this action against the Office of Personnel Management (OPM) and the Acting Director of OPM and allege as follows:

1.      The Office of Personnel Management's January 28, 2025 decision to offer a purported "deferred resignation" program to federal career employees is the latest effort by this Administration to drastically reduce the nonpartisan career civil service upon which this country has depended and under which it has thrived for more than 140 years.

2.      The continued success of government is based, in large part, on the institutional memory of its career civil servants who are committed to the missions of their agencies and the prospect of working for the American people. These civil servants are professionals and subject matter experts, many of whom have worked diligently and impartially through successive administrations of both major parties to implement changing administration priorities. If these employees leave or are forced out *en masse*, the country will suffer a dangerous one-two punch. First, the government will lose expertise in the complex fields and programs that Congress has, by statute, directed the Executive to faithfully implement. The government will have fewer qualified employees to execute the statutorily-required tasks that still remain.

3.      And second, when vacant positions become politicized, as this Administration seeks to do, partisanship is elevated over ability and truth, to the detriment of agency missions and the American people.  That is why Congress, since 1883, has established rights and processes for

2

protecting these employees from undue political influence and has granted employees who have completed a probationary period, or prior applicable service, protections from termination.

4. The Administration, in its first two weeks, has purported to wipe away longstanding civil service protections and merit system principles mandated by Congress with strokes of a pen. On Inauguration Day, the President signed an executive order, quickly followed by an OPM memorandum, that would make it possible for him to convert large swaths of the civil service to at-will employment, in contravention of the CSRA and OPM regulations (*see* 89 Fed. Reg. 24982 (Apr. 9, 2024)). The President signed an executive order declaring that career members of the Senior Executive Service serve at the pleasure of the President, even though Congress specifically granted these civil servants adverse-action rights (*see* 5 U.S.C. §§ 7541-7543). Daily, the President is also eliminating offices and programs that are supported by Congressional appropriations and tasked by Congress with specific functions.

5. In line with these efforts, on January 28, 2025, Defendants sent federal employees an email titled "Fork in the Road," offering employees what they called a "deferred resignation . . . program" – the ability to resign now and purportedly retain all pay and benefits until September 30, 2025. *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025) (hereinafter, "the Directive" or "the Fork Directive").

6. Employees were given a little more than a week, until February 6, 2025, to accept or reject the offer. *Id.*

7. To leverage employees into accepting the offer and resigning, the Fork Directive threatens employees with eventual job loss in the event that they refuse to resign. OPM stated that "the majority of federal agencies are likely to be downsized through restructurings, realignments,

3

and reductions in force," and Defendants "cannot give you full assurance regarding the certainty of your position or agency." *Id.*

8. Plaintiffs, who are routinely called upon to advise their federal employee members, as well as unions affiliated with Plaintiffs who directly represent federal employees, are unable to render dependable advice because basic information is absent from the Directive, including:

a. Whether OPM can (or will) honor the financial commitment for agencies across government when Congress has appropriated no funds for this purpose, and the statutory basis and appropriation for this promise remain unclear;

b. Whether and under what circumstances employees are expected to continue working for the federal government, and whether they can seek outside employment before their final resignation date;

c. The implications for pensions, health insurance, retirement eligibility, service tenure requirements, reinstatement rights, and similar issues; and

d. How and when the threatened restructuring, realignments, and reductions in force will be announced and whether the Administration will honor employees' adverse-action and due process protections.

9. The Fork Directive is arbitrary and capricious in numerous respects, including that the Directive: (1) fails to consider possible adverse consequences of the Directive provided to millions of federal employees to the continuing functioning of government; (2) offers conflicting information about employees' rights and obligations if they accept the government's offer; (3) runs counter to long-standing rules and requirements for federal employees; (4) is contrary to reasoned practices of government restructuring, (5) ignores history and practices around effective

4

workforce reduction, (6) sets an arbitrarily short deadline; and (7) is pretext for removing and replacing government workers on an ideological basis.

10.     The Fork Directive is also contrary to law. OPM has offered no statutory basis for its unprecedented offer. Moreover, the current appropriation for most federal agencies expires on March 14, 2025, but the Directive purports to make or authorize an expenditure or obligation through September 30, 2025, before an appropriation is authorized. The Antideficiency Act forbids such a guarantee.

11.     Plaintiffs are labor organizations that collectively represent more than 800,000 federal civil servants. They have a direct interest in ensuring that their members make informed decisions about their employment, and that the ability to make those decisions is not compromised by an irrational and illegal offer made on such a compressed and arbitrary timetable. Plaintiffs have had to expend significant resources to counsel their federal employee members, as well as unions affiliated with Plaintiffs who represent those members, about the effects of the directive.

12.     Because the Fork Directive is a final agency action that, as written, is arbitrary and capricious and contrary to law, the Court should, *inter alia*, declare that the Directive as issued is arbitrary, capricious, and not in accordance with law, vacate and remand the Directive to OPM to provide a reasoned basis for the Directive and extend the deadline accordingly, and until such time as Defendants provide an adequate justification for the Directive, and enjoin the February 6, 2024 deadline.

## PARTIES

13.     The American Federation of Government Employees, AFL-CIO ("AFGE") is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington,

D.C. 20001. AFGE, the largest federal employee union, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

14. AFGE members include nurses caring for our nation's veterans, border patrol agents securing our borders, correctional officers maintaining safety in federal facilities, scientists conducting critical research, health care workers serving on military bases, civilian employees in the Department of Defense supporting our military personnel and their families, and employees of the Social Security Administration making sure retirees receive the benefits they have earned.

15. AFGE was founded in 1932 by federal employees seeking to create a right to fair employment and pay during the Great Depression. As the union grew, it advocated for and secured numerous victories for career civil servants, including the passage of the Civil Service Reform Act in 1978.

16. AFGE is dedicated to fighting for dignity, safety, and fairness on the job for its members, and promoting efficiency and the improvement of government service so that government can more effectively serve the American people.

17. AFGE Local 3707 ("Local 3707") is a labor organization and unincorporated association based at the Westover Airforce Reserve Base, Chicopee, MA 01022. Local 3707 represents approximately 400 civilian employees at Westover Reserve Air Base.

18. The American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association headquartered at 1625 L Street N.W., Washington, D.C. 20036. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils and other affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME, through its affiliate District Council 20 and its constituent

A028

local unions, represents federal civilian employees in agencies and departments across the federal government.

19. AFSCME was founded in 1932 by civil servants seeking to combat state efforts to replace a competitive civil service system with political patronage, united by a simple idea: that a professional civil service is essential to a strong democracy, and public service should be delivered by individuals dedicated to serving their communities, not those who have close connections to politicians. This idea has sustained AFSCME through nearly nine decades, as the union has succeeded in its efforts to pass or strengthen civil service laws across the United States.

20. AFSCME members include nurses, corrections officers, childcare providers, emergency medical technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common: a dedication to making our communities stronger, healthier, and safer. Its members working for the federal government make our communities stronger, healthier, and safer by working to ensure aviation safety at the Federal Aviation Administration, criminal justice through the Department of Justice, and more.

21. The National Association of Government Employees, Inc. ("NAGE") is a national labor organization and is affiliated with the Service Employees International Union. NAGE is incorporated in the state of Delaware with its place of business at 159 Thomas Burgin Parkway, Quincy, MA 02169. NAGE and its local units are the certified exclusive bargaining representative of approximately 125,000 employees, including nearly 75,000 federal employees in 43 states, including Massachusetts.

22. NAGE members, many of whom are veterans, include health care workers, police officers, scientists, office workers, researchers, childcare providers, janitorial staff, drivers, and

more, working at many federal agencies such as the U.S. Department of Defense, U.S. Department of Veterans Affairs, the U.S. Department of Transportation, and the National Park Service.

23. Founded in 1961, NAGE is an organization of members united by the belief in the dignity and worth of workers and the services they provide, dedicated to improving the lives of workers and their families, and creating a more just and humane society.

24. AFGE, Local 3707, AFSCME, and NAGE bring this action on behalf of themselves as organizations.

25. Defendant Office of Personnel Management (OPM) is a federal agency that serves as the chief human resources agency and personnel policy manager for the Federal government.

26. Defendant Charles Ezell is the Acting Director of OPM. He is sued in his official capacity.

<b><u>JURISDICTION AND VENUE</u></b>

27. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et. seq.*, and the Administrative Procedure Act, 5. U.S.C. § 701, *et seq*.

28. Venue is proper in the District of Massachusetts pursuant to both 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiffs AFGE Local 3707 and NAGE are residents of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts, where thousands of their members have received the Fork Directive.

<b><u>LEGAL FRAMEWORK</u></b>

29. Under the Administrative Procedure Act (APA), a court shall "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise

8

not in accordance with law." 5 U.S.C. § 706(2)(A). The APA likewise requires a court to hold unlawful agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(B).

30.     The Appropriations Clause of the Constitution commands that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, § 9, cl. 7. In 1870, Congress enacted the Antideficiency Act (31 U.S.C. §§ 1341, 1342, 1349-1351, 1511-1519) to address the increasingly common problem of the executive branch obligating funds in advance of appropriations, which put pressure on Congress to then appropriate those funds so that creditors would be paid.

31.     The Antideficiency Act protects Congress's constitutional power of the purse. Section 1341 of the Act provides, in relevant part, that a federal official may not (1) "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation"; or (2) "involve" the federal government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a).

## ALLEGATIONS

32.     On the afternoon of January 28, 2025, OPM sent an email directly to all—or nearly all—federal employees with the subject title, "Fork in the Road," which announced a "deferred resignation" "program" to those employees—the "Fork Directive." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025).

33.     The Fork Directive instructed recipients to reply to the email with the word "RESIGN" directly to hr@opm.gov to participate. Specifically, OPM's message stated:

> This program begins effective January 28 and is available to all federal employees until
> February 6. If you resign under this program, you will retain all pay and benefits regardless

9

of your daily workload and will be exempted from all applicable in-person work requirements until September 30, 2025 []. *Id.*

34.     OPM announced that "deferred resignation is available to all full-time federal employees" except those in certain national security roles and at the U.S. Postal Service and "any other positions specifically excluded by your employing agency." *Id.*

35.     In making this extraordinarily broad solicitation for resignations, OPM offered employees barely more than a single week to respond, demanding a single word response— "RESIGN"—by February 6, 2025.

36.     This incredibly short timeframe was accompanied by implicit threats of earlier termination for those who failed to accept a deferred resignation date of September 30, 2025, and substantial uncertainty about the legality and details of the newly announced program and the breadth of its exclusions.

37.     Indeed, the Fork Directive itself made clear that "the majority of federal agencies are likely to be downsized," including through reductions in force and furloughs. *Id.* The OPM website now explains to workers that the "federal workplace is expected to undergo significant near-term changes" and advises that employees "may wish to depart" "on terms that provide you with sufficient time and economic security to plan for your future." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Feb. 4, 2025) ("Why am I being offered deferred resignation?").

### *OPM failed to consider numerous factors, including critical concerns of continuity and service across government operations, in promulgating the Directive*

38.     In issuing the Directive across the government barely a week after the new Administration was sworn in, OPM did not conduct any analysis of which agencies were likely to experience high levels of resignations, the optimal number of resignations, or where staffing was

10

already woefully insufficient such that soliciting resignations would be incontrovertibly harmful to government operations. *See, e.g.*, Department of Veterans Affairs, Office of Inspector General, *OIG Determination of Veterans Health Administration's Severe Occupational Staffing Shortages Fiscal Year 2024* (Aug. 7, 2024), https://www.vaoig.gov/reports/national-healthcare-review/oig-determination-veterans-health-administrations-severe-0 (documenting 2,959 Veteran Health Administration medical facilities with "severe occupational staffing shortages" in the fiscal year (FY) 2024).

39.     Compounding the confusion, OPM sent the Fork Directive to individuals that it ultimately deemed ineligible to participate. Even where OPM may have made determinations to exclude employees in critical positions from the program, those employees were still sent multiple emails soliciting their resignations, creating uncertainty and suggesting their employment could be in jeopardy if they did not resign. *See, e.g., Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025) ("the majority of federal agencies are likely to be downsized through . . . actions . . . likely to include the reclassification to at-will status for a substantial number of federal employees"). For example, air traffic controllers received this email even as an OPM official told media that air traffic controllers were exempt from the program. *See* Thomas Beaumont *et al.*, *Air traffic controllers were initially offered buyouts and told to consider leaving government*, ABC News (Jan. 31, 2025), https://abcnews.go.com/US/wireStory/air-traffic-controllers-initially-offered-buyouts-told-leaving-118330627.

40.     Nor did OPM consider the programmatic or other impacts on government service of dramatically—and with almost no advance warning—reducing the size of the federal workforce. OPM offered no plan or analysis as to how many employees they expected to take advantage of the program, or how the hundreds of agencies and their components across the government would

11

ensure continuity of expertise and operations in light of the sudden unplanned administrative leave of some untold number of federal workers.

41. Indeed, OPM acknowledges that some federal agencies actually require larger workforces to function, stating that "a few [unspecified] agencies . . . are likely to see increases in the size of their workforce." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025). But the Fork Directive is addressed in an overwhelmingly blanket fashion to millions of employees without targeting or analysis. OPM's program can only be expected to cause resignations and resultant staff reductions at even the unspecified agencies it acknowledges will require increases in the size of their workforce at a time of low unemployment.

### *The Directive, which provides conflicting information regarding employees' rights and obligations if they accept the government's offer, does not reflect reasoned decision-making*

42. The Directive and related materials offer conflicting information about employees' rights and obligations if they accept the government's offer.

43. Following the original communication, OPM began publishing Frequently Asked Questions (FAQs) concerning the program, and sent a follow-up email on the evening of January 30, 2025 to encourage federal employees to resign, facetiously citing their ability to travel to "a dream destination" and asserting that "The way to greater American prosperity is encouraging people to move from lower productivity jobs in the public sector to higher productivity jobs in the private sector." Kate Kelly, Michael C. Bender, and Zolan Kanno-Youngs, *Official Email Urges Federal Workers to Find 'Higher Productivity' Jobs* (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/us/politics/federal-workers-opm.html; Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025).

12

44. The FAQs continue to be changed, with OPM adding and changing material on the FAQ over the following days. *See Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://web.archive.org/web/20250000000000*/https://www.opm.gov/fork/ (internet archive showing numerous changes to Fork Directive FAQs).

45. This guidance continues to shift in a way that obscures the true nature of the Directive from Plaintiffs, federal employees, and the public.

46. For example, OPM has repeatedly shifted its position as to whether and when employees who accept the offer in the Fork Directive will be expected to work.

47. The initial communication from OPM on January 28, 2025 suggested that employees would be required to continue working, but "will be exempted from all applicable in-person work requirements," *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025).

48. And, among other things, OPM purported to reverse its positions regarding whether employees would be required to work during the deferred resignation period, stating that "[e]xcept in rare cases determined by your agency," employees were "not expected to work." @Elonmusk, X (Jan. 29, 2025, 8:56 AM), https://x.com/elonmusk/status/1884601571347943773.





*See also* https://web.archive.org/web/20250129012319/https:/www.opm.gov/fork/faq (same).

49. But OPM provided no guidance as to the "rare" circumstances under which employees would be expected to work.

50. OPM sent a second email on January 30, 2025 that purported to provide clarity. @News_MTorres, X (Jan. 31, 2025, 9:26 AM), https://x.com/News_MTorres/status/1885333873766080615 (post on X showing OPM email providing "Fork in the Road FAQs").

51. At some point, OPM subsequently revised this guidance yet again, apparently in an effort to sweeten the deal and encourage employees to resign. As of February 1, 2025, OPM's response to a question about whether employees will be expected to work their government jobs during the deferred resignation period simply reads, "No." Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025).

## Frequently Asked Questions

**Am I expected to work at my government job during the deferred resignation period?** —

No.

52. Beginning on or about January 30, 2025, agencies across the federal government advised federal employees by mass emails, at OPM's direction, that the Fork in the Road program

14

was "valid, lawful, and will be honored." Anne Flaherty, Mary Alice Parks, and Soo Youn, *Federal workers told offer to get paid through September if they resign is 'valid,' 'lawful'*, ABC News (Jan 31, 2025), https://abcnews.go.com/Politics/federal-workers-told-offer-paid-september-resign-valid/story?id=118317566.

53. OPM's decision to issue a "deferred resignation" program that gave employees—and Plaintiffs who advise them—little more than a week to decide the future of their career is unprecedented.

54. Particularly in light of the extremely compressed timeline to participate in the Fork Directive, OPM's continual changing of the contours of that program—and the rights and obligations of employees under it— reflects the opposite of reasoned decision-making.

55. OPM's need to broadly and flatly assert that the exploding offer in the Fork in the Road directive was "lawful" and "valid" only demonstrates the agency's awareness of the tremendous extent of uncertainty surrounding the directive's validity, and an effort to rush federal employees to make a decision in a matter of days despite that uncertainty. *See* Andrea Hsu, *Legal questions surround Trump's federal worker resignation offer*, NPR (Jan. 31, 2025), https://www.npr.org/2025/01/31/nx-s1-5282075/trump-federal-employees-resignation-offer-legal-questions.

*The Directive fails to consider or adequately explain how it is consistent with long-standing ethics rules concerning outside employment, which place agency-specific restrictions on employees' ability to obtain additional employment*

56. OPM's FAQs following the issuance of the Directive flatly stated that federal employees could obtain a "second job" if they submitted their resignation. Indeed, OPM stressed that employees could "Absolutely!" obtain additional employment during the period they would

15

be placed on administrative leave. *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Feb. 4, 2025).

> **Am I allowed to get a second job during the deferred resignation period?** —
>
> Absolutely! We encourage you to find a job in the private sector as soon as you would like to do so. The way to greater American prosperity is encouraging people to move from lower productivity jobs in the public sector to higher productivity jobs in the private sector.

57. But this bald assertion contradicts longstanding regulations and nuanced rules that federal employees must consider when engaging in outside employment while still employed by the federal government.

58. Federal ethics regulations provide that federal employees who seek outside employment must comply with numerous conditions, including "[a]ny agency-specific requirement for prior approval of outside employment or activities." 5 C.F.R. § 2635.801. And the regulations further provide that agencies may impose a prior-approval requirement before individuals employed at the agency can accept outside employment. *Id*. at § 2635.803. Some agencies have codified their requirement for prior approval by regulation and these policies could hardly be expected to change uniformly in the accelerated timeframe created by the Fork Directive. *See, e.g.*, 5 C.F.R. § 5701.101 (Federal Trade Commission regulations).

59. There are further restrictions on outside employment for federal employees, including a prohibition on receiving dual pay from federal employment. *See* 5 U.S.C. § 5533. But OPM informs employees that, should they resign from their positions, doing so "does not affect your ability to work for the federal government in the future." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Feb. 4, 2025).

16

60. OPM's blanket assertions that all federal employees who accept the exploding deferred resignation offer can "Absolutely!" obtain a second job are simply incorrect.

*The Fork Directive is contrary to reasoned practices of restructuring and seeds chaos, not effective government functioning*

61. On information and belief, the Fork in the Road directive is based on a staff reduction approach of the same name conducted by Elon Musk shortly after taking over Twitter (now X). Mr. Musk is reportedly deeply involved in OPM's operations, has close ties to senior OPM staff politically appointed by the new Administration, and has repeatedly commented publicly on the Fork Directive.

62. OPM's rapid adoption of Musk's private-sector program confirms that the agency took very little time to consider the suitability of applying an approach used with questionable success in a single for-profit entity to the entirety of the federal workforce. *See, e.g.*, Dave Lawler, *The Elon-ification of the federal government*, Axios (Jan. 30, 2025), https://www.axios.com/2025/01/30/elon-musk-government-takeover-federal-workers ("A workforce discombobulated by chaotic recent events receives an email with the subject line 'Fork in the Road.' Inside, a deadline to quit or commit to the new mission. That's the scenario Twitter employees faced in November 2022 — and the one now confronting some 2.3 million government workers."); Clare Duffy, *The 'Muskification' of the federal government is in full swing*, CNN (Jan. 30, 2025), https://www.cnn.com/2025/01/29/tech/elon-musk-government-cuts-twitter-takeover/index.html.

63. The "Fork in the Road" approach at Twitter was widely regarded as chaotic, and the company's value declined precipitously after it was implemented. As one report summarized, "While Mr. Musk ultimately transformed Twitter, reducing staff by 80 percent and minimizing its real estate footprint, its business has declined. Advertisers have fled the site in droves, and at least

17

one major asset management firm, Fidelity Investments, estimates the company is now worth 72 percent less than the $44 billion he paid for it." Kate Conger and Ryan Mac, Déjà Vu: *Elon Musk Takes His Twitter Takeover Tactics to Washington*, N.Y. Times (Jan. 30, 2025), https://www.nytimes.com/2025/01/30/technology/musk-doge-x-playbook.html.

64.     The Directive offers no rationale for translating a questionable private-sector experiment into a program for virtually the entire federal civilian workforce.

***As the Fork Directive rashly replicates the chaotic private-sector approach employed at Twitter, it eschews the reasoned, logical, and congressionally authorized approach used for federal workforce reduction through voluntary departure in the recent past.***

65.     In the mid-1990s, then-President Clinton and his Administration undertook a significant effort to streamline and reduce the size of the federal workforce to increase efficiency and reduce the deficit. *See* https://www.presidency.ucsb.edu/documents/statement-the-buyout-program-for-federal-employees.

66.     President Clinton charged Vice President Gore with first leading a National Performance Review to gather information and make reasoned recommendations concerning government efficiency.

67.     After the National Performance Review conducted information-gathering and analysis, the Administration sought and received approval from Congress to offer buyouts to certain federal employees, with targeted offers.

68.     The offers were designed to reduce unproductive layers of management, with 70 percent of buyout uptake coming from managerial employees.

69.     This approach led to a reduction of more than 100,000 federal government positions a little more than a year after obtaining congressional authorization.

18

70. The buyout authorities obtained from Congress in the Clinton Administration, *see* Public Law No. 103-226, 108 Stat. 111 (1994), generally gave agencies a calendar year—not nine days—to make and accept buyout offers from employees using considered principles articulated both by statute and in Office of Management and Budget guidance. These principles required the use of strategic plans before offering buyouts, ensuring the maintenance of productivity and ability to achieve agency objectives, and targeting to specific positions and integrating the efforts into restructuring plans. *See* U.S. Gov't Accountability Off., GGD-97-124, *Federal Downsizing: Effective Buyout Practices and Their Use in FY 1997*, https://www.gao.gov/products/ggd-97-124.

### *The Directive's deadline is arbitrary*

71. Federal employees must weigh whether to accept the Fork Directive in short order, by February 6, 2025. But the Directive comes with a questionable legal basis, continually changing guidance, and with no clear mechanism to ensure that its promise will be fulfilled. Employees are advised if they forgo the offer—even with all of this attendant lack of clarity— they risk unemployment.

72. The February 6, 2025 deadline to respond to the Fork Directive is not mandated by law. It is an arbitrary date Defendants selected to put maximum pressure on the federal workforce so that they would accept the offer, in many cases contrary to federal agency and federal employee interests.

### *The Directive is pretext to remove career federal civil servants and replace them with staff who are politically aligned with the Administration*

73. The Fork Directive itself concedes that some agencies require more—not less— less staffing.

19

74.    Statements made by the Administration and their surrogates make clear that they intend to reduce the size of the government in part so that they can replace career federal employees with individuals ideologically aligned with the Administration.

75.    The President has pledged to fire wide swaths of civil servants, promising to "throw off the political class that hates our country." Donald J. Trump, Speech at Conservative Political Action Conference (March 4, 2023), https://tinyurl.com/2hjrs5ah. As he explained, "you'll see that on the first day of my presidency, the deep state which is destroying our nation. The tables will turn and we will destroy the deep state. We're going to destroy the deep state." Donald J. Trump, Speech at South Carolina GOP Dinner (Aug. 5, 2023), https://tinyurl.com/36uhbe74.

76.    President Trump has singled out Democrats and so-called "RINOs" (Republicans In Name Only) for termination. For example, in one video post from May 2023, Trump told a reporter that he would make "very big changes" to the FBI in a potential second term. Donald J. Trump (@realDonaldTrump), Truth Social (May 15, 2023, 11:04 PM ET), https://tinyurl.com/bdesuz3w. The DOJ and FBI, Trump said, personify the "deep state" as they are filled with "thousands and thousands" of "RINOs and with Democrats" that have been there for decades. Rebecca Jacobs, *Trump Has Said He Wants to Destroy the "Deep State" 56 Times On Truth Social*, CREW (Aug. 1, 2024), https://tinyurl.com/36z27phm. In another speech, he criticized the "deep state" workers who "work with the with the Democrats and the Republicans, and those are the Republicans I don't like." Donald Trump, *Speech at Political Rally in Sarasota*, Florida (July 3, 2021), https://tinyurl.com/58r46v4a.

77.    Vice President Vance reiterated that President Trump should "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people."

20

Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024), https://tinyurl.com/4rsvn7xv.

78.     The scattershot approach of the Fork Directive—which does not set a target for specific goals, agencies, positions or functions—can only be understood as an effort to hollow out the federal government to allow the Administration to make room for the Administration's partisan hiring.  *See* The White House, Reforming the Federal Hiring Process and Restoring Merit to Government Service, https://www.whitehouse.gov/presidential-actions/2025/01/reforming-the-federal-hiring-process-and-restoring-merit-to-government-service/ (directing agencies to make federal "recruitment and hiring processes more efficient" by, *inter alia*, involving political appointees "throughout the full hiring process" and prioritizing hiring of individuals "passionate about the ideals of our American republic").

### *The Fork Directive is contrary to law as it was promulgated with no clear statutory basis or authorization and violates the Antideficiency Act*

79.     OPM has offered no explanation or statutory basis for offering the Directive, nor has it identified how the federal government intends to pay an unspecified number of workers for not performing work for the next eight months.

80.     Nor has OPM offered a justification for this apparently unprecedented use of administrative leave.

81.     The Antideficiency Act prohibits federal officials from making or authorizing an expenditure or obligation exceeding an amount available in an appropriation or from contracting or obligating for the payment of money before an appropriation is made (31 U.S.C. § 1341(a)). This is precisely what Defendants are purporting to do via the Fork Directive.

82.     The government is currently operating on a continuing resolution that expires on March 14, 2025. There is currently no appropriation in place to cover the salaries of federal

A043

employees after that date. The Directive, however, unequivocally promises all pay and benefits until September 30, 2025. As written, Defendants are making or authorizing an obligation for the payment of money before an appropriation is made. *See* Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025) (original communication to employees, explaining that workers will "maintain [their] current compensation…until [their] final resignation date").

83.    Following significant concerns about whether, in light of the lack of appropriations and other concerns, employees would "really" receive "full pay and benefits through September 30," OPM doubled down in its FAQs without reservation, stating, "Yes." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Feb. 4, 2025)

> **Will I really get my full pay and benefits during the entire period through September 30, even if I get a second job?**    —
>
> Yes. You will also accrue further annual leave, sick leave, etc. and be paid out for unused leave at your final resignation date.

84.    These questionable assertions led to public concerns about the lawfulness of the Fork Directive given the lack of government appropriations beyond March 14, 2025, Andrea Hsu, *Legal questions surround Trump's federal worker resignation offer*, NPR (Jan. 31, 2025), https://www.npr.org/2025/01/31/nx-s1-5282075/trump-federal-employees-resignation-offer-legal-questions.

85.    In response, OPM— changed the contours of the Directive's guidance. OPM added a statement to the FAQ that asserts that a lapse in funding could affect employees' pay regardless of whether they submit a deferred resignation. OPM nonetheless unequivocally assured employees that they will be entitled to back pay in case of a lapse in appropriations under the Government

22

Employee Fair Treatment Act of 2019. *Compare Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (retrieved February 3, 2025. 8:49 AM) (explaining that a government shutdown could impact pay, but assuring employees that they would be entitled to backpay after any shutdown) *with* *id* *at* *https://web.archive.org/web/20250131184447/https://www.opm.gov/fork/faq* (extant version at 6:44 PM, Jan. 31, 2025) (FAQ does not include any equivocation on the entitlement to pay). In adding this new FAQ, OPM neither rescinded previous communications to federal employees nor changed its other unequivocal statements that employees "really" will be paid through September 30, 2025.

86. Whether or not an employee is guaranteed backpay following Congress's issuance of an appropriation, the Antideficiency Act forbids OPM from guaranteeing payment without an appropriation. Particularly where, as here, OPM does not know the contours of future appropriations or funding levels, this promise is improper. If Congress decides to not fund certain offices after March 14, for example, employees in those offices who accepted the Fork Directive would have no appropriation to satisfy their promised pay.

***Plaintiffs have been, and will continue to be, harmed by the Fork Directive.***

87. AFGE, on its own and in conjunction with its affiliated councils and locals, represents members and bargaining unit employees in agencies and departments across the federal government for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

88. Local 3707 represents members and bargaining unit employees consisting of most civilian employees of the Westover Airforce Reserve Base in Chicopee, Massachusetts, for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

23

89.    AFSCME, through its affiliated District Council 20 and its constituent local unions, represents members and bargaining unit employees in agencies and departments across the federal government for which AFSCME District Council 20 has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

90.    NAGE, on its own and in conjunction with its locals, represents members and bargaining unit employees in agencies and departments across the federal government for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

91.    Membership in AFGE, Local 3707, AFSCME, and NAGE is voluntary.

92.    The leadership of AFGE, Local 3707, AFSCME, and NAGE are democratically elected by and from their respective members.

93.    The activities of AFGE, AFSCME, and NAGE are funded by their respective members through voluntary membership dues.

94.    AFGE members who are federal employees work in a wide variety of positions, in every U.S. state and the District of Columbia, and in agencies including the Environmental Protection Agency, the Department of Labor, the Department of Veterans Affairs, the Social Security Administration, the Department of Defense, and the Department of Homeland Security.

95.    AFSCME members who are federal employees work in a wide variety of positions at multiple federal agencies including AmeriCorps, the Department of Agriculture (USDA), the Department of Justice (DOJ), the Federal Aviation Administration (FAA), the Peace Corps, and Voice of America.

96.    NAGE members who are federal employees work in a wide variety of positions in 43 states, in agencies including the Department of Veterans Affairs, the Department of Defense, the Department of Transportation, the Environmental Protection Agency, and the National Park

24

Service.

97.     AFGE members are located in all fifty states. AFGE has several affiliates across the State of Massachusetts, representing approximately 2,900 federal workers at various agencies, including the Department of Veterans Affairs, the Department of Defense, the Social Security Administration, and the Environmental Protection Agency.

98.     Among AFSCME's thousands of affiliated subordinate bodies throughout the country, AFSCME Council 93 and its affiliated local unions represent employees of public and private employers in the State of Massachusetts including but not limited to employees of the City of Springfield and the Springfield Housing Authority.

99.     NAGE has multiple units in Massachusetts, representing approximately 7,000 federal employees at various federal agencies, including the Department of Veterans Affairs, Department of Defense, and Department of Transportation.

***Plaintiffs have already expended significant resources responding to the Directive and will be forced to continue to expend and divert resources to respond to the Directive.***

100.     One of AFGE, AFSCME, and NAGE's core services is responding to inquiries and concerns, both from individual members of the union and the union affiliates who directly represent those members, as well as counseling union members about issues that relate to the workplace. In general, AFGE, AFSCME, and NAGE, through their affiliates, work to ensure that all member inquiries receive a response, whether by email, phone, or meeting.

101.     One of AFGE's core functions is to provide guidance, legal representation, training, and other services to its over 800 affiliates.

102.     AFGE has over 150 employees who regularly receive inquires directly from members and affiliates.

103.     Core to Local 3707's mission is providing advice and guidance to the civilian

25

employees at Westover Airforce Reserve Base.

104. Local 3707 provides guidance and representation to its members through elected and volunteer union officers and stewards.

105. AFSCME has over 100 employees in its Organizing and Field Services Department whose role is to provide member relations services; they regularly receive calls and emails from members and affiliates, including from federal employee members of AFSCME District Council 20 and its subordinate bodies.

106. AFSCME represents its members through its constituent local unions, councils and other affiliates. Within this structure, one of AFSCME's core functions is to provide resources and guidance to its affiliates for organizing, bargaining, political action and education, legal issues of national significance, and the administration of members-only benefits.

107. NAGE provides guidance, legal representation, training, and services to its locals, members, and bargaining unit employees.

108. NAGE has employees who regularly receive inquiries directly from federal local affiliates and federal employees.

109. Since the Fork Directive, AFGE, Local 3707, AFSCME, and NAGE have been inundated by members and affiliates seeking advice and information about the Fork Directive.

110. For example, since January 28, 2025, AFGE has received thousands of emails from members and affiliates asking about the Fork Directive. AFGE has received countless additional inquiries through other channels, including phone calls, town hall meetings, and site visits. AFGE members and affiliates have asked about the implications of the Fork Directive and guidance on how to respond to OPM's email. AFGE affiliates have also asked for services and support in responding to member and press inquiries about the Fork Directive.

26

111. Since January 28, 2025, Local 3707 has received numerous inquiries about the Directive. Responding to these questions has demanded a significant amount of time from the union's limited group of volunteer officers and stewards—time that would have otherwise been spent representing members, organizing new members, and addressing other important issues.

112. OPM's unclear and ever-changing guidance on the Directive has made it particularly challenging to provide accurate advice. An example of how this has been particularly difficult for Local 3707 involves the impact of accepting the Fork Directive on dual-status Air Reserve Technician employees represented by Local 3707. Specifically, it is unclear whether acceptance would make them ineligible for continued military service.

113. Since the Directive, AFSCME District Council 20 and its constituent local unions have also received emails and phone calls from members asking about the implications of the Fork Directive. AFSCME local unions have been requesting guidance about the legality of the Fork Directive, the implications of the Fork Directive on the future of AFSCME members' work, and whether AFSCME members should respond to OPM's email.

114. Since January 28, 2025, NAGE has received hundreds of inquiries, emails, and telephone calls from locals and federal employees asking about the Directive and seeking guidance. NAGE members have questions about the legality of the Directive, its implications, effects on their benefits, their options, and how to respond.

115. Responding to these concerns has required AFSCME, Local 3707, AFGE, and NAGE to devote substantial additional resources into counseling members and affiliates and responding to inquiries.

116. For example, at least one AFGE attorney and one AFGE communications staff member spent almost the entirety of their working day on January 29, 2025, working on Fork

27

Directive-related issues. Several other staff members have spent a significant portion of each day since the 28th responding to and researching Fork Directive related issues. These staffers would ordinarily be performing other necessary work, such as preparing for affiliate arbitrations, reviewing affiliate requests for legal and communications advice, and drafting newsletters and other AFGE communications.

117. Because of the volume of inquiries, AFGE has held 2 virtual town halls for its affiliates. Each town hall took place in the evening and required over 25 staff members to perform duties outside their normal working hours.

118. Likewise, because of numerous inquiries by AFSCME members, AFSCME attorneys and communication department staff have had to devote resources to preparing a Frequently Asked Questions ("FAQ") document to address AFSCME member questions about the Fork Directive, diverting these AFSCME employees from performing other necessary work servicing AFSCME members and affiliates in other jurisdictions nationwide. And AFSCME local unions of federal employees have scheduled special meetings with their bargaining-unit members to discuss the Fork Directive and provide guidance.

119. NAGE has utilized several attorneys and representatives to receive questions, research issues, prepare a FAQ, and host two webinar-style town halls. Each town hall lasted over an hour and required multiple staff members to present materials and answer live questions. These NAGE staff would ordinarily perform other necessary work, including legal representation and union representational assistance with grievances, bargaining, communications, and other matters.

120. In addition to directly responding to inquiries from affiliates and members, AFGE, AFSCME, and NAGE employees have invested significant time and effort into researching issues related to the Fork Directive. These efforts have been necessary to develop written guidance to

28

help members and affiliates, to try to ensure as well-informed an approach to addressing these issues as is possible under the circumstances.

121. The substantial increase in volume of inquiries and counseling requests from members and affiliates has required AFGE and NAGE to divert resources from other work. For example, the attorney time spent developing guidance and responding to inquiries has resulted in delays in preparing for arbitration hearings and responding to non-Directive-related affiliate inquires.

122. In addition, media outlets have contacted AFGE, AFSCME, and NAGE seeking comment or information about the Fork Directive. These inquiries continue.

123. These resource challenges are particularly acute because of the very limited timeframe and changing guidance surrounding the Directive. Members need answers to their questions by the impending deadline presented by the Fork Directive, and are urgently reaching out to Plaintiffs for advice.

***The Directive impedes Plaintiffs' ability to perform their missions.***

124. Core to Plaintiffs' mission is fighting for fairness and full protection of the law on behalf the employees they represent.

125. Because of the paucity of information about the Fork Directive, it is challenging for Plaintiffs to adequately advise their members or affiliates as to many of their questions.

126. For example, it is unclear whether members will really be guaranteed full payment of wages through September 30, 2025, even if appropriations lapse, the government shuts down, or Congress passes a law that forbids employees to be paid when they are not working.

127. Dual employment is unclear, and whether members could seek outside employment while in this "deferred resignation" period, in light of prior guidance and ethics rules limiting

29

federal workers' ability to work for others while on the federal payroll.

128. It is unclear whether members could leave the country while in "deferred resignation" status given prior government guidance about leaving the country or the commuting area while employed.

129. It is unclear what authority or appropriations the government has to provide this program and to guarantee that employees will be paid without working.

130. The potential effect of a government shutdown on a "deferred resignation" if a budget or continuing resolution is not passed in the future is unclear.

131. It is unclear what will happen there are later reductions in force or other layoffs, and whether members would continue to be paid.

132. The implications for pensions, health insurance, retirement eligibility, service tenure requirements and other issues are unclear.

133. It was unclear whether members would retain competitive status or reinstatement rights, whether they will continue to accrue annual leave and sick leave, and whether they will receive their annual leave payout.

134. Given the very limited information available about the Fork Directive, and the absence of a clear statutory basis for some of the claims in the January 28, 2025 email, it is challenging for Plaintiffs to adequately counsel or advise their members as to many of these issues.

135. The difficulty in responding to inquiries, and time spent addressing concerns, is amplified by the inconsistent guidance provided to Plaintiffs' affiliates and members by different federal agencies and OPM, and the changing nature of that guidance.

136. The Directive's lack of clarity and shifting contours thus directly undermine Plaintiffs' core mission of serving and counseling their members.

30

137.    The substantial increase in volume of inquiries and counseling requests from members and affiliates has required AFSCME, Local 3707, AFGE, and NAGE to divert resources from being otherwise used to further their mission by organizing and representing employees, negotiating with employers, and advocating for improved employment conditions.  For example, AFGE and NAGE attorneys are not preparing for arbitrations and answering other affiliate concerns, and AFGE field representatives (also known as national representatives) are able to devote less time handling grievances and bargaining issues. Likewise, an AFSCME attorney working on the union's efforts to counsel members and affiliates about the Fork Directive would otherwise be engaged in supporting other AFSCME affiliates in preparing for arbitrations in other jurisdictions, filing unfair labor practices against non-federal employers, and other AFSCME core services for its affiliates nationwide.

138.    In addition, Plaintiffs will likely lose revenue because of the Fork Directive. Members currently pay voluntary dues through payroll deductions. The vast majority of members who leave federal service for reasons other than retirement cease being members of their respective unions and cease paying dues. Members' deferred resignations will reduce Plaintiffs' membership rolls, thereby reducing the revenue available to further Plaintiffs' mission.

139.    Further, as members look to AFSCME, Local 3707, AFGE and NAGE to provide answers about the Fork Directive and its unclear and ever-changing guidance, AFSCME, Local 3707, AFGE and NAGE are at risk of reputational harm among their membership, and more broadly among other federal employees, due to the difficulty of providing satisfactory answers to members concerning an agency policy with enormous potential consequences for members' interests.

140.    Given the short timeline attendant to the Directive, and the ongoing lack of clarity,

31

Plaintiffs will not be able to improve on their advice to members, or offer further clarity, in the future – the time will have simply expired.

## CLAIMS FOR RELIEF

### Count One
### (Administrative Procedure Act - Arbitrary, Capricious)

141.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

142.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

143.    The Fork Directive is arbitrary and capricious for a host of reasons.

144.    Defendants have failed to consider innumerable potential consequences of the Fork Directive, which was sent a mere week after the beginning of the new Administration to millions of federal employees, including the impact on continuity and effectiveness of government functioning.

145.    The Directive and related materials offer conflicting information regarding employees' rights and obligations if they accept the government's offer.

146.    The Directive adopts a questionable approach from the private sector, without considering whether it is applicable in the federal context or consistent with prior history relating to restructuring.

147.    The Directive aims to entice federal employees to relinquish their livelihoods on the basis of barely-veiled threats of future termination.

148.    The Directive runs contrary to long-standing rules and requirements for federal employees, including prior guidance and ethics rules regarding outside employment.

32

149. The Directive provides an arbitrarily short deadline for decision that is not based in any articulated need or statutory requirement and—particularly in light of open questions and changing guidance—puts Plaintiffs in an impossible position in advising their members and developing guidance.

150. The Directive is pretext for removing federal workers on an ideological basis to replace them with staff who are politically aligned with the Administration.

151. The arbitrary and capricious nature of OPM's decision has harmed Plaintiffs.

**Count Two**
**(Administrative Procedure Act – not in accordance with law,**
**and exceeding statutory authority)**

152. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

153. The Fork Directive and related communications include no indication as to the statutory or appropriations basis for OPM's "deferred resignation" program.

154. The Appropriations Clause of the Constitution commands that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, § 9, cl. 7.

155. The Antideficiency Act forbids an agency from authorizing or obligating the payment of money before an appropriation is made.

156. The Fork Directive purports to obligate payment until September 30, 2025 to civil servants who accept the deferred resignation offer, even though the federal government's current appropriations will expire on March 14, 2025.

157. By purporting to obligate payments for six months past the March 14, 2025 continuing resolution deadline, the Fork Directive violates the Antideficiency Act, and is therefore

33

not in accordance with law and is beyond statutory authority, in violation of the Administrative Procedure Act. 5 U.S.C. 706(2).

158. Defendants' violation causes ongoing harm to the Plaintiffs.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court:

A. Declare that the Fork Directive, as currently drafted, is arbitrary, capricious, and not in accordance with law in violation of the Administrative Procedure Act;

B. Vacate the Fork Directive and remand to OPM to provide a reasoned basis as required by the APA for the Directive and extend the purported deadline for the Fork Directive accordingly;

C. Preliminarily and permanently enjoin Defendant Charles Ezell, Acting Director of the Office of Personnel Management; Defendant Office of Personnel Management; and their agents and successors from implementing or otherwise giving effect to the February 6, 2024 deadline in the Fork in the Road Directive until such time as Defendants can provide adequate legal justification for the Fork Directive and adequate legal assurance of its terms;

D. Order Defendant Charles Ezell, Acting Director of the Office of Personnel Management; Defendant Office of Personnel Management; and their agents and successors to prepare and submit for Court approval a corrective communication to send all government workers who received the Fork in the Road Directive, advising them that the Directive is suspended and the deadline is held in abeyance for a reasonable period of not less than 60 days following OPM's completion of the required consideration of the Directive's legal basis, justifications, and funding.

34

E.   Award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

F.   Grant any other relief this Court deems appropriate.

A057

DATED this 4th day of February, 2025.

By: /s/ Nicolas F. Mendoza
Michael T. Anderson (BBO #645533)
Nicolas F. Mendoza (BBO #703711)
MURPHY ANDERSON PLLC
1401 K Street N.W., Suite 300
Washington, DC 20005
Telephone: (202) 223-2620
manderson@murphypllc.com
nmendoza@murphypllc.com
*Counsel for Plaintiffs*

Elena Goldstein* (NY Bar No. 4210456)
Michael C. Martinez* (D.C. Bar No. 1686872)
Daniel McGrath* (D.C. Bar No. 1531723)
Skye Perryman* (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Facsimile: 202-796-4426
egoldstein@democracyforward.org
mmartinez@democracyforward.org
dmcgrath@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs*

Teague P. Paterson* (D.C. Bar No. 144528)
Matthew S. Blumin* (D.C. Bar No. 144528)
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, DC 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Counsel for American Federation of State,
County, and Municipal Employees, AFL-CIO
(AFSCME)*

36

Rushab B. Sanghvi* (D.C. Bar No. 1012814)
Andres M. Grajales* (D.C. Bar No. 476894)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
Grajaa@afge.org
*Counsel for Plaintiff American Federation
of Government Employees, AFL-CIO (AFGE)
and Local 3707*

Sarah Suszczyk* (M.D. Bar No. 0512150240)
NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, SEIU
LOCAL 5000
NAGE/IBPO/IAEP/IBCO
159 Burgin Parkway
Quincy, MA 01269
Telephone: (202) 639-6426
Facsimile: (617) 376-0285
Ssuszczyk@nage.org
*Counsel for Plaintiff National Association of
Government Employees, SEIU Local 5000*

*\*pro hac vice pending*

37

## Verification

Cory Bythrow being first duly sworn hereby affirm and state under the penalties

of perjury the following:

I am the Chief of Staff of the American Federation of Government Employees, AFL-CIO

(AFGE), Plaintiff in the above-entitled action. I have read the foregoing complaint and know the

contents thereof. I verify under penalty of perjury that the foregoing paragraphs relating to AFGE

are true and correct.


Dated: February 4, 2025
Washington, DC
(City)          (State)

Cory Bythrow
Chief of Staff
American Federation of Government
Employees, AFL-CIO

## <u>Verification</u>

Fernando Colon being first duly sworn hereby affirm and state under the penalties

of perjury the following:

I am the Associate General Counsel of the of State, County, and Municipal Employees,

AFL-CIO (AFSCME), Plaintiff in the above-entitled action. I have read the foregoing complaint

and know the contents thereof. I verify under penalty of perjury that the foregoing paragraphs

relating to AFSCME are true and correct.


Dated: February 4, 2025
Washington, DC
(City)          (State)

                                   _Fernando Colon_ (signature)

Fernando Colon
Associate General Counsel
American Federation of State,
County, and Municipal Employees,
AFL-CIO (AFSCME)

## <u>Verification</u>

Lee Sutton being first duly sworn hereby affirm and state under the penalties of perjury the following:

I am the Federal Director of the National Association of Government Employees, Inc. (NAGE), Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I verify under penalty of perjury that the foregoing paragraphs relating to NAGE are true and correct.

Dated: February 4, 2025
Alexandria, Virginia

*Lee Sutton*
_____
Lee Sutton
Federal Director
National Association of Government
Employees, Inc.

A062

James Johnson being first duly sworn hereby affirm and state under the penalties

of perjury the following:

I am the President of American Federation of Government Employees, AFL-CIO (AFGE),

Local 3707, Plaintiff in the above-entitled action. I have read the foregoing complaint and know the

contents thereof. I verify under penalty of perjury that the foregoing paragraphs relating to AFGE,

Local 3707 are true and correct.

Dated: February 4, 2025  
Springfield, MA  
(City)         (State)

James Johnson  
President  
American Federation of Government  
Employees, AFL-CIO, Local 3707

# American Federation of Government Employees, AFL-CIO et al v. Ezell et al

**Massachusetts District Court**

Case no. 1:25-cv-10276-GAO (D. Mass.)
Filed date: February 06, 2025
Docket entry no.: 42

Docket text:

> Electronic Clerk's Notes for proceedings held before Judge George A. O'Toole, Jr: Plaintiffs reply brief due by 6:00 PM on Friday, February 7, 2025. Merits arguments continued to 2:00 PM on Monday, February 10, 2025, for an in-person only hearing. (Court Reporter: Valerie OHara at vaohara@gmail.com.) (Attorneys present: N. Mendoza, A. Grajales, D. McGrath, E. Goldstein, S. Suszczyk and M. Anderson) (JMF) (Entered: 02/06/2025)

This PDF was generated on February 06, 2025 by PacerPro for a text-only docket entry.

https://app.pacerpro.com/cases/1080480420

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


AMERICAN FEDERATION OF            )
GOVERNMENT EMPLOYEES, AFL-CIO,    )
                Plaintiffs,       )
                                  )
                                  )  Civil Action
vs.                               )  No.
                                  )  25-10276-GAO
                                  )
CHARLES EZELL, ACTING DIRECTOR,   )
OFFICE OF PERSONNEL               )
MANAGEMENT, et al,                )
                                  )
        Defendants.               )


BEFORE:  THE HONORABLE GEORGE A. O'TOOLE


<u>MOTION HEARING</u>


John Joseph Moakley United States Courthouse
Courtroom No. 22
1 Courthouse Way
Boston, MA 02210


February 6, 2025
1:09 p.m.


Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way
Boston, MA 02210
E-mail: vaohara@gmail.com

2

APPEARANCES:

For the Plaintiffs:

       Democracy Forward Foundation, by ELENA GOLDSTEIN, ESQ., and DANIEL ALEXANDER MCGRATH, ESQ., P.O. Box 34553, Washington, D.C. 20043;

       Murphy Anderson PLLC, by NICOLAS MENDOZA, ESQ., 1401 K Street NW, Suite 300 Washington, D.C. 20005;

       Murphy Anderson, PLLC, by MICHAEL T. ANDERSON, ESQ., 33 Harrison Ave, 7th Floor, Boston, MA 02111;

       ANDRES M. GRAJALES, ESQ., AFGE 80 F. Street, N.W., Washington, D.C. 20001;

For the Defendants:

       Department of Justice - Civil Division, by JOSHUA E. GARDNER, ESQ. Poc Agostinho, Jean, 1100 L St., N.W., Suite 12200 Washington, D.C. 20530.

PROCEEDINGS

THE CLERK:  Your Honor, this is Civil Matter of 25-cv-10276, American Federation of Government Employees, AFL-CIO, et al.  Motion hearing.  Parties identify themselves for the Court.  For the plaintiff, please.

MS. GOLDSTEIN:  Your Honor, Elena Goldstein representing the plaintiffs.

MR. McGRATH:  Daniel McGrath representing the plaintiffs, your Honor.

MR. ANDERSON:  Michael Anderson, Murphy, Anderson for the plaintiffs.

MR. GRAJALES:  Andres Grajales for plaintiffs.

MR. MENDOZA:  Nick Mendoza for the plaintiffs.

THE COURT:  Are there any counsel for the government defendants online?  Well, all right, we'll proceed without them.

This proceeding will be very brief.  It's my intention simply to establish an appropriate and adequate briefing schedule, and I make no assessment at this stage of the merits of the claims or the defenses.

The sound is not very good.

Representing the government defendants?

THE CLERK:  Is the government present?  Are the people at the bottom --

THE COURT:  All right, I'll just continue.  So I will

4

set -- the briefing is already underway.  Of course, the plaintiff's brief was submitted at the time the case was filed. I'm told now that within about the last 40 minutes or so, the government, the defendants, have submitted a brief.

I'm not clear where we are.  Let me continue.  As I say now, there's a brief from the defendants, which I have not yet seen.  I'm aware it's been filed.  I will permit the plaintiffs to enter, to submit a further reply by the close of business tomorrow, Friday, and we will schedule oral agreement for 2:00 on Monday afternoon.

In aid of the proper consideration of the issues presented by both sides, I enjoin the defendants from taking any action to implement the so-called directive pending the completion of briefing and oral agreement on the issues, and that will, as I say, that hearing will be conducted Monday afternoon commencing at 2:00.

And I believe that's as far as I want to go today, so we will look for the completion of the paper submissions and schedule a hearing like this one for 2:00 Monday afternoon.

MS. GOLDSTEIN:  Your Honor, may I be heard? Elena Goldstein for the plaintiffs.

THE COURT:  Go ahead.

MS. GOLDSTEIN:  Your Honor, the plaintiff's directive to employees state that they must either accept the directive, the offer of deferred resignation by today or else that offer

Case: 25-1959   Document: 00176841312   Page: 72   Date Filed: 02/07/2025   Entry ID: 6789986
Case 1:25-cv-10276-GAO   Document 48   Filed 02/03/2026   Page 5 of 7

5

will expire.  I understand that the Court's order now pauses that communication.

THE COURT:  Yes.

MS. GOLDSTEIN:  Absent notice to employees, they will not know that, and they may be inclined to accept this ultimatum without the benefit of this Court's consideration.

Accordingly, we would request that defendants be required to send out notice immediately to all the employees who originally received that invitation for this deferred resignation so that they are aware of the Court's order.

(Indiscernible - garbled)

THE COURT:  I'm not understanding what was said.

MS. GOLDSTEIN:  I think that was someone who was not a party to the case who was on the phone and was unmooted, your Honor.  I believe the government is on the line.  I don't think we can hear Mr. Gardner, unfortunately.  I'm not sure if there is another lawyer for the government who might be able to be heard.

MR. GARDNER:  Your Honor, can you hear me?  This is Josh Gardner.

THE COURT:  All right.

MR. GARDNER:  Your Honor, can you hear me?

THE COURT:  Yes, I can hear you now.

MR. GARDNER:  Okay, thank you.  We have comments.  I understand Ms. Goldstein's views, and if this Court believes

6

that additional notice is appropriate at this juncture, we're prepared to do that.

THE COURT:  And the people involved will receive that notice by the close of business today?

MR. GARDNER:  Yes, your Honor, what I can do, I can work with OPM immediately after this to ensure that the same individuals who received the previous notification receive a notification that the deadline is paused pending Monday's hearing.

THE COURT:  Right.  That's correct.  And I assume that you have the capacity to contact all those people who were contacted?

MR. GARDNER:  I assume the answer to that is correct, your Honor, given that those federal employees have received multiple notices since January 28th.  I assume we would distribute this notice to that same group of people.

THE COURT:  I presume electronically, right?

MR. GARDNER:  Correct.

THE COURT:  Okay.  I think that should satisfy the plaintiff's concern.  So this is just a table setting session. The merits of the arguments are on Monday afternoon.  That completes our hearing.

MR. GARDNER:  Thank you, your Honor.

THE CLERK:  Court is in recess.

(Whereupon, the hearing was adjourned at 1:15 p.m.)

CERTIFICATE


UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS ) ss.

CITY OF BOSTON )


        I do hereby certify that the foregoing transcript, Pages 1 through 7 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 25-10276-GAO, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO vs. CHARLES EZELL, ACTING DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

        Dated February 7, 2025.


                    s/s Valerie A. O'Hara

                    _____

                     VALERIE A. O'HARA

                     OFFICIAL COURT REPORTER

# *American Federation of Government Employees, AFL-CIO et al v. Ezell et al*

**Massachusetts District Court**

Case no. 1:25-cv-10276-GAO (D. Mass.)
Filed date: February 10, 2025
Docket entry no.: 60

Docket text:

> Electronic Clerk's Notes for proceedings held before Judge George A. O'Toole, Jr: Motion hearing held on 2/10/2025. Counsel for Plaintiffs and Defendants present. Arguments held re: 11 Motion for Temporary Restraining Order. The Court orders that the current stay of the February 6, 2025, deadline to remain in effect until further order of the Court. Matter taken under advisement. (Court Reporter: Valerie OHara at vaohara@gmail.com.) (Attorneys present: D. McGrath, E. Goldstein, M. Anderson and S. Suszczyk for the Plaintiffs; J. Gardner, E. Hamilton, J. Altabet and R. Farquhar for the Defendants.) (JMF) (Entered: 02/10/2025)

This PDF was generated on February 10, 2025 by PacerPro for a text-only docket entry.

https://app.pacerpro.com/cases/1080480420

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


AMERICAN FEDERATION OF            )
GOVERNMENT EMPLOYEES, AFL-CIO,    )
                    Plaintiffs,   )
                                  )
                                  ) Civil Action
vs.                               ) No. 25-10276-GAO
                                  )
                                  )
CHARLES EZELL, ACTING DIRECTOR,   )
OFFICE OF PERSONNEL               )
MANAGEMENT, et al,                )
                                  )
          Defendants.             )


BEFORE:   THE HONORABLE GEORGE A. O'TOOLE


MOTION HEARING


John Joseph Moakley United States Courthouse
Courtroom No. 22
1 Courthouse Way
Boston, MA 02210


February 10, 2025
2:03 p.m.


Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way
Boston, MA 02210
E-mail: vaohara@gmail.com

APPEARANCES:

For the Plaintiffs:

 Democracy Forward Foundation, by ELENA GOLDSTEIN, ESQ., and DANIEL ALEXANDER MCGRATH, ESQ., P.O. Box 34553, Washington, D.C. 20043;

 Murphy Anderson PLLC, by NICOLAS MENDOZA, ESQ., 1401 K Street NW, Suite 300 Washington, D.C. 20005;

 Murphy Anderson, PLLC, by MICHAEL T. ANDERSON, ESQ., 33 Harrison Ave, 7th Floor, Boston, MA 02111;

 NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, SEIU LOCAL 5000, by SARAH SUSZCZYK, ATTORNEY, 159 Burgin Parkway, Quincy, Massachusetts 01269;

For the Defendants:

 Department of Justice - Civil Division, by JOSHUA E. GARDNER, ESQ., and JASON ALTABET, ESQ. Poc Agostinho, Jean, 1100 L St., N.W., Suite 12200 Washington, D.C. 20530;

 U.S. Department of Justice, ERIC HAMILTON, ESQ., 950 Pennsylvania Avenue NW, Washington, D.C. 20530;

 United States Attorney's Office, by RAYFORD A. FARQUHAR, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02210.

PROCEEDINGS

THE CLERK:  All rise.  Court is now in session.  Your Honor, this is Civil Matter of 25-cv-10276, American Federation of Government Employees, AFL-CIO vs. Ezell, et al., motion hearing.

Would the parties identify themselves for the Court and the record beginning with the plaintiff, please.

MS. GOLDSTEIN:  Elena Goldstein for the Democracy Forward Foundation for the plaintiffs.

MR. McGRATH:  Daniel McGrath for the Democracy Forward Foundation for the plaintiffs, your Honor.

MR. ANDERSON:  Michael Anderson, Murphy Anderson for the plaintiffs.

MS. SUSZCZYK:  Sara Suszcyk for National Association of Government Employees, Inc., plaintiff.

MR. HAMILTON:  Good afternoon, your Honor, Eric Hamilton, Deputy Assistant Attorney General, the Civil Division, Department of Justice for defendants.

MR. GARDNER:  Good afternoon, your Honor, Josh Gardner for the United States Department of Justice on behalf of the defendants.

MR. ALTABET:  Good afternoon, your Honor, Jason Altabet with the Department of Justice on behalf of the defendants.

MR. FARQUHAR:  Good afternoon, your Honor,

Ray Farquhar, United States Attorney's Office for defendants.

THE COURT: Good afternoon. The earlier submission was a request for a temporary restraining order. I think it's more proper now at this point where there's an issue joined on both sides that we can refer to it as a preliminary injunction question. I don't think there's any substantive difference with the label.

Everybody is being heard on both sides, just so there's no ambiguity about that. One thing -- never mind. For the plaintiff.

MS. GOLDSTEIN: Good afternoon, your Honor, and may it please the Court.

THE COURT: Good afternoon.

MS. GOLDSTEIN: And I represent the plaintiffs. Over the course of the last two weeks, confusion has reigned for millions of career civil servants after defendants rationally delivered an ultimatum to nearly all federal workers, resign within 10 days or face the prospect of unemployment without compensation.

OPM's directive, which they entitled, "Fork In The Road," stunning the architect. OPM issued it in federal fashion without even a cursory consideration or an analysis of which portions across hundreds of federal agencies were no longer needed or which positions were vital to government functioning or to the ramifications of continuing functioning

of government of a nearly unsolicited application for resignations.

What's more, the directive unlawfully committed the government to expending funds to pay for resigning employees six months past the conclusion of existing appropriations, and OPM continues to unequivocally assure employees that they will be paid for this time period if they resign, notwithstanding this administration's efforts to shutter existing agencies and uncertainty about forthcoming appropriations.

So to understand this slap shot about defendant's actions, one need only look at the constantly changing nature of OPM's guidance here and the representations to the employees that they are asking to resign, changes to the very contours of the program.

Take work requirements as one example, your Honor. At first, defendants informed millions of employees by mass email that they would be exempted from in-person, in-office work requirements until September 30th if they submitted a deferred resignation.

Within a day or two, employees were told that they would only have to work in rare, though unspecified circumstances, and days later, on February 1st, defendants shifted position yet again to say that, no, resigning employees would not have to work during their deferred resignation period, however, since just February 1st, this guidance

continues to change, and reporting has indicated that at the IRS, for example, employees, including those who have already accepted the deferred representation program, are being told that they must work until the middle of May.

These changes have been communicated to employees in uneven fashion, often just put in buried FAQs on OPM's website or in memoranda addressed to agency heads. But every indication from the past 10 days or two weeks suggests that defendants may continue to change the terms of their ultimatum right up until the last moment before the short fuse deadline that they've set for millions of workers today.

Plaintiffs in their role as unions, their core organizational mission is about counseling and advising their members and their affiliates, and plaintiffs have unsurprisingly been inundated with requests for guidance from their members and affiliates as a result of the shifting and chaotic process.

They've deferred unrecoupable resources responding to these inquiries and harmed their mission and the changing and slap shot guidance from defendants likewise undermines their ability to counsel their members, and they will lose more members if that exploding deadline is reinstated by the Court.

Today, as this deadline approaches --

THE COURT: Why would they lose more if the time is extended? There's more opportunity for people to change their

minds and sign up for it?

MS. GOLDSTEIN: Your Honor, the nature of the ultimatum is designed to, and as the facts in the record reflect, increase the number of those employees who accept this under the high pressure terms of just that two-week period.

As the evidence in the record reflects, those numbers have increased dramatically as that deadline comes to a point, and that is indeed the point of having only a two-week or 10-day period for employees to respond.

In addition, right now, employees don't know what they are accepting, and it is very likely that to the extent that plaintiffs are able to fulfill their organizational mission of providing clear advice and counsel about what it is that employees are actually accepting, that fewer folks, particularly accepted from this slap shot exploding deadline, would accept that offer.

Accordingly, your Honor, as this deadline approaches in mere hours, we ask only for modest relief that this Court continue to pause the deadline for folks to accept this deferred resignation offer and that defendants immediately communicate that stay to all federal employees.

In addition, we ask that defendants cease soliciting and encouraging other agents either directly or indirectly from through other agencies soliciting individuals to take advantage of this program while this Court considers the merits.

I'm happy to answer questions, your Honor, or go through some of the major questions in the case.

THE COURT: Go ahead.

MS. GOLDSTEIN: Thank you, your Honor. So one of the questions here, your Honor, is whether or not defendants have overcome the strong statutory presumption in favor of reviewability offered by the Administrative Procedure Act. They have not.

What defendants are arguing here is that Congress has implicitly precluded plaintiffs from bringing their action in federal court. They aren't arguing that Congress has expressly intended to staff them because they can't, and I think all parties agree that there is no expressed implication from Congress that plaintiffs's claims are precluded, so they're arguing that Congress impliedly intended this. That is incorrect.

This is a program of unprecedented magnitude that raises serious questions as to the rationality of eight OPM's decision-making and the legality of that decision-making that has caused a deluge of inquiries to plaintiffs's unions and irreparable harm to them as organizations.

This is not what Congress intended to preclude through the Civil Service Reform Act administrative schemes that it set up, and I think to understand that, it's helpful to talk a little bit about what Congress really did intend with respect

to those administrative schemes.

There are two of them under the Civil Service Reform Act or CSRA. The first is the Merits Systems Protection Board or the MSPB, so the MSPB is set up to hear claims from covered employees about covered adverse employment action, things like suspensions, terminations, demotions, and the like,

But plaintiffs here are not employees, they are organizations asserting harm to themselves in their capacity as organizations, and the claims here are not about covered employment actions or covered adverse employment actions, they are about the rationality of OPM's decision-making process, they are about the legality of that decision-making process.

And, indeed, defendants argue that there is no adverse employment action here at all because what they proffer is a benefit, not an adverse action, but these claims by plaintiffs are nothing like as in *Feds for Medical Freedom v. Biden*, the claims that are heard through the MSPB.

So what about the second scheme, that is the scheme involving the Federal Labor Relations Authority or the FRLA. The FRLA hears collective bargaining disputes between agents that employ employees and unions as their representatives of their members, of those employees employed by those agencies.

But, here, plaintiffs are asserting their claims are not in the representative capacity but as organizations that are being harmed and the agencies that they have collective

bargaining with, those are not in this case, and those, they cannot seek relief there.

This is a program that was promulgated by OPM, that OPM sent directly more than 2 million federal civil servants, and OPM directed those civil servants to reach directly back out to OPM. But plaintiffs don't have collective bargaining agreements with OPM, and OPM is not acting in the capacity as the employer of employees. These issues do not involve bargaining, they do not involve the collective bargaining relationship between agencies that employ employees and unions in their representative capacity.

And so for all those reasons, your Honor, this case is not precluded under just the first step of the *Thunder Basin* test. There is no indication that Congress impliedly intended these kinds of cases to go through the MSPB or the FRLA process, and maybe it's helpful to think about a hypothetical.

You can imagine a situation in which let's say the administration decides to shutter the Department of Education, and in so doing, fires all of the individuals who administer federal Pell grants. These are the low income financial assistance that goes to families to help their kids go to college.

Now, if you had a group of families that wanted to challenge the loss of those statutorily required grants, would they be precluded from going to federal court to challenge the

rationale of that decision just because it involved terminations from their upstream? No, your Honor, and so here, too.

Now, even if this Court were to conclude that the first step of *Thunder Basin* that Congress intended to preclude these kinds of plaintiffs in these kinds of situations from going into federal court and availing ourselves of jurisdiction, you go to the second step of the *Thunder Basin* test, and that is a three-question analysis, three equitable factors. All of them here weigh in favor of jurisdiction.

The first question is whether preclusion would take out all meaningful judicial review. First, for the reasons I just gave, that unions cannot avail themselves in their organizational capacity or against this defendant for these kinds of claims.

All of those reasons mean that there is no meaningful judicial relief, but there's a second reason why meaningful judicial review would be precluded absent jurisdiction, your Honor, and that is because of irreparable harm.

As the Supreme Court said in *Axon,* this is a here and now injury, and absent this Court's relief, that injury will be irreparable, and this is unlike the cases that defendants cite, like *Filebark* or *Jalbert.*

THE COURT: Say that again.

MS. GOLDSTEIN: *Filebark.* That was the case where

folks had filed a grievance of their low salaries and then they tried to relitigate those in federal court. There was a pathway for those claims to be heard, unlike here.

So, too, *Jalbert*. That was the case where the SEC, again, there was a pathway of relief that they could have followed through the administrative scheme but chose not to.

So, too, FLEOA. That's the case where the union waited three years to challenge an OPM regulation regarding retirement benefits, and the regulation and the statutory scheme again set up a procedure by which the union could receive and the individuals could receive review of that claim.

So, your Honor, the first factor, meaningful preclusion of judicial review weighs in favor of plaintiffs. So, too, do the last two factors, whether these claims are collateral to the agencies here and whether they are within the agency's expertise.

Defendants urge somehow that a factual record about a particular termination would ultimately help a court decide the merits of this action, but that can't be right. This is not about employees and those kinds of questions, this is about the rationality of OPM's process and the legality of it: Did OPM properly consider history? Did OPM do a proper analysis in sending out this mass resignation solicitation?

This is about the Administrative Procedure act, about the Anti-Deficiency Act, not statutes in which these agencies

have any expertise and not facts relating to individual employment actions.

Your Honor, I'm happy to answer questions about the jurisdictional issue, but if not, I will move on.

THE COURT:  All right, go ahead.

MS. GOLDSTEIN:  So your Honor asked a moment ago effectively a question about why we need a temporary restraining order right now and wouldn't an extension lead to an increase in the number of folks who are taking, who are submitting their deferred resignation?

I think that's not correct for a few reasons, and I think first it's helpful to review the kinds of irreparable harm that plaintiffs are here alleging, and there are three:

The first is that they have expended unrecoupable resources to respond to the deluge of inquiries regarding this deferred resignation program.

The second is that this has harmed their mission in two ways:

First, it has required diversion of resources away from other core organizational activities, like preparing for arbitrations and bargaining and the like.

And then, second, undermining their mission because they are not able to provide adequate and appropriate advice of counsel to their members and affiliates, again, a core organizational function because of the poor and shifting

information that they're receiving from OPM.

In this way, this case is on all fours with the *Havens Realty* case, which the Supreme Court cited favorably and the *Alliance for Hippocratic Medicine* cases.

In *Havens*, you have plaintiffs who are an organization that were providing counseling, as do plaintiffs in this case, regarding real estate transactions.  The harm that they alleged was they were receiving bad, in that case, racist information from the defendants that made it more difficult for them to adequately counsel their clients regarding their purposes of real estate.

It's strikingly similar to this one.  You have an organization, and we have an organization.  One of their core functions is providing advice and counsel, but defendants provisionally offer poor information or in this case also shifting information, which makes it impossible to fulfill that organizational mission effectively.

And then the third harm, your Honor, is the loss of membership that is triggered by the pressure that comes with that short-term exploding deadline, here, just two weeks for employees to decide a question about their livelihoods.

Now, without a temporary restraining order, your Honor, irreparable harm will continue for several reasons.  The first is that the questions will continue that individuals will be asking and affiliates will be asking plaintiffs what is it

that they actually accepted, what are the terms of this deferred resignation program, and that makes sense because OPM appears to be making this up as they are going along.

As set forth in our papers, the contours of this program continue to shift and have continued to shift even in the last several days.

And we can expect to the extent that your Honor would like to put this on for a preliminary injunction hearing after this, we would be happy to provide more factual development about the ways in which this guidance continues to shift.

Your Honor, in addition, defendants argue that this is not final agency action, but, here, two tests for final agency action, is it the consummation of the agency's process and do legal consequences flow?

Defendants don't dispute that this is the consummation of the agency's process, so the question is just whether legal consequences flow from The Fork Directive, and here legal consequences flow from the ultimatum. What the ultimatum does is it effectively divides the federal work force into two categories, two parts of the fork.

On the one hand, you have the folks who have accepted the deferred resignation offer and who are protected from rifts from layoffs and so forth.

On the other hand, for employees who do nothing, they are prioritized for those rifts. They are prioritized for

those layoffs, and in such a way, regardless of whether they accept an offer or not, legal consequence flow to them, but, in many ways, your Honor, defendants seek to have it both ways. One the one hand, they're saying that this program is not final agency action, that it has no effect, but for the tens of thousands of employees who have accepted this purported offer from defendants, they are bound to it, they have no unilateral right to rescind their resignations. They can request a resignation, but that does not remain in their control.

The cases that defendants cite are inapposite. You have the *Merrimack Bay* case, your Honor, which concerned agency consultation that was tentative by intention and was going to come later, come final agency opinion. That's nothing like this. There is no tentative nature about this program. Indeed, defendants repeatedly said that they will not, absent this Court's intervention, extend it or pause it in any way.

Likewise, the other case defendants cite, the California case, that was about an agency guidance document that had no legal effect for anyone. That's the opposite of what's happening in this case.

Your Honor, I will not belabor the arbitrary and capricious nature of defendant's actions. I don't think either that defendants are really disputing this, but I will just outline very briefly a couple of the categories of the arbitrary and capricious nature of their action, the first that

they have failed to consider the continued functioning of government in numerous respects, you know, seeking this broad solicitation of resignations without any analysis with respect to who will take it or who should be taking it or how to improve government functioning.

There's been recent reporting cited or cases about, for example, veterans hospitals and how veterans nurses, an in-demand profession, may well choose to go elsewhere leaving these hospitals without the staff that they need to function and to provide essential services.

Second, as I've already talked about the shifting contours of this program, even as they are asking employees to rely on this, quote, "serious questions about their livelihood."

Third, that it is inconsistent with the rules governing outside employment.

Fourth, that it's contrary to historical evidence, both with respect to how this Fork in the Road Directive worked with Elon Musk's private program and private business as well as the historical evidence that when the government wants to downsize, there are ways to do this correctly, to do this with study and analysis and Congressional approval, none of which happened here in the two weeks that they have tried to run this program.

Fifth, that this program, the deadline is arbitrary.

And, lastly, that this is pretext to remove individuals and fill them, fill these positions with folks who are ideologically aligned with this administration.

Next, your Honor, plaintiffs allege that this program violates the Anti-Deficiency Act. They have made an unequivocal promise to individuals who have accepted the deferred compensation offer that they will be paid through September, even past the expiration of the existing appropriations, so that promise is still on the front page of OPM's website, "You will be paid." They continue to double down on that representation.

If you look at their FAQ, your Honor, there's a question that says, "Will I really be paid?" The answer on the FAQ is yes. Now, that is a promise that they cannot make because they cannot -- because the ADA prohibits obligating money like this in the absence of an appropriation, and it's not how other employees are treated.

Typically employees do work for the government for many years as appropriations change, but when Congress does reduce appropriations or does not provide adequate funding for the government, agencies are forced to furlough individuals, agencies are forced to do reductions, but what defendants have done by making this unequivocal promise to this subset of individuals is to say that they will be exempted from all that.

That's not a promise that they can make. It's not a

promise that Congress is bound by, particularly in light of the fact that defendants are suggesting that some of these agencies be shuttered particularly in light of the fact that Congress may not want to pay workers for doing no work and particularly in light of the purpose of the Anti-Deficiency Act, which is precisely to avoid the executive putting pressure on Congress because they have already obligated funds in the absence of an appropriation.

Your Honor, I am happy to distinguish their cases if that would be helpful or happy to let opposing counsel go and respond after they've gone.

THE COURT:  Go ahead.

MS. GOLDSTEIN:  Sure.  So defendants cite a whole host of cases, mostly arguing that this Court should not exercise jurisdiction here, but those cases have no applicability, largely because they apply in situations involving adverse employee actions and also because they do not involve situations where plaintiffs's labor unions are proceeding in a representative capacity.

The case they seem to rely upon the most is *AFGE*, but that case, which is not binding on this Court, is inapposite for several reasons:

The first is that it did not include an APA claim, and the Administrative Procedure Act includes a presumption in favor of this Court's reviewability.

Indeed, I don't think any of their cases in which defendants rely rely on an Administrative Procedure Act claim and with it its presumption of judicial reviewability.

Second, *AFGE* did not involve unions in their organizational capacity, only in a representational capacity.

And, third, in that case, plaintiffs conceded that they were bound by *Thunder Basin,* Step 1 of the test, so plaintiffs actually conceded that Congress intended them to be precluded unless an exception applies from judicial review.

And, fourth, that case involved a whole host of executive orders that were both to be implemented by agencies, the agencies with which the unions have collective bargaining contracts, unlike this situation, which is about OPM and not about the collective bargaining rights of individual agencies, and those executive orders at issue were specifically targeting and about the collective bargaining process.  They were about official time and similar kinds of issues, not about this government-wide solicitation of resignations, nothing like this case here.

And *AFGE v. Air Force*, your Honor, this is a dress code where a court held that there was no jurisdiction, and that makes sense.  With a dress code that was held by one agency, that union could have filed a grievance or could have filed other claims against that agency and obtained relief, but that's not the case here, where OPM, not the agencies with whom

these defendants contract, OPM is the one that is sending out the directive and is promulgating the directive.

*FLEOA* that I previously mentioned involved waiting three years before folks filed a review request and where the agency scheme had a specific way in which relief could be obtained. I think one case that defendants don't grapple with at all is *NTEU vs. Devine.* This is a case in D.C. Circuit where a union brought a claim, a pre-enforcement challenge like this one to an OPM regulation on appropriation grounds like this, and the D.C. Circuit held that there was jurisdiction.

This case is talked about at length in the *Feds For Medical Freedom v. Biden* case, another case which defendants do not grapple and which stands for the proposition that where government action may have employees somewhere in the background but is not about covered employees challenging covered adverse employment actions, then Congress did not intend preclusion to apply.

Now, one of defendant's main arguments is that, sure, plaintiffs as unions cannot go to these administrative tribunals, but that suggests even more that Congress didn't want them to be heard or to obtain any relief at all, and they cite a number of cases for that proposition, but those cases are all about claims that are coherently inside the CSRA scheme.

So, for example, *Fausto*, that case involved an

individual suspension. Now, if that individual -- that individual did not have procedural due process rights, could not go to the MSPB, it's true, and so the Court held that that individual was precluded from going to federal court because then they would have even more rights than if they were just in a slightly different category of employee within that CSRA program.

It is very different from plaintiffs's challenge to what we are hearing is the directive toady. Plaintiffs are not employees. They are not challenging agency action, and they are not challenging covered adverse employment actions.

Likewise, *Elgin* on which defendants rely, this was a termination for individuals terminated because they didn't want to comply with the statute, but those individuals were challenging their adverse employment action, not a government-wide policy promulgated by a separate agency as this one.

And the last one, the *Gordon v. Ashcroft* case, this is the FBI case that involved a letter of censure, that individual couldn't go to the MSPB because the MSPB was too low of a -- not harmful enough or big enough adverse employment action, but, again, you had a covered employee and the kind of action that was contemplated by the MSPB and by Congress in promulgating the CSRA. That is not what you have here.

The last case that I'll mention, which I don't think

is cited in defendant's brief but may come up today is the *Payne* case. That case also considered President Biden's vaccine mandate case, as did *Feds For Medical Freedom* vs. Biden.

Now the Fifth Circuit in *Feds for Medical Freedom v. Biden* concluded that there was jurisdiction including for a union proceeding in its representative capacity because plaintiffs were challenging a government-wide program about vaccines, that it was not about the covered adverse personnel action.

The D.C. Circuit in contrast held that jurisdiction would be precluded, but, there, the plaintiff there, Mr. Payne, was precluded, premised his standing on the fourth coming adverse employment action that he would experience if this policy went into effect, so meaningfully distinguishable, and, in addition, we would argue that the Fifth Circuit has the better of this argument.

Your Honor, I'm happy again to answer questions following opposing counsel's presentation.

THE COURT: All right. Thank you.

MS. GOLDSTEIN: But thank you.

MR. HAMILTON: Good afternoon, your Honor. My name is Eric Hamilton. This Court should deny plaintiffs's motion, but before getting into the arguments that support that outcome, I thought I would take a moment to talk about the voluntary

24

resignation program, why it exists and how it operates.

President Trump campaigned on a promise to reorganize the federal work force, and shortly after taking office, he made two important announcements to the federal work force. One, he announced a change to the remote work policies that had been in effect and said that much of the federal work force would be required to return to in-person work.

Second, he announced he'd be reducing the overall size of the federal government work force and that there would be reductions in force in some federal agencies and departments.

We understand that these announcements may have come as a disappointment to some in the federal work force, and so the voluntary resignation program offers a humane off-ramp to federal government employees who might have structured their life around having a remote work opportunity.

This gives those employees seven months to seek new employment that might still be remote work without having a change to their federal salary and benefits, and we also understand that the announcement of a reorganization of the work force may have come as a disappointment.

Employees not wanting to deal with the uncertainty of that have this also as a main off-ramp to have the certainty of no change to their salary and benefits during the programming.

Turning to the motion, your Honor, this is the rare motion for a temporary restraining order that I think does not

require the Court to even get to the four-element *Winter* test, and the reason is that the relief that plaintiffs propose is legally incoherent and at odds with their theory of their case.

Your Honor, plaintiffs are asking the Court to hold that it is likely that the voluntary resignation program is unlawful, and on that premise, to extend the program out into time. That does not make any sense, and the Court should not consider that possibility. In addition, it is a fundamentally inequitable outcome.

Plaintiffs's complaint signals that their plan for the case is for the Court to vacate the voluntary resignation program. In other words, plaintiffs want the Court today to hold open the program, allow continued participation in the program only so that at the end of this case, all of that can be wiped away. That would be inequitable.

Turning though to the four-element test under *Winter* that controls requests for preliminary equitable relief, I want to start with irreparable harm because it is the element that is most obviously absent here.

Plaintiffs claim irreparable harm in the form of the questions that they're receiving from their members about how the program works, and they also worry that the program will result in more uptake and then those individuals who choose to participate will decide to end their membership in plaintiffs's unions.

Well, both of those harms would only increase if the Court enters a temporary restraining order that extends the program out into time.  It would not mitigate that harm.  In addition, I think recognizing the fundamental flaws in their proposed temporary restraining order, plaintiffs have attempted to rework their request in their reply brief attaching to that reply brief a brand new proposed TRO that also asks the Court to enjoin defendants from soliciting participation in the program.

Your Honor, that proposal is forfeited, arguments raised for the first time in a reply brief are forfeited, and that is only more true for new proposals for injunctive relief that are raised for the first time in a reply brief.

The proposal that plaintiffs make also doesn't make any sense.  They never explain why the Court should act to stop the defendants from soliciting participation in the program but at the same time require defendants to continue to operate the program and permit participation in it.

This suggestion also raises administrability problems. It isn't clear exactly what would and would not qualify for defendants as soliciting resignations.  For example, would answering questions about the program to federal government employees constitute solicitation?

I'll turn next to the likelihood of success on the merits.  The plaintiffs lack standing here, and I would note

that there's a decision from just Friday on the standing of one of the plaintiffs here, which is the AFL-CIO. This is in the Federal District Court in Washington D.C., and because it's a decision that came after we filed our brief, I'm just going to read it into the record of the case caption. It's AFL-CIO, Department of Labor, Number 1:25-cv-339.

On Friday, Judge Bates held that the AFL-CIO lacked organizational standing to challenge the Department of Government Efficiency's access to Department of Labor data based on the loss of trust with members. The union there claimed that this would result in some change of trust, but that's a very similar theory standing with the one that plaintiffs are relying on today.

They rely on this diversion of resources theory that they are receiving questions about the program, and as a consequence, that is diverting resources. The most important authority on that is the U.S. Supreme Court's very recent decision in *FDA against Alliance For Hippocratic Medicine*. There, an organization similarly claimed that the FDA's approval of a drug would require that organization to study the drug and then for the organization to provide information to its members about that drug's risk.

U.S. Supreme Court held that was not a valid theory of standing, and if that were the case, organizations could will themselves into becoming plaintiffs in federal litigation

through their own conduct, and it's a similar theory to the one plaintiffs rely on here.  Their voluntary choice to provide information to their members, it's a self-inflicted harm like the *Clapper* case, and there also is no limiting principle on plaintiffs's theory for standing.

If this really did suffice for standing, changes to, for example, the general schedule pay scales, timekeeping rules, travel and reimbursement policies, and ethics rules would all become reasons for unions to bring litigation in federal trial courts on the idea that those changes generate questions to the union from its members and that those policy changes could conceivably cause employees to leave federal employment and then the unions.

In the end, the unions are the wrong plaintiffs.  To the extent federal employees are disappointed with their participation in the voluntary resignation program and have legal claims to submit, those claims should be run through the statutes that Congress established in the CSRA and FSLMRS, which turns to the jurisdictional question on which there is substantial briefing from both sides.

This Court lacks jurisdiction because CSRA and the FSLMRS implicitly preempt plaintiffs's claims.  I won't repeat our briefing on that, but I'll just highlight that at bottom. Our argument is that it is absurd that the Congress developed these carefully created schemes for the litigation of claims

between federal employers and their employees about workplace conditions and rules but that Congress would also have wanted federal employee employment unions to be able to come into court on the allegation that they have received questions from their members about a policy and initiate litigation in any federal trial court of their choosing.

Turning to the APA, there is no final agency action here, which is a requirement for every APA action, and that is because the voluntary resignation program does not impose a right or obligation on anyone.  That standard is met when something basically has the status of law and a right or obligation would only happen in this context once an employee's participation in the program has been finalized.

Next is the Anti-Deficiency Act.  Two points on this, your Honor.  Nothing about the voluntary resignation program changes any of the federal government's financial obligations, it simply changes what employees are expected to do or not do during their period of federal employment.

If plaintiffs were right about the Anti-Deficiency Act's application here, your Honor, it would mean that today in February, the federal government could not make an offer to an employee to begin new employment in April, and that offer could not say that an employee would receive a salary from the Federal Government.  Surely, that is not the case.

Our second point on the Anti-Deficiency Act is that

compliance with the Anti-Deficiency Act is, of course, implicit in contracts and also the government's representations about the voluntary resignation program. Irreparable harm is another factor under the *Winter* test. Plaintiffs cannot show irreparable harm here because, if anything, the injuries that they claim would only be exacerbated by entry of a temporary restraining order.

The voluntary resignation program was slated to end the day after plaintiffs filed a lawsuit and sought a temporary restraining order. It is only open today because plaintiffs filed this lawsuit. If no injunctive relief is entered, the program will close, and plaintiffs's complaints about the questions they are receiving and the possibility of members joining and leaving their unions will end.

Finally is the balance of the equities as well as the public interest. Both of these elements favor the defendants. Your Honor, equitable relief here would be enormously disruptive for the federal government. The OPM plans to take next steps in its reorganization once this program closes. It needs to close to move forward with its plans, and it also needs this program to close for OPM to engage in the planning that is required to rebalance and reorganize the federal work force.

OPM needs to know who is not and who is not going to participate in the program, and it can't have the answer to

that question as long as this remains open.

Equitable relief would also be hugely disruptive for federal employees. OPM has always expected that most of the uptake would happen in the last 24 to 48 hours of the program, and holding the program open in time into the future would only inject more uncertainty into the program.

Finally is the President's Article II powers in this space because this is in the end a policy about the federal government managing its work force, and for plaintiffs to remake this program into something of their own choosing with a longer participation period and where OPM is prohibited from soliciting participation but must receive participation, that is an intrusion on the Article II interests at stake here.

I'm happy to answer any of your Honor's questions. If there are none, I just conclude by asking the Court to deny plaintiffs's motion.

THE COURT: All right. Thank you. Briefly.

MS. GOLDSTEIN: Thank you, your Honor. Just a few points with respect to opposing counsel's arguments here. First, defendants claim that the plaintiffs have forfeited the ability to request the relief that they now seek, but plaintiffs would have no way of knowing at the time that we filed our initial TRO and at the time that the Court ordered that plaintiffs were enjoined from implementation of the directive that they would use that opportunity to further

32

pressure employees into taking the deferred resignation offer.

In fact, that's exactly what they did.  The emails went out from OPM and from their surrogates notifying employees that this directive had been extended and soliciting and encouraging and seeking additional resignations.

Your Honor, that is why plaintiffs are seeking additional relief here because it is plain that OPM, not plaintiffs, is seeking to use any additional relief to put additional pressure on employees, something that will cause additional irreparable harm to plaintiffs.

Second, your Honor, they cite the TRO from Judge Bates.  I will read from that decision right here. Judge Bates states that, "Nowhere does the record state that the union in question or any other plaintiff will use its resources to counteract the harm caused by the defendant's challenged conduct."  That is in direct contrast to numerous paragraphs of plaintiffs's verified complaint.

Next, Judge Bates's decision notes that nor does plaintiffs's motion even allege that any of them will divert resources.  Again, that is in direct contrast to the allegations that plaintiffs have raised here.  That TRO denial has no bearing on plaintiffs's allegations in this case in which we have outlined very specifically the harm that plaintiffs will experience absent a TRO.

Second, your Honor, they argue that plaintiffs, or,

third, they argue that plaintiffs lack standing, that the plaintiffs are essentially spending their way into standing in this case, and they cite the *Alliance for Hippocratic Medicine* case, but that case was different.  That organization did not have organizational business streams.  They were an organization that was solely an advocacy organization in contrast with the *Havens* plaintiffs that had as one of their core business functions providing advice and counseling.

Here, this is not a self-inflicted harm.  Plaintiff unions have a duty to provide advice and counsel, a duty of fair representation to their members, and a duty to provide these services to their affiliates, and this is something that these unions have been doing for many years.  It is part of their core business function, and it is that core business function, one of them that is being undermined here.

And the issue here is not that plaintiffs object to getting questions or counseling their members or affiliates, that is what they do, that it is a part of what they do, but what they are experiencing now in an unprecedented two-week period, where defendants have put this explosive offer concerning their members and employees's very livelihoods, and given them just days to make that decision, and then repeatedly change the guidance as to what was being offered day by day as that offer continued.  That is a different situation than the vast majority.

And that is part, your Honor, why they're concerned that this would somehow result in circumventing standing, unions turning up to challenge every little thing is not the case.

The question of injury and fact is an essential part of this test, and in the vast majority of typical cases, unions as organizational plaintiffs will not be able to show that they have suffered organizational harm, but this case is not typical, your Honor, this is an unprecedented program promulgated not by agencies but by OPM under a short two-week deadline that has caused harm to the plaintiffs as organization.

Your Honor, I believe I've adequately covered jurisdiction, but I do want to talk for a moment about their Anti-Deficiency Act argument. They're saying that their action here does not change the federal government's obligations to employees, but that is not what they are telling employees, and that is not the agreement that individuals are accepting.

Their website, even now, in the FAQ asks, "Will I really get paid?" The answer to that is an unequivocal yes, your Honor. That is not how regular employees are treated. You may make a job offer to someone to start in April, but the form job offers that I've received from the federal government say that that is subject to appropriation, and as we've seen, the federal government has shown no reluctance to rescind job

offers from individuals before they've actually started, even not subject to appropriations.  They are prioritizing these individuals and putting them in a separate category and saying that they will receive all of their benefits and pay through September 30th in an unequivocal fashion.  That is what the APA recognizes.

Lastly, your Honor, or almost lastly, your Honor, they make the same argument with respect to irreparable harm that it will only be exacerbated here, but here, as defendants have just conceded in their argument, they anticipate that in the last hours of the program, they will receive the most uptick to the program.

That concession alone, your Honor, is sufficient to find that there is irreparable harm if this Court reinstates that deadline now.

In addition, they overlook the constantly changing guidance that means that even if there is no injunctive relief, we're effectively locking in and continuing the harm that plaintiffs will continue to get questions about what it is that folks agreed to, questions about what they've accepted, and they will not be able to counsel folks effectively.

The last argument or the second to last argument, your Honor regards balance of equities.  They say that it will be enormously disruptive to the government to extend the deadline on this case.

Defendants have no right to rush out a program in two weeks that does not comply with requirements of reasoned agency decision-making and the Anti-Deficiency Act, and, in fact, the public's interest in the smooth functioning of government, particularly in light of this conduct, cuts against that argument.

The last argument they make is a new argument with respect to the President Article II arguments that does not appear in this brief. We would argue, as they do, that that argument would be waived, but even if it were not, your Honor, it is irrelevant.

This case is not about executive power, this case is about agency action, and agencies under the APA are held to requirements of reasoned decision-making. This is also, their argument also ignores the fact that Congress has had a lot to say with respect to how the federal workplace works and what rules govern that, both with respect to requiring agencies like OPM to be bound by the Administrative Procedure Act and by the CSRA itself, which sets a host of requirements and due process protections and others on employees and on the federal workplace.

Your Honor, in conclusion, this is an unprecedented action taken on an unprecedented timeline that is causing serious and irreparable harm to plaintiffs in their capacity as organizations, and we ask that this Court enjoin that action

here.

THE COURT:  I'll give you a brief response if you want.

MR. HAMILTON:  Thank you, your Honor.

THE COURT:  I can see you looking that way.  Emphasis on briefly.

MR. HAMILTON:  Yes, two very quick points.  One on the scope for relief in the temporary restraining order.  Plaintiffs suggested that there's no way that they could have known that the OPM and Mr. Ezell would have implemented the Fork In The Road Voluntary Resignation Program after your Honor entered his Thursday order orally, but I will just read from the proposed temporary restraining order, Docket 11.1.  They wanted the February 6th deadline for federal employees to accept the directive stayed, which is exactly what defendants did, and the attachment to their reply brief is a revision of that request.

On the DDC decision of Judge Bates on Friday, the theory that Judge Bates rejected is very similar to the reputational harm that plaintiffs are claiming here that their questions and need to answer them is going to negatively affect the reputation they have with union membership.

And, finally, I just wanted to respond to some of plaintiffs's questions about how the program works by explaining that the Telework Enhancement Act gives the federal

38

government substantial discretion in determining who is and who is not subject to an in-office work policy, and, as I said, nothing about financial obligations of the federal government is changing, instead it is that work responsibilities are eliminated for those who choose to participate, and that is carried out by placing employees on administrative leave.

There's additional discussion of this in the February 4th OPM memo, of which there is a hyperlink in our brief.

And, finally, I would just ask your Honor about comments that your Honor shared at the beginning of the hearing and the status of this and that your Honor is converting the requests for a TRO to a preliminary injunction?

THE COURT:  Well, sort of.  The TRO will continue until I resolve the issues that are presented, but I guess what I was saying, this is equivalent to a preliminary injunction because it's thorough, it's contested, and so on, so it's not converted right yet, but after something happens in the order, it may or may not, depending.

MR. HAMILTON:  Thank you for that clarification, your Honor.

THE COURT:  A little mix-up in the terminology, I guess.  We'll be in recess, thank you.

THE CLERK:  All rise for the Honorable Court.

(Whereupon, the hearing was adjourned at 3:00 p.m.)

39

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS ) ss.

CITY OF BOSTON )


          I do hereby certify that the foregoing transcript, Pages 1 through 39 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 25-10276-GAO, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO vs. CHARLES EZELL, ACTING DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

          Dated February 11, 2025.


                         s/s Valerie A. O'Hara

                         _____

                          VALERIE A. O'HARA

                          OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-10276-GAO

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN
FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, LOCAL 3707; AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; and
NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.,
Plaintiffs,

v.

CHARLES EZELL, in his official capacity as Acting Director of the Office of Personnel and
Management, and OFFICE OF PERSONNEL MANAGEMENT,
Defendants.

OPINION AND ORDER
February 12, 2025

O'TOOLE, D.J.

The plaintiffs, several labor unions representing federal employees, have moved to restrain the Office of Personnel Management ("OPM") and Charles Ezell, the acting director of OPM, from enforcing the deadline by which federal employees may accept OPM's "Fork in the Road" directive, which has been stylized by the plaintiffs as the "Fork Directive." That directive permitted certain federal employees in the executive branch to resign their positions effective September 30, 2025, but also permitted employees who took up the offer to cease active work in their respective agencies and still be paid their existing salaries through the end of the fiscal year. In addition, those employees would be free to pursue other remunerative employment outside of the executive branch if they wished.

On January 28, 2025, OPM sent an email to nearly all federal employees in the executive branch announcing the directive. As originally announced, the opportunity to accept the offer was

to expire as of February 6. (Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork.)

The plaintiffs commenced this action on February 4, 2025, seeking to challenge the legal basis of the directive through two claims asserted under the Administrative Procedure Act ("APA"). The next day, the plaintiffs moved for a temporary restraining order to stay the directive's February 6 closing. The defendants oppose this motion. On February 6, the Court ordered the defendants to refrain from enforcing the deadline until further order of the Court. A hearing on the merits of the motion was held on February 10.

A plaintiff seeking a temporary restraining order or a preliminary injunction must establish four familiar elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm to the plaintiff in the absence of preliminary relief, (3) a balance of pertinent equities tips in plaintiff's favor, and (4) that the requested injunction would be consistent with the public interest. Together Emps. v. Mass. Gen. Brigham Inc., 32 F.4th 82, 85 (1st Cir. 2022) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). The last two factors "merge when the Government is the party opposing the preliminary injunctions." Nken v. Holder, 556 U.S. 418, 435 (2009). Here, the plaintiffs have not established that they are likely to succeed on the merits.

The plaintiffs are unable to succeed on the merits of their two APA claims because they lack Article III standing and because this Court does not have subject matter jurisdiction over the claims asserted.

First, the unions lack standing to challenge the directive. Standing requires the plaintiffs to be more than "mere bystander[s]" and instead requires a "personal stake in the dispute." Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 379 (2024) (quotations omitted). Further, the Supreme Court recently held that an organization that is not directly affected by an agency's

2

actions cannot establish standing simply by "divert[ing] its resources in response to a defendant's actions." Id. at 395. The plaintiffs cannot manufacture standing through self-inflicted harms. See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013).

The plaintiffs here are not directly impacted by the directive. Instead, they allege that the directive subjects them to upstream effects including a diversion of resources to answer members' questions about the directive, a potential loss of membership, and possible reputational harm. The unions do not have the required direct stake in the Fork Directive, but are challenging a policy that affects others, specifically executive branch employees. This is not sufficient. Just as the Court found that the plaintiffs in Hippocratic Medicine could not spend their way into standing, neither can the plaintiffs in this case establish standing by choosing to divert resources towards "respond[ing] to tremendous uncertainty created by OPM's actions" and away from other union priorities. (Pls.' Mem. in Supp. of TRO 17.) Moreover, a loss of membership dues to the unions is not certain before the September 30th deadline.

Second, this Court lacks subject matter jurisdiction to consider the plaintiffs' pleaded claims. While not binding on this Court, the decision in Am. Fed'n of Gov't Emps., AFL-CIO v. Trump ("AFGE") is instructive. 929 F.3d 748 (D.C. Cir. 2019). In that case, the court held that the plaintiff-unions' claims fell within the Federal Service Labor-Management Relations Statute's ("FSL-MRS") scheme and therefore the district court lacked jurisdiction to hear the case. Id. at 754. In so deciding, the court walked through the two-part Thunder Basin framework. Id. ("Under that framework, Congress intended that a litigant proceed exclusively through a statutory scheme . . . when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." (citations and quotations omitted)).

3

The D.C. Court of Appeals ruled that the first Thunder Basin step was satisfied because the FSL-MRS "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims." Id. at 755 (quoting Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force, 716 F.3d 633, 638 (D.C. Cir. 2013)). This is also the case here. Congress intended for the FSL-MRS and the Civil Service Reform Act of 1978 ("CSRA"), of which the FSL-MRS is a part, to provide the exclusive procedures for disputes involving employees and their federal employers and disputes between unions representing federal employees and the federal government. According to this complex scheme, disputes must first be administratively exhausted before the employing agency and the relevant administrative review board and any further challenges are properly heard in a court of appeals. See id. at 752 (citing 5 U.S.C. §§ 7105(a), 7123(a), (c)); 5 U.S.C. § 7703(b). Therefore, the first Thunder Basin step is satisfied because Congress intended the FSL-MRS and CSRA to preclude district court review.

The second Thunder Basin step involves determining whether the plaintiffs' claims are of the type Congress intended for review within the statutory scheme. Again, the AFGE decision is illustrative. In that case, the court found that the plaintiff-unions' claims were of a type intended for review by the circuit court because (1) the unions had the possibility of meaningful judicial review even if they were required to go through the statutory scheme; (2) the claims were not "wholly collateral to the statutory scheme;" and, (3) the claims were not beyond the reviewing agency's expertise. AFGE, 929 F.3d at 755.

The two APA claims alleged in this case are the type of challenges Congress intended for review within the statutory scheme, which provides for "administrative and judicial review." See id. at 752; Parrott v. Merit Sys. Prot. Bd., 519 F.3d 1328, 1334–35 (Fed. Cir. 2008) (reviewing a Merit Systems Protection Board decision regarding an allegedly involuntary resignation).

Aggrieved employees can bring claims through the administrative process. That the unions themselves may be foreclosed from this administrative process does not mean that adequate judicial review is lacking. See AFGE, 929 F.3d at 756; cf. Sackett v. EPA, 566 U.S. 120, 130 (2012) ("Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not subject to the administrative process, is strong."). The second and third factors are also satisfied. See Elgin v. Dep't of Treasury, 567 U.S. 1, 23 (2012) (finding that a constitutional question was within the agency's expertise because threshold questions about employment and routine statutory interpretations may be "brought to bear" to resolve the challenge); Sec'y of Air Force, 716 F.3d at 638 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts. Rather, it means that National AFGE may not raise the claim at all.").

For the foregoing reasons the temporary restraining order previously entered is DISSOLVED and further preliminary injunctive relief is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

5

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
80 F Street N.W.,
Washington, D.C.  20001,

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO,
1625 L Street, N.W.
Washington, D.C.  20036,

and

NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, INC.,
159 Thomas Burgin Parkway
Quincy, MA  01269,

                        Plaintiffs,

      v.

CHARLES EZELL, in his official capacity as
Acting Director of the Office of Personnel
Management,
1900 E Street, N.W.
Washington, D.C.  20415,

and

OFFICE OF PERSONNEL MANAGEMENT,
1900 E Street, N.W.
Washington, D.C.  20415,

                        Defendants.

Case No. 1:25-cv-10276

**AMENDED COMPLAINT**

1

2885998

# AMENDED COMPLAINT

Plaintiffs American Federation of Government Employees, AFL-CIO ("AFGE"), American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"), and National Association of Government Employees, Inc. ("NAGE") bring this action against the Office of Personnel Management ("OPM") and the Acting Director of OPM and allege as follows:

1. The Office of Personnel Management's January 28, 2025 decision to offer a purported "deferred resignation" program to federal career employees was the opening salvo in this Administration's unlawful campaign to usurp agencies' Congressionally delegated powers in its pursuit of drastically reducing the nonpartisan career civil service upon which this country has depended and under which it has thrived for more than 140 years.

2. The continued success of government is based, in large part, on the institutional memory of its career civil servants who are committed to the missions of their agencies and the prospect of working for the American people. These civil servants are professionals and subject matter experts, many of whom have worked diligently and impartially through successive administrations of both major parties to implement changing administration priorities. The departure or expulsion of these employees *en masse* and without reasoned consideration deals this country a dangerous one-two punch.

3. First, the government loses expertise in the complex fields and programs that Congress has, by statute, directed the Executive to faithfully implement. The government will have fewer qualified employees to execute the statutorily required tasks that still remain.

4. Second, when vacant positions become politicized, as this Administration seeks to do, political partisanship is elevated over competence, experience, and facts, to the detriment of agency missions and the American people. That is why Congress, since 1883, has established rights and processes for protecting these employees from undue political influence and has granted

2

2885998

employees who have completed a probationary period, or prior applicable service, protections from termination.

5. The Administration has purported to wipe away longstanding civil service protections and merit system principles mandated by Congress with strokes of a pen. On Inauguration Day, the President signed an executive order, quickly followed by an OPM memorandum, that would make it possible for him to convert large swaths of the civil service to at-will employment, in contravention of the Civil Service Reform Act ("CSRA") and OPM regulations. *See* 89 Fed. Reg. 24982 (Apr. 9, 2024). The President signed an executive order declaring that career members of the Senior Executive Service serve at the pleasure of the President, even though Congress specifically granted these civil servants adverse-action rights. *See* 5 U.S.C. §§ 7541–43. Daily, the President is also attempting to eliminate offices, programs, and full agencies that are supported by Congressional appropriations and tasked by Congress with specific functions.

6. In line with these efforts, on January 28, 2025, Defendants sent federal employees an email titled "Fork in the Road," offering employees what they called a "deferred resignation . . . program"—a termination program that purports to grant workers the ability to resign now and retain all pay and benefits until September 30, 2025. *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited March 15, 2025) (hereinafter, "the Directive" or "the Fork Directive").

7. The Fork Directive did not originate with federal employees' supervisors, or even from their respective agencies. Rather, it was a government-wide missive that OPM sent to more than two million federal employees across all sectors and agencies within the federal workforce.

2885998

8.      Employees were initially given a little more than a week, until February 6, 2025, to accept or reject the offer. *Id.*

9.      To leverage employees into accepting the offer and resigning, the Fork Directive threatened workers with eventual job loss in the event that they refused to resign. OPM stated that "the majority of federal agencies are likely to be downsized through restructurings, realignments, and reductions in force," and Defendants "cannot give you full assurance regarding the certainty of your position or agency." *Id.*

10.      The Court temporarily extended this short-fuse deadline in response to the Plaintiffs' motion for a temporary restraining order ("TRO"). When the Court dissolved the TRO on February 12, OPM—without warning or advance notice of any kind, to this Court, to the Plaintiffs, or to any federal agencies or workers—closed the program.

11.      Federal employees were right to feel threatened by the email—within hours of the end of the sign-up period for the Fork Directive, Defendants fired tens of thousands of federal workers *en masse*. Days later, OPM emailed most remaining federal workers, demanding they defend their professional worth in a few short bullet points, and again threatening termination if they did not comply with the short-fuse deadline.

12.      The Fork Directive is a final agency rule and a government-wide OPM program. Only OPM is responsible, and only OPM can be held accountable. OPM did not receive input for the Directive's development, implementation, or execution from any other employing agency. Agencies were caught off guard by the initial announcement, unable to answer their workers' questions as they struggled to address their own concerns about critical staffing shortages and other consequences created by the rash enactment of this program.

2885998

A120

13.     Compounding the problems with the Directive, OPM failed to comply with even the most basic legal requirement: notice and comment rulemaking. Had OPM taken the time to publish notice in the Federal Register, accept and review comments, and wait the required period before implementation, Plaintiffs and their members would have been able to provide comment, seek answers, be subject to a fully thought-out program, and prepare for reductions to the federal workforce consistent with the rulemaking process Congress has contemplated and approved.

14.     This failure was intentional. OPM and its Acting Director sought to sow chaos and create confusion and fear to push workers to leave the federal government. They did so by implementing a program that was arbitrary and capricious in almost every regard: they (1) failed to consider possible adverse consequences to the continuing functioning of government by providing a termination program to millions of federal employees at once; (2) offered conflicting information about employees' rights and obligations if they accepted the government's offer; (3) violated longstanding rules and requirements for federal employees; (4) acted contrary to reasoned practices of government restructuring; (5) ignored history and practices around effective workforce reduction; (6) set an arbitrarily short deadline; (7) imposed an arbitrary eight-month period for continuation of pay and benefits; and (8) acted on a pretext for removing and replacing government workers on an ideological basis.

15.     The Fork Directive is also contrary to law. There is no statutory basis for OPM's proposal. Though Congress created two separate legal procedures for downscaling the federal workforce—the reduction in force ("RIF") procedure and the voluntary incentive payment plan—OPM used neither. Nor could it. OPM does not have the statutory authority to terminate non-OPM workers or guarantee them pay for no work.

5

2885998

16.    Further, at the time of implementation, Congress had appropriated no money for the Directive; the program offered to pay workers through September 30, 2025, yet the appropriation for most federal agencies expired six months prior. The Antideficiency Act forbids such a guarantee. And while Congress passed and the President signed a Continuing Resolution on March 15, 2025, it did not clearly appropriate funds specifically for the Fork program.

17.    The Fork Directive also exceeds statutory authority and is *ultra vires* in violation of the Administrative Procedure Act and the Constitution. Congress granted each agency, not OPM, the power to terminate employees and create and implement separation plans. Congress has never granted OPM the power to commandeer funds appropriated by Congress to other agencies, or to commit those agencies to paying the salaries of non-working federal employees for eight months.

18.    Plaintiffs are labor organizations that collectively represent more than 800,000 federal civil servants. Plaintiffs bring these claims on behalf of themselves and on behalf of their injured members. Plaintiffs have a direct interest in ensuring that their members make informed decisions about their employment and that the ability to make those decisions is not compromised by an irrational and illegal offer made on such an arbitrary and compressed timetable. Plaintiffs also seek to vindicate the financial, emotional, and reputational injuries suffered by their members as a result of this Directive—interests that are critical to Plaintiffs' missions to protect and advocate for the workers they represent.

19.    Plaintiffs' members—employees across multiple federal agencies—are suffering ongoing injuries from OPM's Fork Directive and its unlawful, chaotic rollout. Some signed up for deferred resignation yet were treated inconsistently with the Directive, including by being subsequently fired. Likewise, others accepted the offer and informed their teams, only to have their

6

2885998

eligibility for Fork revoked and their professional standing and reputations unalterably damaged. Still others wanted to accept the offer to resign but could not obtain basic information about whether their benefits, such as parental leave, would be affected, whether they could take second jobs, or whether the program was even lawful (it's not).

20. Plaintiffs are routinely called upon to advise both their federal employee members and other Plaintiff-affiliated unions who directly represent federal employees. They are—still— unable to render dependable advice because basic information was and is absent from the Directive. It is far from clear, for example, what happens to their members' pensions, health insurance, retirement eligibility, service tenure requirements, and reinstatement rights. It is unclear whether workers can seek outside employment before the end of the Fork Directive. It is not even clear whether Congress's most recent Continuing Resolution will fund the paychecks of these non-working employees for the next six months. And critically, Plaintiffs cannot advise or reassure their members that these programs were lawful from the start; nor can Plaintiffs advise whether their members may be subjected to even more unlawfulness from OPM in the future.

21. Because the Fork Directive is a final agency action that, as written and implemented, violates procedural rulemaking requirements, is arbitrary and capricious, is an abuse of discretion, is contrary to law, exceeds OPM's statutory authority, and is *ultra vires*, the Court should, *inter alia*, declare that the Directive is unlawful and vacate and remand the Directive to OPM to ensure that any such program complies with the law.

## PARTIES

22. The American Federation of Government Employees, AFL-CIO ("AFGE") is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington,

2885998

D.C. 20001. AFGE, the largest federal employee union, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

23. AFGE members include nurses caring for our nation's veterans, border patrol agents securing our borders, correctional officers maintaining safety in federal facilities, scientists conducting critical research, health care workers serving on military bases, civilian employees in the Department of Defense supporting our military personnel and their families, and employees of the Social Security Administration making sure retirees receive the benefits they have earned.

24. AFGE was founded in 1932 by federal employees seeking to create a right to fair employment and pay during the Great Depression. As the union grew, it advocated for and secured numerous victories for career civil servants, including the passage of the CSRA in 1978.

25. AFGE is dedicated to fighting for dignity, safety, and fairness on the job for its members, and promoting efficiency and the improvement of government service so that government can more effectively serve the American people.

26. The American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association headquartered at 1625 L Street N.W., Washington, D.C. 20036. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils, and other affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME, through its affiliate District Council 20 and its constituent local unions, represents federal civilian employees in agencies and departments across the federal government.

27. AFSCME was founded in 1932 by civil servants seeking to combat state efforts to replace a competitive civil service system with political patronage, united by a simple idea: that a

8

2885998

A124

professional civil service is essential to a strong democracy, and public service should be delivered by individuals dedicated to serving their communities, not those who have close connections to politicians. This idea has sustained AFSCME through nearly nine decades, as the union has succeeded in its efforts to pass or strengthen civil service laws across the United States.

28. AFSCME members include nurses, corrections officers, childcare providers, emergency medical technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common: a dedication to making our communities stronger, healthier, and safer. Its members working for the federal government make our communities stronger, healthier, and safer by working to ensure aviation safety at the Federal Aviation Administration, agricultural sustainability at the Department of Agriculture, criminal justice through the Department of Justice, and more.

29. The National Association of Government Employees, Inc. ("NAGE") is a national labor organization and is affiliated with the Service Employees International Union. NAGE is incorporated in the state of Delaware with its place of business at 159 Thomas Burgin Parkway, Quincy, MA 02169. NAGE and its local units are the certified exclusive bargaining representative of approximately 125,000 employees, including nearly 75,000 federal employees in 43 states, including Massachusetts.

30. NAGE members, many of whom are veterans, include health care workers, police officers, scientists, office workers, researchers, childcare providers, janitorial staff, drivers, and more, working at many federal agencies such as the Department of Defense, the Department of Veterans Affairs, the Department of Transportation, and the National Park Service.

2885998

31.     Founded in 1961, NAGE is an organization of members united by the belief in the dignity and worth of workers and the services they provide, dedicated to improving the lives of workers and their families, and creating a more just and humane society.

32.     AFGE, AFSCME, and NAGE bring this action on behalf of themselves as organizations and on behalf of their members via their standing as associations.

33.     Defendant Office of Personnel Management ("OPM") is a federal agency that serves as the chief human resources agency and personnel policy manager for the federal government.

34.     Defendant Charles Ezell is the Acting Director of OPM. He is sued in his official capacity.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*, and the Administrative Procedure Act, 5. U.S.C. § 701 *et seq*.

36.     Venue is proper in the District of Massachusetts pursuant to both 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff NAGE is a resident of this district, and a substantial part of the events or omissions giving rise to this First Amended Complaint occurred and continue to occur within the District of Massachusetts, where thousands of Plaintiffs' members received, and many members accepted, the Fork Directive.

## LEGAL FRAMEWORK

37.     Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law."

10

5 U.S.C. § 706(2)(D). The APA likewise requires a court to hold unlawful and set aside agency actions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). And the APA mandates that a court hold unlawful and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(B).

38.     Under the APA, an agency must undertake notice and comment before publishing a rule, and an agency must publish a rule 30 days before its effective date. 5 U.S.C. § 553(b)–(d). OPM is subject to these notice and comment rulemaking requirements. *See* 5 U.S.C. § 1105.

39.     Congress vested federal agencies and their heads with the authority to employ, regulate, and manage the agency's federal employees. 5 U.S.C. §§ 301–302, 3101.

40.     Congress has also made federal agencies subject to the civil service employment requirements of the CSRA. Agencies and agency heads have a Congressional mandate to comply with the CSRA, including the statutes that govern termination of employment. *See* 5 U.S.C. §§ 7512–7513.

41.     Congress created a statutory scheme by which employing agencies can create plans for "voluntary separation incentive payments." 5 U.S.C. § 3521 *et seq.* These plans must include specific mandatory criteria, must receive OPM approval before implementation, and must be paid in lump sums. 5 U.S.C. §§ 3522–23.

42.     The Code of Federal Regulations provides a detailed process by which agencies may undertake reductions in force ("RIFs"). *See* 5 C.F.R. § 351 *et seq.* The employing agencies are granted the rights and responsibilities to determine how to carry out a RIF and comply with the relevant statutes and regulations. *See, e.g.*, 5 C.F.R. §§ 351.201, 351.204. OPM may "prescribe regulations" for RIFs to account for tenure, veteran status, and other considerations, 5 U.S.C.

11

2885998

§ 3502, and may provide employing agencies with "guidance and instructions for the planning, preparation, conduct, and review" of RIFs, 5 C.F.R. § 351.205.

43. There is no statute that provides a process or procedure for carrying out a "deferred resignation program." There is also no statute that grants OPM the authority to commit other agencies' funds to paychecks for non-working employees.

44. The Appropriations Clause of the Constitution commands that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, § 9, cl. 7. In 1870, Congress enacted the Antideficiency Act, 31 U.S.C. §§ 1341, 1342, 1349–1351, 1511–1519, to address the increasingly common problem of the executive branch obligating funds in advance of appropriations, which put pressure on Congress to then appropriate those funds so that creditors would be paid.

45. The Antideficiency Act protects Congress's constitutional power of the purse. Section 1341 of the Act provides, in relevant part, that a federal official may not (1) "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation"; or (2) "involve" the federal government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a).

## ALLEGATIONS

### OPM commences rollout of its Fork Directive.

46. On the afternoon of January 28, 2025, OPM sent an email directly to all—or nearly all—federal employees with the subject title, "Fork in the Road," which announced a "deferred resignation" "program" to those employees—the "Fork Directive." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025).

12

47. The Fork Directive instructed recipients to reply to the email with the word "RESIGN" to participate, sent directly to OPM at hr@opm.gov. Specifically, OPM's message stated:

> This program begins effective January 28 and **is available to all federal employees** until February 6. If you resign under this program, you will retain all pay and benefits regardless of your daily workload and will be exempted from all applicable in-person work requirements until September 30, 2025. . . .

*Id.* (emphasis added).

48. OPM announced that "deferred resignation is available to all full-time federal employees" except those in certain national security and immigration roles and at the U.S. Postal Service and "any other positions specifically excluded by your employing agency." *Id.*

49. In making this extraordinarily broad solicitation for resignations, OPM offered employees barely more than a single week to respond, demanding a single word response— "RESIGN"—by February 6, 2025. The only action required of employees who wished to accept this offer—to join the program and be paid through September 30 without working—was a reply to the email with this single word response.

50. This incredibly short timeframe was accompanied by implicit threats of earlier termination for those who failed to accept a deferred resignation date of September 30, 2025, and substantial uncertainty about the legality and details of the newly announced program and the breadth of its exclusions.

51. The Fork Directive itself made clear that "the majority of federal agencies are likely to be downsized," including through RIFs and furloughs. *Id.* The OPM website explained to workers that the "federal workplace is expected to undergo significant near-term changes" and

13

advises that employees "may wish to depart" "on terms that provide you with sufficient time and economic security to plan for your future." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Mar. 15, 2025) ("Why am I being offered deferred resignation?").

52. Upon information and belief, these thinly veiled threats, combined with the rapid timeline and general chaos effectuated by the Directive as explained at length below, were intentionally designed to coerce workers to feel helpless, scared, and confused. OPM intimidated and pressured workers to made life-altering professional and personal decisions, with little time or information, through this combination of threats and confusion.

53. Within hours of the close of the sign-up period for the Fork Directive, the threats came to fruition. The federal government announced the mass termination of thousands of employees. *See, e.g.*, Andrea Hsu, *OPM alters memo about probationary employees but does not order mass firings reversed*, NPR (Mar. 4, 2025) (discussing mass firings of probationary employees that began February 13). Within days, thousands more were fired. *See, e.g.*, Michael Bender & Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its Staff*, N.Y. Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/us/politics/trump-education-department-firings.html. Some of these fired workers are Plaintiffs' members who had signed up for the Fork Directive.

54. OPM did not provide notice and comment before sending its email, initiating the Directive, requiring workers to make life-altering career and personal decisions, or impliedly mandating that agencies commit unappropriated funds to pay workers who signed up.

***OPM failed to consider numerous factors, including critical concerns of continuity and service across government operations, in promulgating the Directive.***

2885998

55.     In issuing the Directive across the government barely a week after the new Administration was sworn in, OPM did not conduct any analysis of which agencies were likely to experience high levels of resignations, the optimal number of resignations, or where staffing was already woefully insufficient such that soliciting resignations would be incontrovertibly harmful to government operations. *See, e.g.*, Dep't of Veterans Affairs, Off. of Inspector Gen., *OIG Determination of Veterans Health Admin.'s Severe Occupational Staffing Shortages Fiscal Year 2024* (Aug. 7, 2024), https://www.vaoig.gov/reports/national-healthcare-review/oig-determination-veterans-health-administrations-severe-0 (documenting 2,959 Veteran Health Administration medical facilities with "severe occupational staffing shortages" in the fiscal year 2024).

56.     Upon information and belief, OPM did not conduct any analysis or rely on any reasoned basis for selecting the eight-month time period for the duration of the Fork Directive. Upon information and belief, OPM conducted no agency or employee surveys, financial analyses, or research or outreach of any kind to make a rational determination of an optimal time period to continue to pay non-working federal employees.

57.     OPM also sent the Fork Directive to individuals that it later deemed ineligible to participate. For example, one of Plaintiffs' members is an Air Traffic Safety Inspector who accepted the Fork Directive, told his manager he was leaving, and learned ten days later that he was no longer eligible.

58.     Another of Plaintiffs' members is an Aviation Safety Inspector who decided to sign up for the Directive and learned *the day before the program closed* that he was no longer eligible; when he tried to sign up before the initial deadline, his acceptance was denied.

15

59.     Workers at the Transportation Security Administration ("TSA") received the Fork Directive email inviting participation in the program and were told over a week later that they were ineligible. *Compare* Janet Moore, *TSA workers at Minneapolis-St. Paul International Airport receive federal buyout offer*, Minn. Star Tribune (Jan. 29, 2025), https://www.startribune.com/tsa-workers-at-msp-airport-receive-federal-buyout-offer/601213770; *with* Mary Schlangenstein, *TSA Workers Were Told They Can't Take Musk's 'Buyout' Offer*, Bloomberg (Feb. 6, 2025), https://www.bloomberg.com/news/articles/ 2025-02-06/tsa-workers-were-told-they-can-t-take-musk-s-fork-in-the-road.

60.     On information and belief, even where OPM may have made determinations in advance to exclude employees in critical positions from the program, the agency failed to communicate this to the workers. For example, OPM provided different eligibility information to employees from what it provided to the public: air traffic controllers received the initial Fork email even as an OPM official told media that these workers were exempt from the program. *See* Thomas Beaumont *et al.*, *Air traffic controllers were initially offered buyouts and told to consider leaving government*, ABC News (Jan. 31, 2025), https://abcnews.go.com/US/wireStory/air-traffic-controllers-initially-offered-buyouts-told-leaving-118330627. OPM's lack of communication, lack of planning, and contradictory and inconsistent information created uncertainty even for ineligible workers, who received multiple emails soliciting their resignations and suggesting their employment could be in jeopardy if they did not resign. *See, e.g., Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025) ("[T]he majority of federal agencies are likely to be downsized through . . . actions . . . likely to include the reclassification to at-will status for a substantial number of federal employees").

16

2885998

A132

61.     Nor did OPM consider the programmatic or other impacts on government service of dramatically—and with almost no advance warning—reducing the size of the federal workforce. OPM offered no plan or analysis as to how many employees they expected to take advantage of the program, or how the hundreds of agencies and their components across the government would ensure continuity of expertise and operations in light of the sudden unplanned "administrative leave" of some untold number of federal workers.

62.     Indeed, OPM acknowledges that *some* federal agencies actually require larger workforces to function, stating that "a few [unspecified] agencies . . . are likely to see increases in the size of their workforce." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Feb. 4, 2025). But the Fork Directive is addressed in an overwhelmingly blanket fashion to millions of employees without targeting or analysis. OPM's program can only be expected to cause resignations and resultant staff reductions, at even the unspecified agencies it acknowledges will require increases in the size of their workforce, at a time of low unemployment.

### The Directive, which provides conflicting information regarding employees' rights and obligations if they accept the government's offer, does not reflect reasoned decision-making.

63.     The Directive and related materials offer conflicting information about employees' rights and obligations if they accept the government's offer.

64.     Following the original communication, OPM began publishing Frequently Asked Questions ("FAQs") concerning the program. It sent a follow-up email on the evening of January 30, 2025 to again encourage federal employees to resign, facetiously citing their ability to travel to "a dream destination" and asserting that "[t]he way to greater American prosperity is encouraging people to move from lower productivity jobs in the public sector to higher productivity jobs in the private sector." Kate Kelly, Michael C. Bender, and Zolan Kanno-Youngs,

17

2885998

*Official Email Urges Federal Workers to Find 'Higher Productivity' Jobs* (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/us/politics/federal-workers-opm.html; Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025).

65. The FAQs changed throughout the sign-up period, with OPM regularly adding and changing material. *See Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://web.archive.org/web/20250000000000*/https://www.opm.gov/fork/ (internet archive showing numerous changes to Fork Directive FAQs).

66. The shifting guidance obscured the true nature of the Directive from Plaintiffs, federal employees, and the public.

67. For example, OPM repeatedly shifted its position as to whether and when employees who accept the offer in the Fork Directive would be expected to work.

68. The initial communication from OPM on January 28, 2025 suggested that employees would be required to continue working, but "will be exempted from all applicable in-person work requirements." *Fork in the Road*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025).

69. OPM then purported to reverse its positions regarding whether employees would be required to work during the deferred resignation period, stating that "[e]xcept in rare cases determined by your agency," employees were "not expected to work." @Elonmusk, X (Jan. 29, 2025, 8:56 AM), https://x.com/elonmusk/status/1884601571347943773.

2885998



*See also* https://web.archive.org/web/20250129012319/https://www.opm.gov/fork/faq (same).

70. But OPM provided no guidance as to the "rare" circumstances under which employees would be expected to work.

71. OPM sent a second email on January 30, 2025 that purported to provide clarity. @News_MTorres, X (Jan. 31, 2025, 9:26 AM), https://x.com/News_MTorres/status/1885333873766080615 (post on X showing OPM email providing "Fork in the Road FAQs").

72. At some point, OPM subsequently revised this guidance yet again, apparently in an effort to sweeten the deal and encourage employees to resign. As of February 1, 2025, OPM's response to a question about whether employees will be expected to work their government jobs

19

during the deferred resignation period simply reads, "No." Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025).

## Frequently Asked Questions

| Am I expected to work at my government job during the deferred resignation period? | — |
| --- | --- |

No.

73. OPM's FAQs failed to answer many of the Plaintiffs' members' questions about the Directive, and in fact created more confusion. One of Plaintiffs' members did not understand the impact of the Directive on her benefits, including her retirement. Another did not know whether she could participate in the Directive when she was about to start parental leave, including whether she would be expected to work while on the Directive—which she could not do while eight months pregnant. Another of Plaintiffs' members was unclear whether OPM had the statutory authority to pay her for eight months if she participated in the program. The FAQs did not answer these questions—yet OPM provided no other source for additional information or nuance about the Directive. This lack of information and communication does not reflect reasoned decision making.

74. Beginning on or about January 30, 2025, agencies across the federal government advised federal employees by mass emails, at OPM's direction, that the Fork in the Road program was "valid, lawful, and will be honored." Anne Flaherty, Mary Alice Parks, and Soo Youn, *Federal workers told offer to get paid through September if they resign is 'valid,' 'lawful'*, ABC News (Jan. 31, 2025), https://abcnews.go.com/Politics/federal-workers-told-offer-paid-september-resign-valid/story?id=118317566.

75. But these agencies were unable to answer questions about the lawfulness or contours of the Directive. Many of Plaintiffs' members could not determine whether the Directive

2885998

had any legal basis or would allow them to get paid, and their employing agencies were unable to address their questions.

76. For example, one of Plaintiffs' members recounted how Jeffrey Vincent, an executive director at Federal Aviation Administration ("FAA"), told FAA employees the day after the first Fork email was sent that he could not answer questions about the program because he did not have any more information than they did.

77. Upon information and belief, the agencies were unable to answer questions because OPM controlled all the information but failed to provide any to the agencies. This failure to anticipate and prepare for employees' questions and concerns about a massive and unprecedented program does not reflect reasoned decision making.

78. To the extent that agencies attempted to answer employees' questions, their information sometimes conflicted with the communications from OPM. For example, in contrast to the FAQ post stating the employees would not need to work at all during the deferred resignation period, the VA told its employees on February 6 that they "must continue reporting to work" until the employees were instructed otherwise.

79. OPM's need to broadly and flatly assert that the exploding offer in the Fork Directive was "lawful" and "valid" only demonstrates that the agency knew of the tremendous uncertainty surrounding the Directive's lawfulness and validity, and underscores that OPM rushed federal employees to make a decision, in a matter of days, despite that uncertainty. *See* Andrea Hsu, *Legal questions surround Trump's federal worker resignation offer*, NPR (Jan. 31, 2025), https://www.npr.org/2025/01/31/nx-s1-5282075/trump-federal-employees-resignation-offer-legal-questions.

21

80.     OPM's decision to issue a "deferred resignation" program that gave federal employees—and Plaintiffs who advise them—little more than a week to decide the future of their careers is unprecedented.

81.     Particularly in light of the extremely compressed timeline to participate in the Fork Directive, OPM's continual changing of the contours of that program—and the rights and obligations of employees under it— reflects the opposite of reasoned decision-making.

82.     Plaintiffs would have provided comments with input and suggestions about these issues, had OPM provided the legally required opportunity for notice and comment.

### *The Directive fails to consider or adequately explain how it is consistent with longstanding ethics rules concerning outside employment, which place agency-specific restrictions on employees' ability to obtain additional employment.*

83.     OPM's FAQs following the issuance of the Directive flatly stated that federal employees could obtain a "second job" if they submitted their resignation. Indeed, OPM stressed that employees could "Absolutely!" obtain additional employment during the period they would be placed on administrative leave. *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Mar. 15, 2025).

> **Am I allowed to get a second job during the deferred resignation period?**    —
>
> Absolutely! We encourage you to find a job in the private sector as soon as you would like to do so. The way to greater American prosperity is encouraging people to move from lower productivity jobs in the public sector to higher productivity jobs in the private sector.

84.     But this bald assertion contradicts longstanding regulations and nuanced rules that federal employees must consider when engaging in outside employment while still employed by the federal government.

2885998

85.  Federal ethics regulations provide that federal employees who seek outside employment must comply with numerous conditions, including "[a]ny agency-specific requirement for prior approval of outside employment or activities." 5 C.F.R. § 2635.801(b)(2). And the regulations further provide that agencies may impose a prior-approval requirement before individuals employed at the agency can accept outside employment. *Id*. § 2635.803. Some agencies have codified their requirement for prior approval by regulation; these policies could hardly be expected to change uniformly in the accelerated timeframe created by the Fork Directive. *See, e.g.*, *id*. § 5701.101 (Federal Trade Commission regulations).

86.  There are further restrictions on outside employment for federal employees, including a prohibition on receiving dual pay from federal employment. *See* 5 U.S.C. § 5533. But OPM informed employees that, should they resign from their positions, doing so would "not affect your ability to apply to work for the federal government in the future." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Mar. 15, 2025).

87.  OPM's blanket assertions that all federal employees who accepted the exploding deferred resignation offer could "Absolutely!" obtain a second job were simply incorrect.

88.  Plaintiffs would have provided comments addressing these longstanding ethics rules, had OPM provided the legally required opportunity for notice and comment.

***The Fork Directive is contrary to reasoned practices of restructuring because it rashly implements a workforce reduction strategy that was chaotic and unsuccessful in the private sector, without any reason to believe it would enhance effective government functioning.***

89.  Upon information and belief, the Fork in the Road Directive is based on a staff reduction approach of the same name conducted by Elon Musk shortly after taking over Twitter (now X). On information and belief, Mr. Musk is deeply involved in OPM's operations, has close ties to senior OPM staff politically appointed by the new Administration, and has repeatedly commented publicly on the Fork Directive.

23

2885998

90. OPM's rapid adoption of Musk's private-sector program confirms that the agency took very little time to consider the suitability of applying an approach used with questionable success in a single for-profit entity for the entirety of the federal workforce. *See, e.g.*, Dave Lawler, *The Elon-ification of the federal government*, Axios (Jan. 30, 2025), https://www.axios.com/2025/01/30/elon-musk-government-takeover-federal-workers ("A workforce discombobulated by chaotic recent events receives an email with the subject line 'Fork in the Road.' Inside, a deadline to quit or commit to the new mission. That's the scenario Twitter employees faced in November 2022 — and the one now confronting some 2.3 million government workers."); Clare Duffy, *The 'Muskification' of the federal government is in full swing*, CNN (Jan. 30, 2025), https://www.cnn.com/2025/01/29/tech/elon-musk-government-cuts-twitter-takeover/index.html.

91. The "Fork in the Road" approach at Twitter was widely regarded as chaotic, and the company's value declined precipitously after it was implemented. As one report summarized, "While Mr. Musk ultimately transformed Twitter, reducing staff by 80 percent and minimizing its real estate footprint, its business has declined. Advertisers have fled the site in droves, and at least one investor, Fidelity, estimates the company is now worth 72 percent less than the $44 billion he paid for it." Kate Conger and Ryan Mac, Déjà Vu: *Elon Musk Takes His Twitter Takeover Tactics to Washington*, N.Y. Times (Jan. 30, 2025), https://www.nytimes.com/2025/01/30/technology/musk-doge-x-playbook.html.

92. The Directive offers no rationale for translating a questionable private-sector experiment into a program for virtually the entire federal civilian workforce.

2885998

93. Plaintiffs would have provided comment about the consequences of applying this private sector workforce reduction approach to public employees, had OPM provided the legally required opportunity for notice and comment.

***The Fork Directive eschews the reasoned, logical, and congressionally authorized approach used for federal workforce reduction in the recent past through voluntary departure.***

94. In the mid-1990s, then-President Clinton and his Administration undertook a significant effort to streamline and reduce the size of the federal workforce to increase efficiency and reduce the deficit. *See* https://www.presidency.ucsb.edu/documents/statement-the-buyout-program-for-federal-employees.

95. President Clinton charged Vice President Gore with first leading a National Performance Review to gather information and make reasoned recommendations concerning government efficiency.

96. After the National Performance Review conducted information-gathering and analysis, the Administration sought and received approval from Congress to offer buyouts to certain federal employees, with targeted offers.

97. The offers were designed to reduce unproductive layers of management, with 70 percent of buyout uptake coming from managerial employees.

98. This approach led to a reduction of more than 100,000 federal government positions a little more than a year after obtaining congressional authorization.

99. The buyout authorities obtained from Congress in the Clinton Administration, *see* Pub. L. No. 103-226, 108 Stat. 111 (1994), generally gave agencies a calendar year—not nine days—to make and accept buyout offers from employees using considered principles articulated both by statute and in Office of Management and Budget guidance. These principles required the use of strategic plans before offering buyouts, ensuring the maintenance of productivity and ability

25

to achieve agency objectives, targeting specific positions, and integrating the efforts into restructuring plans. *See* U.S. Gov't Accountability Off., GGD-97-124, *Federal Downsizing: Effective Buyout Practices and Their Use in FY 1997*, https://www.gao.gov/products/ggd-97-124.

100.    Plaintiffs would have provided comment about reasoned prior approaches to workforce reduction, had OPM provided the legally required opportunity for notice and comment.

### *The Directive's deadline was arbitrary.*

101.    The OPM email gave federal employees until February 6, 2025, to weigh the consequences of the Fork Directive. In this *nine-day period*—during which time OPM did not answer questions directly and continued to post conflicting information to its website—federal workers were expected to assess the pros and cons of leaving their employment, talk with their loved ones about benefits and consequences, determine whether the program was lawful or viable, and decide if the risks of participating in a program without any apparent legal basis outweighed any possible benefit. At the same time, these public servants continued to work at their federal jobs.

102.    Every federal worker was forced to make a decision by the end of the Fork Directive: respond to the email with "resign" and hope the promises were true, or continue with their federal employment under the threat of pending terminations. Both actions carried enormous financial, personal, professional, and legal consequences. Though the closing date for the Directive was extended briefly by this Court, the extension did not affect the consequences of the Directive.

103.    The deadline to respond to the Fork Directive was not mandated by law. Indeed, statutes governing voluntary departures and reductions in force provide much longer timelines (and clearer guidelines). *See* 5 U.S.C. § 3521 *et seq.* (voluntary separation incentives); *id.* § 351.201 (RIFs).

2885998

104. Instead, the deadline to respond was an arbitrary date Defendants selected to put maximum pressure on the federal workforce so that they would accept the offer, in many cases contrary to federal agency and federal employee interests. The brief extension of the deadline by this Court does not make the deadline any less arbitrary.

105. Plaintiffs would have provided comment about the arbitrary, unreasonable, and unsound deadline OPM stated in connection with in the Fork Directive, had OPM provided the legally required opportunity for notice and comment.

### The Fork Directive is a pretext to remove career federal civil servants and replace them with staff who are politically aligned with the Administration.

106. The Fork Directive itself concedes that some agencies require more—not less— staffing.

107. Statements made by the Administration and their surrogates make clear that they intend to reduce the size of the government in part so that they can replace career federal employees with individuals ideologically aligned with the Administration.

108. The President has pledged to fire wide swaths of civil servants, promising to "throw off the political class that hates our country." Donald J. Trump, Speech at Conservative Political Action Conference (March 4, 2023), https://tinyurl.com/2hjrs5ah. As he explained, "you'll see that on the first day of my presidency, the deep state which is destroying our nation. The tables will turn and we will destroy the deep state. We're going to destroy the deep state." Donald J. Trump, Speech at South Carolina GOP Dinner (Aug. 5, 2023), https://tinyurl.com/36uhbe74.

109. President Trump has singled out Democrats and so-called "RINOs" (Republicans In Name Only) for termination. For example, in one video post from May 2023, Trump told a reporter that he would make "very big changes" to the FBI in a potential second term. Donald J. Trump (@realDonaldTrump), Truth Social (May 15, 2023, 11:04 PM ET),

2885998

https://tinyurl.com/bdesuz3w. The DOJ and FBI, Trump said, personify the "deep state" as they are filled with "thousands and thousands" of "RINOs and with Democrats" that have been there for decades. Rebecca Jacobs, *Trump Has Said He Wants to Destroy the "Deep State" 56 Times On Truth Social*, CREW (Aug. 1, 2024), https://tinyurl.com/36z27phm. In another speech, he criticized the "deep state" workers who "work with the with the Democrats and the Republicans, and those are the Republicans I don't like." Donald Trump, *Speech at Political Rally in Sarasota*, Florida (July 3, 2021), https://tinyurl.com/58r46v4a.

110.    Vice President Vance reiterated that President Trump should "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people." Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024), https://tinyurl.com/4rsvn7xv.

111.    The scattershot approach of the Fork Directive—which does not set a target for specific goals, agencies, positions or functions—can only be understood as an effort to hollow out the federal government to allow the Administration to make room for the Administration's partisan hiring. *See* The White House, Reforming the Federal Hiring Process and Restoring Merit to Government Service, https://www.whitehouse.gov/presidential-actions/2025/01/reforming-the-federal-hiring-process-and-restoring-merit-to-government-service/ (directing agencies to make federal "recruitment and hiring processes more efficient" by, *inter alia*, involving political appointees "throughout the full hiring process" and prioritizing hiring of individuals "passionate about the ideals of our American republic").

*The Fork Directive's Resignation Program is an OPM government-wide program and policy.*

112.    The Fork Directive was designed by OPM. No other agencies played any part in the design or substance of the Directive. No other agencies provided pre-rollout input about sufficient staffing levels, the impact of a high level of departures to their missions or effectiveness,

28

the ideal duration of the program, or the ability to commit agency funds to non-working employees for eight months. Nor were other agencies given information about the Directive's existence, duration, timing, or legal basis in advance, or provided any information in advance about their employees' eligibility for the program, the impact on employees' future government service, their ability to take other jobs during the program, or the likelihood that the Directive was lawful and would provide the benefits as advertised.

113. The Fork Directive was implemented by OPM. The email announcement about the Directive came from OPM, not each worker's employing agency. Federal employees were required to email OPM directly, not their agencies, to participate. OPM, not the employing agencies, collected the workers' responses. It was an OPM decision to frame the offer as accepted, in full, as soon as the worker responded with, "Resign." OPM initially assessed workers' eligibility and notified workers when the OPM-chosen eligibility guidelines changed; it was apparently not until this approach became unworkable that the agencies themselves were allowed to determine whether their workers qualified.

114. The Fork Directive was executed by OPM. Federal workers were directed to the OPM website for answers. Only OPM could edit and update the FAQs. Only OPM provided—or was even in the position to provide—answers to any questions about the program. Only OPM made changes to the Program during the execution, such as revisions to guidelines and communications to workers when the sign-up period was extended. Employing agencies did not— and could not, due to OPM's control of the program—provide any substantive support or feedback for their workers during the Program's execution.

29

2885998

115. The Fork Directive was provided for federal workers across the entire federal workforce. It was not limited to specific agencies, and it certainly was not limited to OPM employees.

116. The Fork Directive is a government-wide OPM policy and program.

***The Fork Directive was promulgated with no statutory basis or authorization and violated the Antideficiency Act.***

117. OPM offered no explanation or statutory basis for offering the Directive. Nor did OPM identify how the federal government intends to pay an unspecified number of workers for not performing work for eight months. Nor has OPM offered a justification for this apparently unprecedented use of administrative leave.

118. The Antideficiency Act prohibits federal officials from making or authorizing an expenditure or obligation exceeding an amount available in an appropriation or from contracting or obligating for the payment of money before an appropriation is made. 31 U.S.C. § 1341(a). This is precisely what Defendants did via the Fork Directive.

119. When the Fork Directive was announced, the government was operating on a continuing resolution that was set to expire on March 14, 2025. No appropriation was in place to cover the salaries of federal employees after that date. The Directive, however, unequivocally promised all pay and benefits until September 30, 2025. As written, Defendants made or authorized an obligation for the payment of money before an appropriation is made. *See* Fork in the Road, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork (last visited Mar. 15, 2025) (original communication to employees, explaining that workers will "maintain [their] current compensation…until [their] final resignation date").

120. Following significant concerns about whether, in light of the lack of appropriations and other concerns, employees would "really" receive "full pay and benefits through September

30

30," OPM doubled down in its FAQs without reservation, stating, "Yes." *Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (last visited Mar. 15, 2025)

> **Will I really get my full pay and benefits during the entire period through September 30, even if I get a second job?** —
>
> Yes. You will also accrue further annual leave, sick leave, etc. and be paid out for unused leave at your final resignation date.

121. These questionable assertions led to public concerns about the lawfulness of the Fork Directive given the lack of government appropriations beyond March 14, 2025. Andrea Hsu, *Legal questions surround Trump's federal worker resignation offer*, NPR (Jan. 31, 2025), https://www.npr.org/2025/01/31/nx-s1-5282075/trump-federal-employees-resignation-offer-legal-questions.

122. In response, OPM changed the contours of the Directive's guidance. OPM added a statement to the FAQ that asserts that a lapse in funding could affect employees' pay regardless of whether they submit a deferred resignation. OPM nonetheless unequivocally assured employees that they will be entitled to back pay in case of a lapse in appropriations under the Government Employee Fair Treatment Act of 2019. *Compare Frequently Asked Questions*, U.S. Office of Pers. Mgmt., https://www.opm.gov/fork/faq (retrieved February 3, 2025. 8:49 AM) (explaining that a government shutdown could impact pay, but assuring employees that they would be entitled to backpay after any shutdown) *with id at* https://web.archive.org/web/20250131184447/https://www.opm.gov/fork/faq (extant version at 6:44 PM, Jan. 31, 2025) (FAQ does not include any equivocation on the entitlement to pay). In adding this new FAQ, OPM neither rescinded previous communications to federal employees nor

2885998

changed its other unequivocal statements that employees "really" will be paid through September 30, 2025.

123. Whether or not an employee is guaranteed backpay following Congress's issuance of an appropriation, the Antideficiency Act forbade OPM from guaranteeing payment without an appropriation. Particularly where, as here, OPM could not know the contours of future appropriations or funding levels, this promise is improper.

124. Plaintiffs would have provided comment addressing the failure to appropriate funds in connection with the Fork Directive, had OPM provided the legally required opportunity for notice and comment.

### *Plaintiffs' members have been, and will continue to be, harmed by the Fork Directive.*

125. Direct and appreciable legal consequences flowed from the Fork Directive email. Federal employees had no choice—they had to opt in and hope the promises would be kept, or opt out and hope the termination threats would not play out. Concrete consequences flowed from the Fork Directive's implementation, including financial, professional, reputational, personal, and emotional injuries.

126. For example, one of Plaintiff AFSCME's members was employed by the USDA at the time of the Fork Directive. She accepted the Directive and resigned on February 10, 2025, by replying to OPM's email. She never received a response. Four days later, she was terminated as a probationary employee and received correspondence from the USDA that she was ineligible for the Fork Directive. A week after that, she was told by USDA that it was required to honor the Fork Directive for probationary employees. Days later, she received yet another email stating she was ineligible because of the nature of her appointment and because her position was funded by then-frozen USAID grants. She has yet to receive responses or clarification from OPM. She has yet to

32

2885998

be paid. Plaintiffs' member has suffered financial, professional, and emotional harm from the Directive and the obvious problems with its lawless design and shoddy execution.

127. Another of Plaintiff AFSCME's members was also employed by the USDA. She was placed on administrative leave and received a pre-furlough notice on February 8. The next day, she accepted the Fork Directive and resigned. Yet on February 20, she was terminated as a probationary employee without any acknowledgement of her acceptance of the Fork Directive. A week later she was told that she was not eligible for the program because of the funding source for her position. Though she was reinstated pursuant to a court order on March 15, she was immediately furloughed. This member has not been able to receive any information about her acceptance. She has suffered financial, professional, and emotional harm from the Directive.

128. Several of Plaintiff NAGE's members were employed by a component of the Department of Transportation ("DOT"). These members signed up for the Directive within the stated sign-up period. However, according to DOT, to participate in the Directive, the workers had to be placed on administrative leave—a requirement that was not included in the initial Fork email. But because the members' employers are fee-for-service and not directly funded from Congressional appropriations, they were not able to fund administrative leave for these workers. It was not until the week of March 17, 2025 that these members were part of the Fork Directive— six weeks after it was supposed to begin—despite accepting it under the terms of OPM's supposed offer. These members remained in limbo, uncertain about their employment status, incurring financial and emotional harms by the day.

129. Another of Plaintiff NAGE's members was employed by the U.S. Department of Veterans Affairs ("VA"). She accepted the Fork Directive but received no response from the VA or OPM. She only later learned online *through Reddit* that her position was exempt. The employee

2885998

was in limbo, uncertain about her employment status, and incurred emotional and reputational harm.

130.     Another of Plaintiff NAGE's members was also employed by the VA. He accepted the Fork Directive, was told by HR that he was accepted into the program, and signed an agreement related to participating in the Fork Directive. A few weeks later, he was told he was ineligible because he was a reemployed annuitant—a status he has held for three years. Nowhere in the initial email, FAQs, or follow up correspondence did it indicate that this group of federal workers were categorically ineligible to participate in the Directive. This member suffered emotional and financial harm.

131.     One of Plaintiff AFGE's members was a civilian employee with the U.S. Air Force ("USAF"). He was a "term employee" whose appointment lasts through June 2025, but whose appointment is routinely extended as a matter of course. This member accepted the Fork Directive before the closure of the sign-up period. On March 18—*over a month* after the sign-up period closed—he was informed that would be terminated from the Fork program on June 16. Unlike other federal employees, including at USAF, who signed up for Fork and will be paid through September 30, this member will now receive only three months of benefits. He would not have accepted the offer to participate if he had known that he would not qualify for the full eight-month period. This member is suffering ongoing financial and emotional harm.

132.     Another of Plaintiff AFSCME's members was employed by the FAA. The rollout of the program caused him anxiety, but he discussed it at length with his wife. He accepted the Directive and resigned on February 3, 2025, telling his manager of his decision. Ten days later, he received an email from the FAA that his position was excluded from the program. This was an unfair bait-and-switch because had this member known that he was not eligible, he would not have

2885998

accepted the Directive or informed his manager. His anxiety has only increased since being forced back to work. He reasonably believes his initial acceptance affects his standing in the workplace, including with his manager, and his prospects for future promotions or performance awards. He has suffered reputational and emotional harm from the Directive and fears future financial harm. These injuries were caused by the Directive, including OPM's failure to establish clear or reasoned guidelines or provide clear or accurate information.

133.    Another of Plaintiff AFSCME's members was also employed at the FAA and was hired as a remote worker before the COVID-19 pandemic. His duty station is over 80 miles from his home, and he cannot commute there. This member was unsure whether he would soon be required to work in person, which he was not reasonably able to do, so he decided he would likely accept the Fork Directive. This member sought answers about the Fork Directive from FAA leadership and his supervisor; but they were unable to provide help given OPM's failure to provide clear, accurate, or consistent information. This member ultimately chose to accept the Fork Directive and resigned his position, the day before the program was set to close. The next day, the FAA notified this member he was not eligible to participate. This member has suffered professional, reputational, and emotional harm from the Directive's improper rollout and implementation.

134.    One of Plaintiff AFSCME's members worked for the USDA and considered accepting the Fork Directive but could not determine whether it was legitimate. She was concerned that her position would be eliminated by the Administration, both because of the news coverage of the attempted dismantling of USAID and because of the threatening nature of OPM's correspondence, particularly given the number and tone of its emails. She was concerned that the Directive was "too good to be true" and conducted her own research into its legitimacy. She was

35

reasonably concerned that she would be paid for a month or two, then terminated without pay for the remaining six months. She also was uncertain whether she would have to work if she accepted the Directive, given the conflicting guidance from OPM; she was eight months pregnant and about to start parental leave, so she would have been unable to work if required. She eventually received a sample Fork agreement from the FDA which stated that the agreement could be rescinded at any time. As a result of the uncertainty surrounding the program, she declined to participate in the Directive.

135.    Another of Plaintiff AFSCME's members at USDA considered the Fork Directive but could not determine whether it was legitimate. Her agency was unable to share any information about the program, so the only information she received was from OPM. She questioned the Fork Directive's legitimacy because OPM did not share terms of the agreements, because its guidance continued to change, and because OPM seemed ill-informed as to what it had the authority to offer or provide workers. This member tracked the litigation in this case and planned to accept the Fork Directive if she could be assured it was legitimate. The program closed before she was able to accept.

136.    Yet another of Plaintiff AFSCME's members worked at the FAA and considered taking the Fork Directive. But she was not sure about its legitimacy, particularly because all communications came only from OPM and at odd hours, after working hours. The Fork Directive was also dramatically different from the voluntary separation incentives she had previously seen. Its resemblance to the Twitter Fork program—which she knew had resulted in the workers who accepted being summarily fired without benefits—made her fear the same thing would happen to her if she participated in the Fork Directive. This fear was compounded by the knowledge that her agency was only funded through March, yet the Fork Directive promised to pay her through

2885998

September. Superiors at her agency were unable to answer any questions about the Directive. Ultimately, she declined to participate in the Directive. But she would have participated in the program if it bore any resemblance to the lawful, structured resignation programs she had seen in the past, or if she could have been otherwise assured of its legitimacy.

137. Plaintiffs' members' injuries stem from the Fork Directive, particularly the short time period and the lack of reasoned decision making that went into its creation and execution. These injuries were caused because the Directive's substance and implementation were arbitrary and capricious, an abuse of discretion, and contrary to law, and because the Directive did not undergo the notice and comment process, which was the legally required mechanism for surfacing and addressing these and other members' questions and concerns.

138. Based on their injuries from OPM's unlawful conduct, these members have standing to sue in their own right.

139. The Plaintiffs also have associational standing to sue on behalf of their members and to vindicate their members' interests. The interests that the Plaintiffs seek to protect—their members' employment rights, protection from unlawful termination, stable and lawful workplaces, and paycheck protection, among others—are germane to the unions' purpose. The Plaintiffs regularly submit comments via the APA rulemaking process on behalf of their members to protect these kinds of interests.

140. The claims and relief requested do not require the participation of union members.

***Plaintiffs have been, and will continue to be, harmed by the Fork Directive, by expending resources responding to the Directive and being forced to divert resources to respond to the Directive, and through loss of voluntary membership dues from employees who accepted the offer.***

141. AFGE, on its own and in conjunction with its affiliated councils and locals, represents members and bargaining unit employees in agencies and departments across the federal

37

2885998

A153

government for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

142. AFSCME, through its affiliated District Council 20 and its constituent local unions, represents members and bargaining unit employees in agencies and departments across the federal government for which AFSCME District Council 20 has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

143. NAGE, on its own and in conjunction with its locals, represents members and bargaining unit employees in agencies and departments across the federal government for which it has been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

144. Membership in AFGE, AFSCME, and NAGE is voluntary.

145. The leadership of AFGE, AFSCME, and NAGE are democratically elected by and from their respective members.

146. The activities of AFGE, AFSCME, and NAGE are funded by their respective members through voluntary membership dues.

147. AFGE members who are federal employees work in a wide variety of positions, in every U.S. state and the District of Columbia, and in agencies including the Environmental Protection Agency ("EPA"), the Department of Labor ("DOL"), the Department of Veterans Affairs ("VA"), the Social Security Administration ("SSA"), the Department of Defense ("DOD"), and the Department of Homeland Security ("DHS").

148. AFSCME members who are federal employees work in a wide variety of positions at multiple federal agencies including AmeriCorps, the Department of Agriculture ("USDA"), the Department of Justice ("DOJ"), the FAA, the Peace Corps, and Voice of America.

2885998

149.    NAGE members who are federal employees work in a wide variety of positions in 43 states, in agencies including the VA, DOD, EPA, DOT, and the National Park Service ("NPS").

150.    AFGE members are located in all fifty states. AFGE has several affiliates across the State of Massachusetts, representing approximately 2,900 federal workers at various agencies, including the VA, DOD, SSA, and the EPA.

151.    Among AFSCME's thousands of affiliated subordinate bodies throughout the country, AFSCME Council 93 and its affiliated local unions represent employees of public and private employers in the State of Massachusetts including but not limited to employees of the City of Springfield and the Springfield Housing Authority.

152.    NAGE has multiple units in Massachusetts, representing approximately 7,000 federal employees at various federal agencies, including the VA, DOD, and DOT.

153.    Core services provided by AFGE, AFSCME, and NAGE include responding to inquiries and concerns from individual union members and union affiliates who directly represent those members, as well as counseling union members about issues that relate to the workplace. In general, AFGE, AFSCME, and NAGE, through their affiliates, work to ensure that all member inquiries receive a response, whether by email, phone, or meeting.

154.    One of AFGE's core functions is to provide guidance, legal representation, training, and other services to its over 800 affiliates.

155.    AFGE has over 150 employees who regularly receive inquires directly from members and affiliates.

156.    AFSCME has over 100 employees in its Organizing and Field Services Department whose role is to provide member relations services; they regularly receive calls and emails from

39

members and affiliates, including from federal employee members of AFSCME District Council 20 and its subordinate bodies.

157. AFSCME represents its members through its constituent local unions, councils and other affiliates. Within this structure, one of AFSCME's core functions is to provide resources and guidance to its affiliates for organizing, bargaining, political action and education, legal issues of national significance, and the administration of members-only benefits.

158. NAGE provides guidance, legal representation, training, and services to its locals, members, and bargaining unit employees.

159. NAGE has employees who regularly receive inquiries directly from federal local affiliates and federal employees.

160. As a result of the Fork Directive, AFGE, AFSCME, and NAGE were inundated by members and affiliates seeking advice and information about the Fork Directive.

161. For example, within days of January 28, 2025, AFGE received thousands of emails from members and affiliates asking about the Fork Directive. AFGE received countless additional inquiries through other channels, including phone calls, town hall meetings, and site visits. AFGE members and affiliates asked about the implications of the Fork Directive and guidance on how to respond to OPM's email. AFGE affiliates also asked for services and support in responding to member and press inquiries about the Fork Directive.

162. OPM's unclear and ever-changing guidance on the Directive has made it particularly challenging to provide accurate advice.

163. As a result of the Directive, AFSCME District Council 20 and its constituent local unions received emails and phone calls from members asking about the implications of the Fork Directive. AFSCME local unions requested guidance from AFSCME International about the

2885998

legality of the Fork Directive, the implications of the Fork Directive on the future of AFSCME members' work, and whether AFSCME members should respond to OPM's email.

164. Since January 28, 2025, NAGE has received hundreds of inquiries, emails, and telephone calls from locals and federal employees asking about the Directive and seeking guidance. NAGE members have had questions about the legality of the Directive, its implications, effects on their benefits, their options, and how to respond.

165. Responding to these concerns has required AFSCME, AFGE, and NAGE to devote substantial additional resources into counseling members and affiliates and responding to inquiries.

166. For example, at least one AFGE attorney and one AFGE communications staff member spent almost the entirety of their working day on January 29, 2025, working on Fork Directive-related issues. And for multiple weeks after January 28, several other staff members spent significant portions of each day responding to and researching Fork Directive related issues. These staffers would ordinarily be performing other necessary work, such as preparing for affiliate arbitrations, reviewing affiliate requests for legal and communications advice, and drafting newsletters and other AFGE communications.

167. Because of the volume of inquiries, AFGE held at least two virtual town halls for its affiliates. Each town hall took place in the evening and required over 25 staff members to perform duties outside their normal working hours.

168. Likewise, because of numerous inquiries by AFSCME members, AFSCME attorneys and communication department staff had to devote resources to preparing a Frequently Asked Questions ("FAQ") document to address AFSCME member questions about the Fork Directive, diverting these AFSCME employees from performing other necessary work servicing

41

AFSCME members and affiliates in other jurisdictions nationwide. And AFSCME local unions of federal employees scheduled and held special meetings with their bargaining-unit members to discuss the Fork Directive and provide guidance.

169. On behalf of NAGE, several attorneys and representatives received questions, researched issues, prepared a FAQ, and hosted two webinar-style town halls. Each town hall lasted over an hour and required multiple staff members to present materials and answer live questions. These NAGE staff would ordinarily perform other necessary work, including legal representation and union representational assistance with grievances, bargaining, communications, and other matters.

170. In addition to directly responding to inquiries from affiliates and members, AFGE, AFSCME, and NAGE employees invested significant time and effort into researching issues related to the Fork Directive. These efforts were necessary to develop written guidance to help members and affiliates, to try to ensure as well-informed an approach to addressing these issues as possible under the circumstances.

171. The substantial increase in volume of inquiries and counseling requests from members and affiliates required AFGE and NAGE to divert resources from other work. For example, the attorney time spent developing guidance and responding to inquiries resulted in delays in preparing for arbitration hearings and responding to non-Directive-related affiliate inquires.

172. In addition, in the weeks during and following the implementation of the Fork Directive, media outlets contacted AFGE, AFSCME, and NAGE seeking comment or information.

173. These resource challenges were particularly acute because of the very limited timeframe and changing guidance surrounding the Directive. Members needed answers to their

2885998

questions by the impending deadline presented by the Fork Directive and were urgently reaching out to Plaintiffs for advice.

174. And the resource challenges continue even after the closure of the program. As noted, Plaintiffs' members continue to have questions and issues related to the Fork Directive. Some members signed up for the program but were later told they are not eligible, yet they cannot contact OPM to learn about their appeal rights. Other members signed up but were subsequently fired without benefits, and they need help determining their rights and responsibilities, particularly because OPM refuses to answer questions. Still others fear that their paychecks and benefits may stop at any moment because they are not clear what legal basis exists to support the program; the Plaintiffs continue outreach and research to try to find answers for their members. These resources are being diverted because OPM did not follow the law, create reasoned plans, or execute a coherent program.

### *The Fork Directive impedes Plaintiffs' ability to perform their missions.*

175. Core to Plaintiffs' mission is fighting for fairness and full protection of the law on behalf of the employees they represent.

176. Because of the paucity of information about the Fork Directive, including after its closure, it has been challenging for Plaintiffs to adequately advise their members or affiliates as to many of their questions.

177. For example, it is still uncertain that members will receive full payment of wages through September 30, 2025, even after the Continuing Resolution signed on March 15. It is likewise unclear whether the workers' employing agencies are willing or able to follow OPM's mandate that non-working employees must be paid for eight months.

178. It is unclear whether members may seek outside employment during this "deferred resignation" period, in light of prior guidance and ethics rules limiting federal workers' ability to

2885998

work for others while on the federal payroll. It is also unclear whether workers who accept dual employment may be disqualified from later employment with the federal government.

179.    It is unclear whether members could leave the country while in "deferred resignation" status given prior government guidance about leaving the country or the commuting area while employed.

180.    It is unclear what authority or appropriations the government has to provide this program and to guarantee that employees will be paid without working.

181.    It is unclear what will happen if there are later reductions in force or other layoffs, and whether members would continue to be paid.

182.    The implications for pensions, health insurance, retirement eligibility, service tenure requirements, and other issues are unclear.

183.    It was unclear whether members would retain competitive status or reinstatement rights, whether they will continue to accrue annual leave and sick leave, and whether they will receive their annual leave payout.

184.    Given the very limited information available about the Fork Directive, and the absence of a clear statutory basis for some of the claims in the January 28, 2025 email, it is challenging for Plaintiffs to adequately counsel or advise their members as to many of these issues.

185.    The difficulty in responding to inquiries, and time spent addressing concerns, is amplified by the inconsistent guidance provided to Plaintiffs' affiliates and members by different federal agencies and OPM, and the changing nature of that guidance. This difficulty is ongoing: OPM has not provided answers or clarity to any of these questions despite the month that has passed since the closure of the program.

44

2885998

A160

186.    On information and belief, OPM does not have answers to these questions because it did not undertake or execute a reasoned or considered process to execute the Fork Directive. Each of these questions and issues was foreseeable, had the federal government invested the time and resources into a lawful and reasoned rulemaking process under the APA that also complied with the Constitution. Indeed, the Plaintiffs regularly provide comments on these kinds of rules and raise these kinds of issues under the APA's lawful process.

187.    The Directive's lack of clarity and shifting contours directly undermine Plaintiffs' core mission of serving and counseling their members.

188.    The substantial increase in volume of inquiries and counseling requests from members and affiliates has required AFSCME, AFGE, and NAGE to divert resources from being otherwise used to further their mission by organizing and representing employees, negotiating with employers, and advocating for improved employment conditions. For example, AFGE and NAGE attorneys did not prepare for certain arbitrations or answer certain other affiliate concerns, and AFGE field representatives (also known as national representatives) were able to devote less time handling grievances and bargaining issues. Likewise, an AFSCME attorney working on the union's efforts to counsel members and affiliates about the Fork Directive would otherwise have been engaged in supporting other AFSCME affiliates in preparing for arbitrations in other jurisdictions, filing unfair labor practices against non-federal employers, and other AFSCME core services for its affiliates nationwide.

189.    Further, as members look to AFSCME, AFGE and NAGE to provide answers about the Fork Directive and its unclear and ever-changing guidance, AFSCME, AFGE and NAGE have suffered reputational harm among their membership, and more broadly among other federal

45

2885998

employees, due to the difficulty of providing satisfactory answers to members concerning an agency policy with enormous potential consequences for members' interests.

190. Given the lack of reasoned decision making that went into the Fork Directive, the arbitrarily short timeline attendant to its execution, and the ongoing lack of clarity despite the end of the sign-up period, Plaintiffs cannot improve their advice to members or offer further clarity. Indeed, it is not clear that even OPM can offer clarity on any of these questions.

191. Further, because members of each Plaintiff union accepted the Fork Directive's exploding offer and will purportedly cease employment by September 30, 2025, Plaintiffs will no longer collect voluntary union membership dues from these members, who would otherwise pay their union dues as a deduction from their federal paycheck. 5 U.S.C. § 7115. This loss of membership dues, which Plaintiffs use to fund their operations in service of their core mission, constitutes a concrete injury to all Plaintiffs.

***The Plaintiffs cannot file these claims with the FLRA, and their members cannot file these claims with the MSPB.***

192. The Plaintiffs and their members cannot challenge the Fork Directive by filing claims with the Federal Labor Relations Authority ("FLRA") or with the Merit Systems Protection Board ("MSPB").

193. First, the Plaintiffs challenge an OPM government-wide rule and program. They do not challenge any terminations or other workplace decisions, nor do they seek any substantive change to the Directive itself or even, ultimately, to the employment status of the workers who signed up or declined. Plaintiffs seek only compliance with the procedures required by law.

194. There is no statutory process for non-OPM employees or their unions to file these kinds of procedural claims against OPM through the MSPB or FLRA. Nor is there a statutory

2885998

process for these employees or their unions to file claims against government-wide programs through these agencies.

195.     The FLRA and MSPB can adjudicate the claims of unions and workers that are related to workplace personnel issues. Neither body has the statutory authority to adjudicate claims challenging OPM rules or government-wide directives. Congress has never granted—nor has it intended to grant—either body the authority to adjudicate mass actions challenging these kinds of policies. Should these agencies take up these claims, their actions would be *ultra vires*—exceeding the scope of their Congressionally granted powers and usurping the powers of the federal courts.

196.     Second, this Administration is decimating the very agencies to which it seeks to channel personnel claims. The President has fired the heads of the MSPB and the FLRA without cause, taking the position that for-cause removal protections are unconstitutional. Though the D.C. District Court temporarily enjoined the terminations, the D.C. Circuit stayed the injunction with respect to the chair of the MSPB, meaning the agency remains without a leader or full quorum. *See Harris v. Trump*, No. 25-5037 (D.C. Cir., Mar. 28, 2025). The President also fired without cause the head of the Office of Special Counsel, who is also entitled to for-cause removal protections by statute. These terminations leave each agency incapable of functioning properly with decisionmakers protected from removal without cause as Congress intended, vitiating the employment claims that must go through these agencies before being appealed to federal court. As a result, even if any of these agencies were an appropriate channel for Plaintiffs' claims (and none is), none of them are operating in accordance with the statutory contours mandated by Congress.

197.     Forcing Plaintiffs to file claims with defunct or inoperative agencies would not simply delay justice, but would effectively bar any meaningful judicial review, because it is doubtful these agencies would *ever* be able to address the underlying claims. Further, even if these

47

2885998

agencies did exercise review, they would not be doing so in accordance with their Congressionally mandated design.

### *There is a live case and controversy.*

198.    Though the Fork Directive closed to new sign ups at 7:20 pm ET on February 12, 2025, the Directive itself runs through the end of September 2025. And the harms caused by the Directive and its unlawfulness are ongoing and will continue after that date.

199.    As described above, Plaintiffs' members continue to suffer financial, reputational, personal, and emotional injuries from the Directive, which will not be remedied merely by the "natural" ending of the Directive. For example, Plaintiffs' members who accepted the program and told their supervisors and colleagues but were deemed ineligible for the program continue to suffer reputational and emotional injuries and risk of financial loss. They will continue to fear retaliation and backlash. And the mere lapse of time will not address Plaintiffs' members' concerns that dual employment during the Directive precludes future federal government employment. Nor will the end of the program alleviate the ongoing financial and emotional harm caused to Plaintiffs' members who signed up for the program and resigned, then were fired and told they were ineligible. All of these harms are caused directly by the Directive's unlawfulness and failure to comply with the APA and the Constitution.

200.    Additionally, as described above, Plaintiffs continue to be hindered in their efforts to answer their members' questions, including about the Directive's unlawful implementation. And Plaintiffs continue to use their resources to try to help their members with these injuries, diverting limited time and money to stymie the harm caused by the Fork Directive.

201.    There is also nothing to stop OPM from taking similar unlawful action again. Indeed, there is a significant likelihood that the same Plaintiffs—including their federal employee members, particularly the ones that tried to take the Directive but were later deemed ineligible and

48

so still work for federal agencies—will be subject to the same unlawful actions again. This is not conjecture: since the Fork Directive, OPM has repeatedly eschewed the APA and defied powers that Congress granted non-OPM agencies, in order to carry out its plans to cull the federal workforce.

202.    For example, immediately after this Court lifted the TRO in this case, OPM closed the sign-up period for the Fork Directive and began directing federal agencies to fire all probationary workers. The mass firing of probationary workers at non-OPM agencies is a final agency rule that did not comply with the APA or undergo notice and comment rulemaking, ignored the Congressional grant of power to agencies and not OPM to hire and fire their own employees, and violated Separation of Powers principles—exactly like the Fork Directive. The lawless action is currently being challenged in federal court in California, in litigation brought by some of these same Plaintiffs, as well as in Maryland litigation brought by various attorneys general. *See AFGE, et al. v. United States OPM, et al.*, No. 3:25-cv-01780-WHA (N.D. Cal.) (preliminary injunction entered March 14, 2025); *Maryland, et al. v. U.S. Dep't of Agriculture, et al.*, No. 1:25-cv-00748-JKB (D. Md.) (temporary restraining order entered March 13, 2025).

203.    As another example, within two weeks of the closure of the Fork Directive, most federal employees received an email from OPM demanding they respond with a list of all the tasks they accomplished that week, along with the threat that failure to respond would "be taken as a resignation."



2885998

> week.
>
> Failure to respond will be taken as a resignation.
> 2/22/25, 11:46 AM

204. Yet again, OPM attempted to implement a mass termination program, without notice and comment, in a wholly arbitrary manner, without providing any clear guidelines, any sources to support employees with questions, or any clear legal authority.

205. This "bullet point" email was also a government wide OPM program. Not only did employing agencies have no input into or forewarning about the email, but some agencies even instructed their employees to ignore the request. *See, e.g.*, Hannah Natanson, *Several administration officials tell workers not to reply to Musk email*, Wash. Post (Feb. 23, 2025), https://www.washingtonpost.com/nation/2025/02/23/musk-email-government-agencies/ (DOD, DHS, FBI, NOAA, and HHS leaders, among others, instructed employees to not respond). Again, OPM was issuing directives to the whole of government, demonstrating that its recent rules and programs aimed at culling the federal workforce are not employment-related decisions or directives coming from employing agencies, but rather government wide policies promulgated by OPM.

206. And yet again, despite immediate legal backlash, OPM doubled down and re-sent the email, threatening federal employees for the umpteenth time with termination. *See, e.g.*, Jenna McLaughlin, Andrea Hsu, & Shannon Bond, *Federal workers get a new email demanding their accomplishments*, NPR (Mar. 1, 2025), https://www.npr.org/2025/03/01/g-s1-51490/federal-workers-new-email-accomplishments.

207. The Fork program *itself* was even reopened for employees of three agencies—the U.S. Agency for Global Media ("USAGM"), the Small Business Administration ("SBA"), and the

2885998

DOD. USAGM employees received a mass email on March 28, 2025, offering them the same terms (to the extent they were explained at all) and with the same OPM FAQs as the Fork program previously offered to other federal workers.

From: **HR Customer Service** <HRCustomerService@usagm.gov>
Date: Fri, Mar 28, 2025 at 2:25 PM
Subject: USAGM Fork in the Road Opportunity (Deferred Resignation Program)
To: HR Customer Service <HRCustomerService@usagm.gov>

Hello,

As part of the broader workforce reforms initiated by President Trump, the federal government is undergoing significant restructuring to enhance efficiency, accountability, and performance. These changes are designed to build a more effective, high-performing federal workforce.

In alignment with these reforms, the agency is offering another opportunity for employees to voluntarily transition out of federal service through the **Deferred Resignation Program (DRP)**. This program will be available from **March 28 through April 9, 2025**. Employees who choose to participate in the DRP will retain **full pay and benefits** and will be **exempt from in-person work requirements until September 30, 2025**, unless they choose to depart earlier.

We understand that this is a significant decision, and we encourage employees to review the **Fork in the Road: Frequently Asked Questions**.

If you decide to apply for the DRP, please **type the word "Resign – Your Full Legal Name" in the subject line** of your email and send it to hrcustomerservice@usagm.gov. You may submit your request from either your work email address or personal email address.

For any questions, please contact our Office of Human Resources (OHR) customer service team at hrcustomerservice@usagm.gov.

208.    SBA workers received a similar email on March 29.

SBA recently announced its plans for an agency-wide reorganization. To return to its founding mission of empowering small businesses, and to restore accountability to taxpayers, the agency is about to enter into various restructuring initiatives including reductions in force (RIFs). The strategic reorganization will begin a turnaround for the agency by restoring the efficiency of the first Trump Administration, as well as its focus on promoting small businesses.

Previously, OPM and SBA offered a Deferred Resignation Program (DRP).  SBA is currently offering a second DRP/Fork in the Road opportunity.

If you choose to remain in your current position, we thank you for your renewed focus on serving the American people to the best of your abilities and look forward to working together as part of an improved federal workforce. At this time, we cannot give you full assurance regarding the certainty of your position.

If you choose not to continue in your current role in the federal workforce and take SBA's Deferred Resignation Program, we thank you for your service.  This program begins effective March 31 and is available to all full-time and part-time SBA employees (i.e., permanent, temporary and term employees) until April 7. If you resign under this program, you will retain all pay and benefits regardless of your daily workload and will be exempted from all applicable in-person work requirements until September 30, 2025 (or earlier if you choose to accelerate your resignation for any reason). For avoidance of doubt, acceptance of your DRP will be subject to SBA's approval at its discretion, to ensure continuity of business operations as the agency thoughtfully executes the planned strategic reorganization.

If you wish to participate in SBA's DRP/Fork in the Road please opt in using this form (https://forms.office.com/g/SARS6mhUEn) **by 11:59 pm EST on April 7**.  **There will be no extensions.**  Employees participating in this DRP will need to work with their supervisor to transition their work and be on Administrative Leave by June 1 at the latest, and in most cases by the end of April.

209.    Also on March 29, DOD announced the opening of the Fork via a memo signed by the Secretary of Defense.  *See* Matthew Olay, *Hegseth Orders Civilian Workforce Realignment in DOD, Reopens DRP*, U.S. Dep't of Defense (Mar. 29, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4138965/hegseth-orders-civilian-workforce-realignment-in-dod-reopens-drp/.

51

2885998

210. No new analysis, no new reasoning, no new justifications, and certainly no notice and comment accompanied these targeted re-openings of the Fork Directive. Nor was there any recognition that these re-openings *again* contradicted the terms of OPM's first Fork Directive, which compelled workers to accept the Fork under threat that it would only remain open for nine days. Indeed, the fact that the announcements were released by each agency shows OPM knew it acted unlawfully when *it* implemented and released the Fork Directive the first time.

211. Other mass layoff programs are also in the works. *See, e.g.*, Eileen Sullivan, *What to Know About Trump's Large-Scale Layoff Plans So Far*, N.Y. Times (Mar. 14, 2025), https://www.nytimes.com/article/trump-firings-layoffs-rif.html. There is no reason to believe that any will comply with the APA or other legal requirements.

212. The lack of clarity and communication and the blatant disregard for the APA and the Constitution are wrongs of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

## CLAIMS FOR RELIEF

### Count One

### (Administrative Procedure Act – Notice and Comment Rulemaking)

213. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

214. Plaintiffs' federal employee members are subject to the legal consequences of the Fork Directive. Plaintiffs and their members have suffered legal wrong from and have been adversely affected or aggrieved by OPM and the Acting OPM Director's actions under 5 U.S.C. § 702.

215. OPM is subject to the APA via Congressional statute. 5 U.S.C. § 701.

52

216.    OPM's email announcement and commencement of the Fork Directive, sent to federal workers including Plaintiffs' federal employee members, constitutes final agency action under the APA. 5 U.S.C. § 704.

217.    OPM's email announcement and commencement of the Fork Directive, requiring federal agencies to continue to pay non-working employees who enter the program, prohibiting workers who accepted from working their federal jobs, rejecting the acceptances of workers who were found ineligible post hoc, and precluding all workers from taking time to consider critical professional and financial implications, is a "rule" for the purposes of the APA. 5 U.S.C. § 551(4).

218.    OPM's Fork Directive is not an interpretive rule, general statement of policy, or rule of agency organization, procedure, or practice. *See* 5 U.S.C. § 553(b)(A).

219.    Under the APA, an agency must undertake notice and comment before publishing a rule, and an agency must publish a rule 30 days before its effective date. 5 U.S.C. § 553(b)–(d). OPM is subject to these notice and comment rulemaking requirements. *See* 5 U.S.C. § 1105.

220.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

221.    OPM and its Acting Director did not comply with the express obligations to undertake notice and comment rulemaking pursuant to the APA before issuing the Fork Directive.

222.    OPM's Fork Directive violates the APA by failing to observe procedures required by law. 5 U.S.C. § 706(2)(D).

223.    The failure to provide notice and comment has harmed Plaintiffs and their members.

224.    Had OPM provided the lawfully required notice and comment opportunity, Plaintiffs would have provided comments on the Directive.

53

## Count Two

### (Administrative Procedure Act – Arbitrary and Capricious)

225.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

226.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

227.    The Fork Directive is arbitrary and capricious and an abuse of discretion for a host of reasons.

228.    Defendants failed to consider innumerable potential consequences of the Fork Directive, which was sent a mere week after the beginning of the new Administration to millions of federal employees, including the impact on continuity and effectiveness of government functioning.

229.    The Directive and related materials offered conflicting information regarding employees' rights and obligations if they accepted the government's offer.

230.    The Directive provided conflicting and shifting information regarding employees' eligibility to take the program.

231.    The Directive established an arbitrary time period for providing non-working federal workers with paychecks and benefits.

232.    The Directive adopted a questionable approach from the private sector, without considering whether it was applicable in the federal context or consistent with prior history relating to restructuring.

2885998

233. The Directive aimed to entice federal employees to relinquish their livelihoods on the basis of barely veiled and retaliatory threats of future termination. Some of those threats came to fruition within hours of the closure of the program.

234. The Directive runs contrary to longstanding rules and requirements for federal employees, including prior guidance and ethics rules regarding outside employment.

235. The Directive provided an arbitrarily short deadline for decision that is not based on any articulated need or statutory requirement—particularly in light of the many questions and changing guidance. This deadline put Plaintiffs in an impossible position in advising their members and developing guidance. And it put Plaintiffs' members in the impossible position of choosing between accepting or declining a termination offer with a questionable legal basis, ever-changing eligibility requirements, and a host of unanswered questions, in the face of termination threats.

236. The Directive was arbitrarily implemented without considering or finding a lawful source of funding. The Antideficiency Act forbids an agency from authorizing or obligating the payment of money before an appropriation is made. 31 U.S.C. §§ 1341 *et seq.* At the time the Directive was opened to workers, funding had not been appropriated by Congress, yet the Directive purported to obligate appropriations six months in advance. Requiring workers to decide to sign up for a program that may not be funded was arbitrary, capricious, and an abuse of discretion.

237. The Directive is pretext for removing federal workers on an ideological basis to replace them with staff who are politically aligned with the Administration.

238. The arbitrary and capricious nature of OPM's decision has harmed Plaintiffs and their members.

55

**Count Three**

**(Administrative Procedure Act – Not in Accordance with Laws Granting Agency Authority and Governing Reductions in Force and Voluntary Separation Incentive Payment Plans, and Exceeding Statutory Authority)**

239. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

240. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C).

241. Congress vested federal agencies and their heads with the authority to employ, regulate, and manage the agency's federal employees. 5 U.S.C. §§ 301, 302, 3101.

242. Congress created a statutory scheme by which employing agencies can create plans for "voluntary separation incentive payments." 5 U.S.C. § 3521 *et seq.* These plans must include specific mandatory criteria, must receive OPM approval before implementation, and must be paid in lump sums. 5 U.S.C. §§ 3522–3523.

243. The Code of Federal Regulations provides a detailed process by which agencies may undertake RIFs. *See* 5 C.F.R. § 351 *et seq.* The employing agencies are granted with the rights and responsibilities to determine how to carry out a RIF and comply with the relevant statutes and regulations. *See, e.g.*, 5 C.F.R. §§ 351.201, 351.204. The role of OPM is limited to "prescrib[ing] regulations" for RIFs to account for tenure, veteran status, and other considerations, 5 U.S.C. § 3502, and to providing employing agencies with "guidance and instructions for the planning, preparation, conduct, and review" of RIFs, 5 C.F.R. § 351.205.

244. The Fork Directive terminated employees at non-OPM agencies, implemented voluntary separation incentive payment plans in non-OPM agencies, and committed non-OPM

56

2885998

agencies' Congressionally appropriated funds for eight months to pay the salaries and benefits of federal employees who are not working.

245. The Fork Directive also constitutes a RIF by another name, which was designed, implemented, and carried out by OPM, in non-OPM agencies, without complying with relevant RIF statutes or regulations.

246. Congress did not grant OPM the power to terminate employees of other agencies, to create and implement voluntary separation incentive payment plans in other agencies, or to commandeer the Congressionally appropriated funds of other agencies for eight months to pay the salaries and benefits of federal employees who are not working.

247. Congress did not grant OPM the power to independently design, implement, and carry out RIFs at non-OPM agencies. Congress did not grant OPM the power to carry out RIFs at all that do not comply with the relevant RIF statutes and regulations.

248. OPM's actions with respect to the Fork Directive exceed any statutory authority granted to OPM by Congress and so are inconsistent with law and violate the APA. *See* 5 U.S.C. § 706(2)(A), (C).

### Count Four

### (*Ultra Vires* / Separation of Powers)

249. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

250. Plaintiffs and their federal employee members have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

2885998

251.    The Fork Directive unlawfully conflicts with and overrides legislative power. It is an improper attempt to legislate a workforce reduction process different from those that Congress prescribed.

252.    The Constitution divides the delegated powers of the federal government into three distinct, defined categories: legislative, executive, and judicial. *INS v. Chadha*, 462 U.S. 919, 951 (1983). The Legislative and Executive Branches are "separate and wholly independent." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). "[T]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates . . ." *Id.* (quoting *The Federalist No. 47*, p. 325 (J. Cooke ed. 1961)).

253.    Congress is the branch of the federal government with the power to legislate. U.S. Const., art. I. Under Article I, Congress must pass legislation in both chambers before the President can sign and before it becomes law. U.S. Const., art. I.

254.    The Executive is the branch of the federal government with the power to execute the law. U.S. Const., art. II. Under Article II, the President has the duty to "take Care that the Laws be faithfully executed." *Id.*

255.    Congress used its constitutionally designated legislative powers to create federal agencies, including OPM. *See generally* Title 5 of the U.S. Code. Congress delegated to agency heads the power to manage agency functions, including to employ workers, 5 U.S.C. § 3101, and to regulate and manage employees, 5 U.S.C. § 301. And Congress mandated federal agencies and agency heads comply with the CSRA, including the statutes that govern termination of employment. *See* 5 U.S.C. §§ 7512–7513.

256.    "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,

58

595 U.S. 109, 117 (2022). The Fork Directive allows OPM to unlawfully usurp the legislative authority of Congress by requiring agencies to comply with OPM's employment, termination, employee management, and implied budgetary decisions. It overrides the direct Congressional authorization of agency heads to manage the affairs and employees of their respective agencies. And it exceeds the statutory authorization granted to OPM by Congress, which did not confer upon OPM the authority to create or implement mass termination or resignation programs at non-OPM agencies.

257. OPM's actions were not authorized by any Article II Executive power. Its Fork Directive for federal employees and their employing agencies was issued without legal authority and is *ultra vires*.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court:

A. Declare that the Fork Directive, as currently drafted, executed, and implemented, is unlawful;

B. Vacate the Fork Directive and remand to OPM to provide a reasoned basis as required by the APA for the Directive, to undertake notice and comment rulemaking as required by law, and to provide the legally required time period for public comment and before implementation of any revised Directive;

C. Declare that any employment-related retaliation against any current or former government worker for accepting or declining the Fork Directive is unlawful;

D. Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate for this action; and

E. Grant any other relief this Court deems appropriate.

59

2885998

DATED this 31st day of March, 2025.

By:     */s/     Michael T. Anderson*
Michael T. Anderson (BBO #645533)
Nicolas F. Mendoza (BBO #703711)
MURPHY ANDERSON PLLC
1401 K Street N.W., Suite 300
Washington, D.C.  20005
Telephone:  (202) 223-2620
manderson@murphypllc.com
nmendoza@murphypllc.com
*Counsel for Plaintiffs*

ERIN E. MEYER (BBO #677869)
AJAY S. KRISHNAN* (CA Bar No. 222476)
CODY S. HARRIS* (CA Bar No. 255302)
BAILEY W. HEAPS* (CA Bar No. 295870)
NIALL R. FRIZZELL* (CA Bar No. 311929)
CHARLOTTE J. KAMAI* (CA Bar No. 344786)
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
emeyer@keker.com
akrishnan@keker.com
charris@keker.com
bheaps@keker.com
nfrizzell@keker.com
ckamai@keker.com
*Counsel for Plaintiffs*

60

2885998

Elena Goldstein** (NY Bar No. 4210456)
Michael C. Martinez** (D.C. Bar No. 1686872)
Daniel McGrath** (D.C. Bar No. 1531723)
Skye Perryman** (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C.  20043
Telephone:  (202) 448-9090
Facsimile:  (202) 796-4426
egoldstein@democracyforward.org
mmartinez@democracyforward.org
dmcgrath@democracyforward.org
sperryman@democracyforward.org
*Counsel for Plaintiffs*

Teague P. Paterson** (D.C. Bar No. 144528)
Matthew S. Blumin** (D.C. Bar No. 144528)
Georgina C. Yeomans* (D.C. Bar No. 1510777)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, D.C.  20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Counsel for American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME)*

61

2885998

Rushab B. Sanghvi** (D.C. Bar No. 1012814)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, D.C.  20001
Telephone: (202) 639-6426
Facsimile: (202) 329-2928
SanghR@afge.org
Grajaa@afge.org
*Counsel for Plaintiff American Federation of Government Employees, AFL-CIO (AFGE)*

Sarah Suszczyk** (M.D. Bar No. 0512150240)
NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, SEIU LOCAL 5000
NAGE/IBPO/IAEP/IBCO
159 Burgin Parkway
Quincy, MA  01269
Telephone: (202) 639-6426
Facsimile: (617) 376-0285
Ssuszczyk@nage.org
*Counsel for Plaintiff National Association of Government Employees, SEIU Local 5000*

*pro hac vice pending
**pro hac vice admission granted*

62

2885998

A178

**CERTIFICATE OF SERVICE**

I, Michael T. Anderson, hereby certify that on March 31, 2025, a true copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

Dated: March 31, 2025                    /s/  Michael T. Anderson

63

2885998

A179

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-10276-GAO

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, and
NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.,
Plaintiffs,

v.

CHARLES EZELL, in his official capacity as Acting Director of the Office of Personnel
Management, and OFFICE OF PERSONNEL MANAGEMENT,
Defendants.

OPINION AND ORDER
September 24, 2025

O'TOOLE, D.J.

After the plaintiffs' motion for a preliminary injunction was denied by this Court (dkt. no. 66), the plaintiffs filed an Amended Complaint (dkt. no. 77), asserting four revised counts. The first three counts purport to assert claims arising under the Administrative Procedure Act ("APA") and the last count asserts that the Office of Personnel Management lacked legal authority to propose the offers that were made to certain agency employees and therefore those offers were *ultra vires* and unenforceable.

The defendants have moved to dismiss the Amended Complaint with prejudice. They have properly pointed out that the jurisdictions of the federal courts that are inferior to the Supreme Court rest "entirely on statutory grants from Congress." Evans v. Thompson, 518 F.3d 1, 5 (1st Cir. 2008). As the defendants have also pointed out, the Court in this case has already concluded that existing statutes, the Civil Service Reform Act of 1978 ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSL-MRS"), preclude jurisdiction here over the plaintiffs'

claims. See Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell, No. CV 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025). Although the Amended Complaint has recast the claims asserted under the APA in present Counts 1 through 3, the revised claims do nothing to authorize those claims to be litigated in this Court in light of the CSRA and the FSL-MRS for the reasons previously articulated by the Court in its prior Opinion and Order and as carefully and explicitly addressed by the defendants in their brief in support of dismissal.

There is no need for a discussion that simply repeats the two major points argued by the defendants: (1) that this Court lacks subject matter jurisdiction over the plaintiffs' claims in light of the remedies available under the CSRA and FSL-MRS, and (2) that, under the circumstances described in the pleadings and arguments, the plaintiffs lack standing to litigate the grievances set forth in their claims and arguments. For these two reasons, the Amended Complaint is dismissed with prejudice.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**American Federation of**
**Government Employees, AFL-CIO et al**

          Plaintiff(s)

        V.

**Charles Ezell et al**

          Defendant(s)

CIVIL ACTION

NO. 1:25-10276-GAO

**ORDER OF DISMISSAL**

O'TOOLE, D. J.

    In accordance with the Court's OPINION AND ORDER (Dkt. No. 104) dated September 24, 2025, it is hereby ORDERED that the above-entitled action be and hereby is DISMISSED.

        By the Court,

9/24/2025
Date

      /s/ Flaviana de Oliveira
      Deputy Clerk

A182

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
80 F Street N.W.,
Washington, D.C.  20001,

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO,
1625 L Street, N.W.
Washington, D.C.  20036,

and

NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, INC.,
159 Thomas Burgin Parkway
Quincy, MA  01269,

                    Plaintiffs,

     v.

CHARLES EZELL, in his official capacity as
Acting Director of the Office of Personnel
Management,
1900 E Street, N.W.
Washington, D.C.  20415,

and

OFFICE OF PERSONNEL MANAGEMENT,
1900 E Street, N.W.
Washington, D.C.  20415,

                    Defendants.

Case No. 1:25-cv-10276-GAO

## NOTICE OF APPEAL

3130180

A183

Notice is hereby given that AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, and NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC., the Plaintiffs in the above-named matter, hereby jointly appeal to the United States Court of Appeals for the First Circuit from the Order granting the motion to dismiss with prejudice entered in this action on September 24, 2025.

Respectfully submitted,

Dated: October 7, 2025

By:  /s/  Cody S. Harris
CODY S. HARRIS (CA Bar No. 255302)
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
charris@keker.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Sandy Giminez, hereby certify that on October 7, 2025, a true copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

Dated: October 7, 2025

Sandy Giminez

1

3130180

A184

# CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, I electronically filed

APPENDIX TO PLAINTIFFS-APPELLANTS' OPENING BRIEF with

the United States Court of Appeals for the First Circuit by using the

CM/ECF system.  I certify that the following parties or their counsel of

record are registered as ECF Filers and that they will be served by the

CM/ECF system.

*See Attached Service List*

Executed on February 20, 2026, at San Francisco, California.


<u>*/s/ Jessica M. Delgadillo*</u>
Jessica M. Delgadillo

4127559

Service List

| | |
|---|---|
| Michael Robert Keefe<br>Segal Roitman LLP<br>33 Harrison Ave, 7th Fl<br>Boston, MA 02111 | Rayford A. Farquhar<br>US Attorney's Office<br>1 Courthouse Way<br>Ste 9200<br>Boston, MA 02210 |
| Abraham R. George<br>US Attorney's Office<br>1 Courthouse Way<br>Ste 9200<br>Boston, MA 02210 | Donald Campbell Lockhart<br>US Attorney's Office<br>1 Courthouse Way<br>Ste 9200<br>Boston, MA 02210 |
| Charles W. Scarborough<br>US Dept. of Justice<br>950 Pennsylvania Ave NW<br>Washington, DC 20530-0001 | Benjamin Thomas Takemoto<br>US Dept. of Justice<br>Civil Division<br>950 Pennsylvania Ave NW<br>Washington, DC 20530-0001 |

4106515